ALMADANI LAW
Yasin M. Almadani, State Bar No. 242798
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

AI LAW, PLC
Ahmed Ibrahim, State Bar No. 238739
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph.:   949-266-1240
Fax:   949-266-1280
aibrahim@ailawfirm.com

*Attorneys for Plaintiffs Farid Khan,*
*Haya Hilton, and Olivia Lee Individually*
*and On Behalf of All Others Similarly Situated*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FARID KHAN, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, and DOES 1-10, inclusive,<br><br>Defendants. | **CASE NO.: 2:20-cv-03332-GW-JEMx**<br><br>Consolidated for Pretrial Purposes with:<br>No. 2:20-cv-04658-GW-JEM<br>No. 2:20-cv-04659-GW-JEM<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, PROVISIONAL CERTIFICATION OF CALIFORNIA SETTLEMENT CLASS, AND APPROVAL OF PROCEDURE FOR AND FORM OF NOTICE**<br><br>**Hearing Information:**<br><br>Date:          June 2, 2022<br>Time:          8:30 a.m.<br>Courtroom:  9D<br>Judge:         Hon. George H. Wu<br><br>Action Filed:  April 9, 2020 |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  PROCEDURAL BACKGROUND ...................................................................... 3

   A.   THE LAWSUITS ......................................................................................... 3

   B.   DEFENDANTS' MOTION TO DISMISS ........................................................ 4

   C.   WRITTEN DISCOVERY, DEPOSITIONS, AND WITNESS INTERVIEWS ........... 4

   D.   SETTLEMENT NEGOTIATIONS .................................................................... 6

III. THE TERMS OF THE SETTLEMENT ............................................................. 7

   A.   THE SETTLEMENT CLASS. ......................................................................... 7

   B.   SETTLEMENT CONSIDERATION .................................................................. 7

      1. MONETARY BENEFITS TO THE CLASS ................................................... 7

      2. INJUNCTIVE RELIEF BENEFITS TO THE CLASS ...................................... 8

      3. ATTORNEYS' FEES, COSTS, INCENTIVE AWARDS, AND ADMINISTRATION COSTS  10

      4. RELEASE AND DISMISSAL OF CALIFORNIA CLASS CLAIMS .................. 11

   C.   THE NOTICE AND SETTLEMENT ADMINISTRATION PROGRAM ................. 11

   D.   MARKETING CAMPAIGN TO PROMOTE THE GIFT CARDS ........................ 13

IV. LEGAL STANDARD......................................................................................... 13

V.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL........................ 14

   A.   THE PROPOSED SETTLEMENT IS FAIR AND REASONABLE ....................... 14

      1. THE CLASS IS ADEQUATELY REPRESENTED BY PLAINTIFFS AND COUNSEL ........ 15

      2. THE PROPOSAL WAS NEGOTIATED AT ARM'S LENGTH ....................... 16

      3. THE RELIEF FOR THE CLASS IS ADEQUATE UNDER RULE 23(E)(2)(C)................. 17

i

4.   THE PROPOSAL TREATS CLASS MEMBERS EQUITABLY. ....................................... 30

B.   PROVISIONAL CERTIFICATION OF THE SETTLEMENT CLASS SHOULD BE GRANTED. 31

1.   THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(A) ............... 31

2.   THE PROPOSED CLASS SATISFIES RULE 23 PREDOMINANCE AND SUPERIORITY .. 33

3.   INJUNCTIVE RELIEF CLASS PREREQUISITES UNDER RULE 23 ARE SATISFIED...... 38

C.   THE NOTICE PLAN SHOULD BE APPROVED.............................................................. 39

VI.  CONCLUSION..................................................................................................... 40

# **TABLE OF AUTHORITIES**

## **CASES**

*Abdullah v. U.S. Sec. Assocs.*,
    731 F.3d 952 (9th Cir. 2013) ........................................ 31

*Ahmed v. HSBC Bank*, No. ED CV 15-2057 FMO(SPx),
    2019 WL 13027266 (C.D. Cal. Dec. 30, 2019) ........................ 31

*Bias v. Wells Fargo & Co.*,
    312 F.R.D. 528 (N.D. Cal. 2015) .................................... 38

*Briseno v. Henderson*,
    998 F.3d 1014 (9th Cir. 2021) ...................................... 19

*Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx),
    2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) .......................... 17

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ...................................... 13

*Comcast Corp. v. Behrend*,
    569 U.S. 27, 133 S.Ct. 1426 (2013) ................................. 37

Daniel v. Ford Motor Co.,
    806 F.3d 1217 (9th Cir. 2015) ................................... 32, 36

*Donovan v. RRL Corp.*,
    26 Cal. 4th 261 (2001) ............................................. 37

*Elkies v. Johnson & Johnson Servs.*, Inc., No. CV 17-7320-GW (JEMx),
    2020 WL 10055593 (C.D. Cal. June 22, 2020) ......................... 21

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ....................................... 32

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012) ...................................... 33

*Farrell v. Bank of Am. Corp., N.A.*,
    827 F. App'x 628 (9th Cir. 2020) ................................... 22

*Graves v. United Industries Corp.*, No. 2:17-cv-06983-CAS (SKx),
    2020 WL 953210 (C.D. Cal. Feb. 24, 2020) ........................... 20

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................... passim

*Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC,
    2011 WL 4831157 (N.D. Cal. Oct. 12, 2011) .......................... 29

*Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST,
　　2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ............................................ 30

*Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD,
　　2020 WL 520616 (S.D. Cal. Jan. 31, 2020) ............................................ 30

*In re Bluetooth Headset Prod. Liab. Litig.*,
　　654 F.3d 935 (9th Cir. 2011)………………………………………………… passim

*In re EasySaver Rewards Litig.*,
　　906 F.3d 747 (9th Cir. 2018)………………………………………….. 25, 26 , 30

*In re HP Inkjet Printer Litig.*,
　　716 F.3d 1173–86 (9th Cir. 2013) ............................................................ 26

*In re Hyundai & Kia Fuel Econ. Litig.*,
　　926 F.3d 539 (9th Cir. 2019) .......................................................... 14, 39

*In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD,
　　2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ........................................ 22

*In re Online DVD-Rental Antitrust Litig.*,
　　779 F.3d 934 (9th Cir. 2015) .......................................................... 26, 31

*In re Tobacco II Cases*,
　　46 Cal. 4th 298 (2009) ............................................................................ 36

*Johnson v. Ashley Furniture Indus., Inc.*, No. 13cv2445 BTM (DHB),
　　2016 WL 866957 (S.D. Cal. Mar. 7, 2016) ............................................ 27

*Konik v. Cable*, No. CV 07-763 SVW (RZX)
　　2009 WL 10681970 ................................................................................ 37

*LaGarde v. Support.com, Inc.*, No. C12-0609 JSC,
　　2013 WL 1283325 (N.D. Cal. Mar. 26, 2013) ........................................ 29

*Lambert v. Nutraceutical Corp.*,
　　870 F.3d 1170 (9th Cir. 2017) ........................................................ 37, 38

*Leyva v. Medline Indus. Inc.*,
　　716 F.3d 510 (9th Cir. 2013) .................................................................. 37

*Loreto v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19-cv-01366-GPC-MSB,
　　2021 WL 1839989 (S.D. Cal. May 7, 2021) ............................................ 15

*Martin v. Marriott Int'l, Inc.*, No. CV 18-00494 JAO-RT,
　　2021 WL 4888973 (D. Haw. Oct. 19, 2021) ............................................ 29

*Miguel-Sanchez v. Mesa Packing, LLC*, No. 20-CV-00823-VKD,
　　2021 WL 1736807 (N.D. Cal. May 3, 2021) ............................................ 29

iv

*Miller v. Ghirardelli Chocolate Co.*, No. 12-cv-04936-LB,
    2015 WL 758094 (N.D. Cal. Feb. 20, 2015) ............................................. 23

*Ochinero v. Ladera Lending, Inc.*, No. SACV 19-1136 JVS (ADSx),
    2021 WL 4460334 (C.D. Cal., July 19, 2021) ........................................ 15

*People v. Superior Court (J.C. Penney Corp.)*,
    34 Cal. App. 5th 376 (2019) ........................................................ 36

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ............................................ 32, 37, 38

*Russell v. Kohl's Dep't Stores, Inc.*,
    755 F. App'x 605 (9th Cir. 2018) ................................................. 28

*Seegert v. Lamps Plus, Inc.*,
    377 F. Supp. 3d 1127 (S.D. Cal. 2018) ......................................... 26

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA (WMC),
    2012 WL 5392159 (S.D. Cal. 2012) ............................................. 28

*Spann v. J.C. Penney Corp.*,
    211 F. Supp. 3d 1244–61 (C.D. Cal. 2016) ................................ 28, 29

*Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-LB,
    2016 WL 4916955 (N.D. Cal. Sept. 15, 2016) ............................... 22

*Taylor v. Shutterfly, Inc.*, No. 5:18-CV-00266-BLF
    2021 WL 5810294 (N.D. Cal. Dec. 7, 2021) ................................. 27

*Torres v. Mercer Canyons, Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ................................................... 33

*True v. Am. Honda Motor Co.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ....................................... 30

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ..................................................... 38

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................ 31, 32, 38

*Warner Const. Corp. v. City of Los Angeles*,
    2 Cal.3d 285 (1970) ................................................................. 32

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ..................................................... 31

## **FEDERAL STATUTES**

28 U.S.C. § 1711 ............................................................ 25

28 U.S.C. § 1712 ............................................................ 25, 26

## **FEDERAL RULES**

Fed. R. Civ. P. 12 …………………………………………….. 4

Fed. R. Civ. P. 23 …………………………………………. passim

Fed. R. Civ. P. 30 …………………………………………. 5, 15

## **STATE STATUTES**

Cal. Bus. & Prof. Code § 17200 .................................... 3

Cal. Bus. & Prof. Code § 17203 .................................... 38

Cal. Bus. & Prof. Code § 17500 .................................... 3

Cal. Bus. & Prof. Code § 17535 .................................... 38

Cal. Bus. & Prof. Code § 17501 .................................... 25

Cal. Civ. Code § 1750 .................................................. 4

Cal. Civ. Code § 1780 .................................................. 38

Cal. Civ. Code § 1781 .................................................. 39

*Plaintiffs' Motion for Preliminary Approval of Class Action Settlement*        *Case No. 20-cv-03332-GW (JEMx)*

# I.  INTRODUCTION

On May 20, 2022, Plaintiffs Farid Khan, Haya Hilton, and Olivia Lee, on behalf of themselves and all others similarly situated, on the one hand ("Plaintiffs"), and Defendants Boohoo Group PLC ("Boohoo Group"), Boohoo.com USA, Inc., Boohoo.com UK Limited, Prettylittlething.com USA, Inc., Prettylittlething.com Limited, NastyGal.com USA, Inc., and Nasty Gal Limited (collectively "Defendants"), on the other hand, entered into a Class Action Settlement Agreement and Release (the "Settlement"). (*See* Ibrahim Decl., Ex. 1.) Plaintiffs now move for preliminary approval of the Settlement.

Boohoo Group is the ultimate parent of Boohoo.com UK Limited, PrettyLittleThing.com UK Limited, and Nasty Gal Limited, which are internet retailers selling women's and men's clothing, footwear, accessories, and beauty products direct to consumers throughout the world, including the United States. Boohoo Group owns the three brands that are the subject of this litigation:  Boohoo (which includes BoohooMAN) ("BH"), PrettyLittleThing ("PLT"), and Nasty Gal ("NG"). This litigation thus involves three class action lawsuits arising out of Defendants' pricing practices on their U.S. websites for each of these brands (collectively, the "Actions").[1]

Plaintiffs contend that during the respective class periods for each of the Actions, Defendants perpetually advertised nearly all the products on their U.S. websites with deceptive original prices (referred to in the complaints as "reference prices"). Plaintiffs allege the reference prices are deceptive because, as discovery in the Actions also confirms, Defendants rarely sell their merchandise at the reference prices. Instead, Defendants' reference prices are significantly discounted on a near daily basis by sitewide percentage-off "promotions" or sales (e.g., "50% Off Sitewide" or "Up to 70% Off Everything"). Customers are thus deceived into a false belief that they are receiving a deep discount, when in reality, they are receiving no such discount. As a result, Defendants have misled customers by falsely inflating the value of their products and induced class

---

[1] (1) *Khan v. Boohoo.com USA Inc.*, No. 2:20-cv-03332-GW-JEMx (**"BH Action"**), (2) *Hilton v. PrettyLittleThing.com USA Inc.*, 2:20-cv-04658-GW-JEMx (**"PLT Action"**), and (3) *Lee v. NastyGal.com USA Inc.*, 2:20-cv-04659-GW-JEMx (**"NG Action"**).

members to buy items they would have never bought, or pay more than they otherwise would have paid, had they known the truth about Defendants' discounting practices. Defendants make no admissions of fact or law and deny liability.

Plaintiffs are pleased to present a Settlement that provides excellent relief for the classes of California purchasers from the U.S. websites of the three brands at issue. (hereafter, the "Class Members" or the "Class"). The Settlement provides for each Class Member to receive a $10 Gift Card with *free shipping* (additionally valued at $7.28 per Class Member, for a total value of $17.28 per Gift Card) to use towards the purchase of any item on the site from which they made a purchase. The Gift Cards have ultimate flexibility. There are no expiration dates, blackout dates, minimum purchase requirements, or fees, and they may be used in conjunction with other offers and promotions. There are no restrictions on transferability and, when they are transferred to others, multiple Gift Cards may be combined together (i.e., "stacked"). Class Members who bought from more than one of the subject websites may receive multiple Gift Cards—one from each site from which they made a purchase (BH, PLT, and NG). These websites consistently include thousands of items available for $10 or less across a wide variety of product categories and styles, meaning that Class Members can use their Gift Cards without incurring any out-of-pocket expense or apply the Gift Cards toward a more expensive purchase, all with free shipping. The Class presently consists of more than 1.8 million individuals and is growing. Thus, the monetary value of the Settlement based on the Gift Card and free shipping amounts to more than $32.5 Million to date. (Tregillis Decl., ¶¶53-62.)

One of the most important features of the Settlement is that, unlike other settlements where receipt of the benefits are dependent on the filing of a timely claim (usually resulting in less than 10% of the class benefiting), in this Settlement, *all* Class Members who do not affirmatively opt out will *automatically receive* the Gift Cards via email. Because the Gift Cards never expire, the benefits of the Gift Cards will forever remain with Class Members until they use them. There is no possibility of reversion to Defendants.

Even more importantly, the Settlement also provides impactful injunctive relief to

prevent future harm to California consumers. Defendants are required to fully disclose to California site visitors that their reference prices *are not based on former prices*, but rather are *merely Defendants' own opinion* of the full retail value of the item. Consumers thus will no longer be misled into believing that Defendants' reference prices are supposed to reflect the price at which the item was sold in the recent past. Under the Settlement, the required disclosures must be conspicuously displayed in bold font throughout the sites in multiple places wherever reference prices and discounts off reference prices are advertised. (Settlement, Ex. G; Tregillis Decl. ¶¶65-67) Moreover, these critical changes are not temporary; they must be maintained forever. The present value of this injunctive relief for the first five years alone is valued at $79.5 Million. (Tregillis Decl., ¶69.)

Class Counsels' proposed attorneys' fees and costs are a small fraction (4%) of the Settlement's monetary and non-monetary value—far less than the 25% benchmark—with no reversion to Defendants. The proposed $5,000 incentive awards to the class representatives are well within the norm.

In view of the risks of proceeding with this litigation through class certification, summary judgment, trial, and appeal, this is an excellent result for the Class. Plaintiffs therefore respectfully request the Court to enter an order granting preliminary approval of the Settlement, provisionally certifying the Settlement Class, directing notice of the Settlement in the manner proposed herein, and setting a schedule for final approval.

## II.   PROCEDURAL BACKGROUND

### A.   The Lawsuits

The operative complaints in the Actions were filed on August 7, 2020, namely, the Second Amended Complaint ("SAC") in the BH Action, the First Amended Complaint ("FAC") in the PLT Action, and the FAC in the NG Action. (*See* BH D.E. 14; PLT D.E. 15; NG D.E. 15.)[2] Plaintiffs assert claims in each of the Actions for violations of (1) the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), (2) the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

---

[2] "D.E." denotes "Docket Entry" followed by a docket control number. Page number cites refer to the pagination reflected in the blue PACER header at the top of each page.

("FAL"), and (3) the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), as well as (4) fraud (intentional misrepresentations), (5) fraudulent concealment, and (6) unjust enrichment. Plaintiffs seek damages and injunctive relief.

## B.   Defendants' Motion to Dismiss

On September 4, 2020, Defendants filed a motion to dismiss and strike the operative complaints in each of the three Actions, pursuant to Rule 12(b)(2), 12(f), and 12(b)(6) of the Federal Rules of Civil Procedure. (*See*, *e.g.*, BH D.E. 22 and 25.) Defendants' motion covered a wide range of issues, including jurisdiction, standing, and pleading sufficiency. Defendants argued, among other things, that (1) the Court lacked personal jurisdiction over Boohoo Group, (2) Plaintiffs sued the wrong entities, (3) all non-California class allegations should be stricken, (4) Plaintiffs lacked standing, (5) Plaintiffs' pre-litigation CLRA notices were non-compliant, and (6) Plaintiffs' claims were not properly pled. (*See* D.E. 22 at 6-7.) Plaintiffs filed a comprehensive opposition, and a detailed declaration full of exhibits contesting Defendants' personal jurisdiction arguments. (D.E. 27.)

On November 16, 2020, the Court denied Defendants' Rule 12(f) motion to strike and Rule 12(b)(6) motion to dismiss in its entirety. (D.E. 34 at 6-16.) With regard to personal jurisdiction, the Court found Plaintiffs "produced enough reason for the Court to conclude that they are entitled to an opportunity to take jurisdictional discovery to solidify a basis for a proper assertion of personal jurisdiction over" Boohoo Group. (D.E. 34 at 8-9.) The Court thus deferred ruling until after Plaintiffs conducted jurisdictional discovery.

After several status conferences and joint status reports, the Court established the parameters of allowable jurisdictional discovery and set a further briefing schedule and hearing to address personal jurisdiction. (D.E. 52.) On December 30, 2020, Plaintiffs propounded interrogatories, document demands, and requests for admission related to personal jurisdiction. (Ibrahim Decl., ¶16.) However, due to these considerable efforts, on January 15, 2021, Boohoo Group dropped its personal jurisdiction challenge. (D.E. 57.)

## C.   Written Discovery, Depositions, and Witness Interviews

In early 2021, Plaintiffs served written class discovery on Defendants in each of the

Actions consisting of two sets of interrogatories and document demands, and one set of requests for admission. (Ibrahim Decl., ¶17.) Due to the inadequate responses, Plaintiffs were forced to file a lengthy motion to compel further discovery. (D.E. 67.) In April 2021, Magistrate Judge McDermott issued two separate orders granting Plaintiffs' motion, in significant part, and denying Plaintiffs' motion, in certain respects. (D.E. 71, 73.)

In March 2021, Plaintiffs responded to written class discovery consisting of interrogatories, document demands, and requests for admission. (Ibrahim Decl., ¶18.) Defendants also filed a motion to compel discovery. (D.E. 76.) However, on July 19, 2021, Judge McDermott denied the motion in its entirety, the only exception being that Plaintiffs were ordered to provide a verification confirming they had no documents responsive to one document demand. (D.E. 83.)

Not including voluminous spreadsheets and data, Defendants produced more than 546,000 pages of documents responsive to Plaintiffs' document demands. (Ibrahim Decl., ¶20.) Class Counsel and their team reviewed these documents to conduct depositions and prepare their class certification motion. (*Id.*)

In the meantime, in June 2021, Plaintiffs noticed the deposition of Boohoo Group's Executive Chairman. (Ibrahim Decl., ¶21.) On July 7, 2021, Defendants filed a motion for protective order to quash the deposition, which Plaintiffs opposed. (D.E. 78.) On July 28, 2021, Judge McDermott again sided with Plaintiffs, rejecting Defendants' arguments and concluding that "Plaintiffs have presented evidence that [the Executive Chairman] has unique personal non-repetitive knowledge of facts relevant to this suit and to class certification[.]" (D.E. 89 at 3.) He was thus ordered to appear for deposition. (*Id.*)

In late January and early February 2022, Plaintiffs deposed four Rule 30(b)(6) corporate representatives designated by Defendants on behalf of the BH, PLT, and NG brands to testify concerning class topics central to the allegations of wrongdoing. (Ibrahim Decl., ¶22, Exs. 2-7.) In addition, Plaintiffs' counsel conducted an additional three deposition-like interviews of key defense witnesses on relevant topics. (*Id.*)

### D.   Settlement Negotiations

The parties commenced settlement negotiations by agreeing to private mediation before the Honorable Irma Gonzalez (Ret.) from the U.S. District Court for the Southern District of California. (Ibrahim Decl., ¶26.) The parties initially participated in three mediation sessions on May 20, 21, and 27, 2021. (*Id.*) The parties scheduled a fourth session with Judge Gonzalez on June 1, 2021. (*Id.*) Although the case did not settle, a general framework for a potential settlement was laid at these initial sessions. (*Id.*) The parties then reengaged settlement negotiations in September 2021, beginning with an in-person meeting. (*Id.* at ¶27.) Counsel for the parties then began an ongoing and regular dialogue over the remainder of 2021 in dozens of video conferences and phone calls. (*Id.*) In these direct sessions, the parties negotiated all the detailed and intricate aspects of the Settlement, provision by provision, beginning with a memorandum of understanding delineating the material terms of the parties' agreement. (*Id.*) In the interim, Plaintiffs conducted depositions and interviews of Defendants' witnesses in January and February 2022, as described above. (*Id.*) The parties continued intense back and forth dialogue and negotiations over numerous videoconferences to address additional details of the settlement in February through May 2022. (*Id.*) The Parties did not discuss or negotiate plaintiffs' counsel's request for attorneys' fees and costs until all other material terms, including the amount of the gift cards and free shipping, were agreed upon.  (*Id.* at ¶34.)

The parties then reengaged Judge Gonzalez for a fifth and final mediation session on May 4, 2022. (*Id.* at ¶30.) In this session, the parties presented her with a near final draft of the Settlement which, among other things, contained the provisions for proposed attorneys' fees and costs. (*Id.*) Judge Gonzalez had spent considerable time on the case and commented that Plaintiffs' counsel had achieved an excellent result for the Class and the request for attorneys' fees seemed fair. (*Id.*) The parties then worked together to finalize the exhibits to the Settlement, including class notices and the exhibits showing the changes required of Defendants under the injunctive relief provisions of the Settlement. (*Id.*) On May 20, 2022, the parties executed the final settlement agreement. (*Id.* at Ex. 1.)

## III.   THE TERMS OF THE SETTLEMENT[3]

### A.   The Settlement Class.

The Settlement defines the classes whose claims are being resolved as follows:

- For the BH Action, "all individuals in California who made a purchase on the Boohoo U.S. Websites during the Class Period." (Settlement at § 1.3.1.) The class period is "from April 9, 2016, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

- For the PLT Action, "all individuals in California who made a purchase on the PLT U.S. Website during the Class Period." (Settlement at § 1.3.1.) The class period is "from May 19, 2016, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

- For the NG Action, "all individuals in California who made a purchase on the Nasty Gal U.S. Website during the Class Period." (Settlement at § 1.3.1.) The class period is "from March 1, 2017, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

### B.   Settlement Consideration

#### 1.   Monetary Benefits to the Class

Under the Settlement, each Class Member who does not timely opt out of the Settlement "shall automatically receive" a $10 gift card to include free shipping (additionally valued at $7.28 per gift card) for single use on each U.S. website from which one or more "Qualifying Purchases" were made during the Class Period (the "Gift Card"). (Settlement at § 2.1; Stipulation in Support of Motion for Preliminary Approval of Class Settlement ("Stip.") at ¶13, Ex. 2.) The Settlement covers purchases from https://us.boohoo.com and/or https://boohooman.com/us (the "BH Websites"), https://prettylittlething.us (the "PLT Website"), and https://nastygal.com (the "NG Website") (collectively, the "U.S. Websites"), which include their associated mobile phone applications. (*Id.*) "Qualifying Purchase" is defined as "the purchase of any product by a California resident from the Boohoo U.S. Websites, the PLT U.S. Website, or the Nasty Gal U.S. Website within the Class Period." (*Id.* at § 1.22.) The Gift Cards have the

---

[3] Other than the Settlement, no other agreement exists that would be required to be identified under Rule 23(e)(3). (Ibrahim Decl., ¶36.)

7

following important attributes:

- All class members who do not opt out will automatically receive the Gift Card via email without the need to file a claim. (Settlement at §§2.1 and 2.1(a)(ii).)

- Each Gift Card has a face value of $10.00 plus free shipping and handling (Settlement at §2.1(a)(i)), which provides Class Members considerable choice and variety in using the Gift Cards without having to incur any out-of-pocket costs. "On any given day, Defendants generally have thousands of styles that may be purchased for $10 or less with a wide variety of styles across many different categories on their websites." (Stip. at ¶19; Tregillis Decl. at ¶¶ 57-59.)

- There is no requirement for Class Members to pay any shipping charges when a Gift Card is used, but because Defendants do not normally offer free shipping and are thus incurring a significant cost as a result of this benefit, the Gift Cards must be used in one transaction. (Stip. at ¶13.) The value of this benefit is at least $7.28 based on Defendants' customary shipping and handling charges on average per order across the U.S. Websites during the Class Period. (Settlement at §2.1(a)(i)(xi); Stip. at ¶13, Ex. 2; Tregillis Decl. at ¶¶ 60-62.)

- The Gift Cards have no expiration date. Defendants have no right to cancel the Gift Cards and they cannot revert to Defendants under any circumstance. (Settlement at §2.1(a)(iii).)

- There is no minimum purchase requirement to use the Gift Cards and they may be used toward any purchase. (*Id*. at §2.1(a)(iv).)

- There are no blackout dates restricting use. (*Id*. at §2.1(a)(vi).)

- The Gift Cards may be used with other offers and promotions. (*Id*. at §2.1(a)(vii).)

- The Gift Cards may be freely transferred or given to others. (*Id*. at §2.1(a)(viii).)

- The Gift Cards are stackable, meaning that multiple Gift Cards from the same website may be combined to use in a single transaction. (*Id*. at §2.1(a)(ix).)

- There are no fees for inactivity or any other reason. (*Id*. at §2.1(a)(xii).)

- The Gift Cards may be used on the website from which a Class Member made his or her purchase. (*Id*. at §2.1(a)(i).) For example, if a Class Member bought from the PLT Website, she will receive one Gift Card to use on the PLT Website only. (*Id*.)

- If Class Members bought from multiple sites, they may receive multiple Gift Cards—one for each website from which a purchase was made (with BH and BoohooMAN counting as one site). (*Id*. at §2.1(a)(v).) Class Members may thus be entitled to a total of three (3) Gift Cards if they made a purchase on all three sites.

- Lost Gift Cards will be replaced upon request. (*Id*. at §2.1(a)(xiii).)

### 2. *Injunctive Relief Benefits to the Class*

The Settlement provides for significant injunctive relief whereby Defendants agree to implement, no later than 14 days after the Court's entry of the Preliminary Approval Order, certain changes to the marketing and advertising on the U.S. Websites. (Settlement at §2.10.) Specifically, Defendants are required to make clear and conspicuous disclosures

on their product display pages whenever they advertise a discount off the original or full price (i.e., what Plaintiffs refer to as "reference prices" in the Actions). (*Id*.) The disclosures advise the customer that the original price advertised is not intended to be a former price, but instead merely reflects Defendants' opinion of the full value, as follows:

> *Our percentage off promotions, discounts, or sale markdowns are customarily based on our own opinion of the value of this product, which is not intended to reflect a former price at which this product has sold in the recent past. This amount represents our opinion of the full retail value of this product today based on our own assessment after considering a number of factors.*
>
> *That's why before checking out, it's important you acknowledge that you understand this. Cool with that? Great, happy shopping!*

(Settlement at § 2.10.2(b).) Both the disclosure and the original price on the product display page must have an asterisk to alert the customer to the fact that the disclaimer relates to the displayed original price. (*Id.* at § 2.10.2(a), (c).) The disclosure cannot be hidden in a "click to reveal" format; rather, it must be always viewable under the header "Pricing Policy" without the need for customers to click to open it. (*Id.* at § 2.10.2(a).) This full disclosure must also be displayed on the terms and conditions of each of the U.S. Websites. (*Id.* at § 2.10.2(e).)

In addition, Defendants must include a short disclosure on all landing pages, all product display pages, and all emails sent to customers containing advertisements of discounts from an original or full price. (*Id.* at § 2.10.2(d).) The short disclaimer must state: "*Discounts may not be based on former prices. See pricing policy*." (*Id*.) The phrase "See pricing policy" must have a hyperlink taking the customer directly to the full pricing policy disclaimer set forth above. (*Id.*)

These changes must be consistent with Exhibit G to the Settlement, which provides a visual mockup of what the changes will look like on the U.S. Websites. (Settlement at §2.10.2, Ex. G.) Importantly, these mockups show that the disclosures shall be visible to customers to satisfy the conspicuousness requirement. (*Id.* at Ex. G.) As shown on Exhibit G, Defendants shall include the short form disclaimer in the *center* of the top banner on the home landing page of their websites and product display pages where they advertise their percent-off promotion for a given day (including on the mobile application version);

9

moreover, the short form disclaimer shall be *bolded*, and the font size of the short form disclaimer must be large enough to match the discount messaging that it accompanies. (*Id.* at Ex. G.) Exhibit G also shows that the short form disclaimer shall be bolded, centered, and of equal font size to the accompanying promotional message on all emails sent to customers advertising a sale or discount off an original price. (*Id.* at Ex. G.)

There is no end date on the required disclosures, i.e., they shall be maintained forever on the subject websites. (*See id.* at §2.10.2.)

Further. the settlement also contains a provision titled "Compliance with the Law." (*Id.* at §2.10.1.) This clause requires Defendants to "agree that their comparison pricing practices in California . . . will not violate then-existing Federal or California law . . ." (*Id.*)

### 3. *Attorneys' Fees, Costs, Incentive Awards, and Administration Costs*

As noted, the Settlement provides a monetary value of $17.28 per Class Member consisting of $10 Gift Cards with free shipping valued at $7.28 per person. For the 1,882,885 Class Members known at present, this computes to a total monetary value of the Settlement in the approximate amount of $32.5 Million, which does not account for the value of injunctive relief. (Tregillis Decl. at ¶¶53-62.) Injunctive relief is valued at an additional $79.5 Million over the next five years. (*Id.* at ¶¶63-69.)

In consideration of obtaining these significant benefits for the Class, the many hours spent by Class Counsel, the significant funds Class Counsel has spent on litigation costs, including experts, in litigating this case, and the risks taken by Class Counsel, the Settlement provides that Class Counsel may seek an award of attorneys' fees and costs up to $4,750,000 with no opposition from Defendants. (Settlement at § 2.4(b).) Class Counsel estimates that their total litigation costs through final approval will be approximately $250,000. (Ibrahim Decl., ¶23.) Therefore, Class Counsel's fee request amounts to 13.8% of the $32.5 Million monetary value recovered for the Class, not considering the value of the injunctive relief. (*See id.*) If the value of the injunctive relief is considered, Class Counsel's request for fees is 4% of the overall value provided to the Class. (*See id.*) Counsel have spent considerable time and money working on the Actions and will provide

an exact accounting of time and costs for the Court's consideration at final approval. (*Id.*)

Furthermore, the parties agree that if the Court awards an amount less than $4,750,000, the difference will *not revert* to Defendants. (Settlement at §2.5.) Instead, it will be donated to *cy pres*—either the National Consumer Law Center (NCLC) (as proposed by Plaintiffs) or the Better Business Bureau (BBB) (proposed by Defendants), or divided equally between the two organizations, as determined by the Court in its discretion. (*Id.* at § 2.5.) If the Court finds that neither organization should receive the funds, the unawarded fees will be donated to an organization chosen by the Court. (*Id.*)

The Settlement further provides that each of the three class representatives may seek an incentive award not to exceed $5,000 with no opposition from Defendants. (*Id.* at §2.3.)

Defendants also agree to pay all costs associated with settlement administration in the amount of $350,000. (Settlement at § 2.4(a).) This amount is based on an estimate prepared by Kurtzman Carlson Consultants LLC ("KCC"), the selected settlement administrator, to execute the notice and administration plan set forth in the Settlement. (Ibrahim Decl., ¶35.) The entire $350,000 is to be used with no reversion back to Defendants. (*See* Settlement at §3.4(f), Ex. J.)

### 4.    *Release and Dismissal of California Class Claims*

Defendants deny liability. (*Id.* at § 2.9) Thus, in exchange for the above-described benefits of the Settlement, the individual Plaintiffs and all Class Members who do not timely opt out agree to a standard release against Defendants and other affiliated entities. (*Id.* at §§ 1.7, 1.8, 1.9, 2.7, 2.8.) However, because the Class Members are comprised only of individuals in California who made purchases on the U.S. Websites, there is no release in the Settlement from non-California putative class members. (*Id.* at §§ 1.3, 1.7.)

Following final approval of the Settlement, Plaintiffs agree to dismiss with prejudice the claims of the Class, and to dismiss *without prejudice* the claims of the remaining non-California class members. (Settlement at Recital L, § 3.10, Ex. H at ¶13.)

### C.    **The Notice and Settlement Administration Program**

As noted above, KCC will be the settlement administrator. (Ibrahim Decl., ¶35;

Reed Decl.) The notice program tailored by the parties and KCC to reach Class Members was designed to give the best notice practicable. Indeed, the notice program is reasonably calculated under the circumstances to apprise Class Members of the Settlement, how they can automatically receive their Gift Cards, and their right to opt out or object. (Reed Decl., ¶¶7-15.) KCC will also handle distribution of the Gift Cards to all Class Members who do not opt out. (*Id.*, ¶15.)

The notice program consists of (1) Email Notice to all Class Members at the email address in Defendants' databases, (2) Postcard Notice by mail to those Class Members whose email address is unknown or who are believed to have not received the Email Notice, (3) a long form notice (i.e., "Full Notice") posted on a dedicated case website allowing Class Members to obtain additional information and access key documents, (4) Publication Notice in the digital edition of the *Los Angeles Times* for a four week period to fulfill the CLRA's publication requirement, (5) notice to the appropriate federal and state officials as required by the Class Action Fairness Act, and (6) Notice of Distribution of the Gift Cards after final approval to all Class Members, except those who have opted out. (Reed Decl., ¶¶8-14; Settlement at §§ 3.3-3.6, Exs. B-F, I.)

Class Members will have 45 days from the date the Email Notice to submit any objections or to opt out. (Settlement at §§ 3.8-3.9.) Instructions for submitting objections and opting out are described in detail in the Full Notice on the settlement website, which all Class Members via all forms of notice will be made aware of. (*Id.* at §3.4; Exs. B-E.)

Finally, KCC will also be responsible for administering Class Members' requests to replace or stack Gift Cards for a period of eight (8) years. (*Id.* at §2.1(a)(ix), (xii).) After that period, this function will be taken over by Defendants. (*Id.*; Reed Decl., ¶19.) The parties also agreed to a mechanism to prevent fraud and commercial activity with regards to the Gift Cards. (*Id.* at §2.1(a)(x).) Thus, Defendants may request KCC to investigate any request to stack more than $500 worth of Gift Cards. (*Id.*) KCC, however, maintains the ultimate discretion to grant or deny any stacking request. (*Id.*)

### D.   Marketing Campaign to Promote the Gift Cards

The parties have also devised a program to promote the Gift Cards so that Class Members are aware of them regardless of when they decide to use them. Part of the budget for KCC is devoted to advertising a social media campaign targeting Class Members to remind them to check their email for their Gift Cards. (Settlement at § 3.4(f), Ex. J.)

In addition, Defendants must also independently promote the Gift Cards. For 60 days after the Gift Cards are distributed, Defendants must conspicuously display on the landing pages of each subject website the message: "Class Action Settlement: Check Your Email for $10 Gift Cards Plus Complimentary Shipping on Any Purchase. Click here for additional information: [Live Link to Settlement Website]." (*Id.* at § 3.4(g).) Furthermore, Defendants are additionally required to send at least four marketing emails (one every 45 days) to subscribed customers to remind them about the Gift Cards. (*Id.* at § 3.4(h).)

## IV.   LEGAL STANDARD

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Before a district court grants approval, it must determine that the settlement would be "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Congress amended Rule 23, which took effect on December 1, 2018. These amendments provide guidance on the "fair, adequate, and reasonable" standard at the preliminary approval stage. *See* Fed. R. Civ. P. 23(e)(2). The amended Rule 23 clarifies that courts must employ a two-step process in granting preliminary approval. Under the first step, the parties must show "that the court will likely be able to (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). These factors are:

(A)   the class representatives and counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees and costs; and (iv) any agreement required to be identified;

(D)   the proposal treats class members equitably relative to each other.

13

Fed. R. Civ. P. 23(e)(2).[4]

The second step of the analysis requires a "showing that the court will likely be able to . . . (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii). Where, as here, the proponents of the proposed settlement seek certification of a settlement class seeking monetary remedies, they must demonstrate that they meet the prerequisites of Rule 23(a), as well as the requirements of Rule 23(b)(3). *See Hanlon*, 150 F.3d at 1019-1022.

Rule 23(a) requires the putative class to meet four threshold requirements: numerosity, commonality, typicality, and adequacy of representation. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558-60 (9th Cir. 2019) (an individual question that "would only apply to a subset of the class and would primarily implicate trial management issues is not considered when conducting a predominance analysis for a settlement class.")

## V.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL

### A.   The Proposed Settlement is Fair and Reasonable

As noted above, under the first step of the Court's analysis of whether preliminary approval of a class settlement should be granted, the parties must show "that the court will likely be able to (i) approve the proposal under [the final approval factors set forth in] Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). These factors are considered below, in turn.

---

[4] Prior to the amendments, courts in this Circuit routinely applied the four fairness factors from *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007), or the eight factors set forth in *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Although not technically displaced by the amendments, Plaintiffs will not discuss these factors to avoid redundancy as they are directly or indirectly discussed in applying the factors from Rule 23(e)(2). Further, "some of these fairness factors cannot be fully assessed until the Court conducts the final approval hearing[.]" *Dawson v. Hertz*, No. CV 17-8766-GW(JEMX), 2019 WL 13014626, at *1 (C.D. Cal. Mar. 8, 2019).

14

### 1.     *The Class Is Adequately Represented by Plaintiffs and Counsel*

The first fairness factor under Rule 23(e)(2) is whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "This analysis includes the nature and amount of discovery undertaken in the litigation." *Ochinero v. Ladera Lending, Inc.*, No. SACV 19-1136 JVS (ADSx), 2021 WL 4460334, at *4 (C.D. Cal., July 19, 2021). The analysis is also "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Loreto v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19-cv-01366-GPC-MSB, 2021 WL 1839989, at *7 (S.D. Cal. May 7, 2021).

Here, the class representatives and counsel have more than adequately represented the class. The class representatives have cooperated in discovery by producing documents and responding to Defendants' written discovery, and have been involved and kept up to date on all aspects of the case. (Ibrahim Decl., ¶18; Khan Decl., ¶12; Hilton Decl., ¶12; Lee Decl., ¶12.) As summarized in section II, *supra*, Class Counsel have vigorously prosecuted this case on behalf of the Class. This has required Class Counsel to, among other things, investigate the validity of claims arising from Defendants' practices on three different websites, procuring three separate class representatives, and filing three distinct actions. Class Counsel also defeated Defendants' challenge to the pleadings and personal jurisdiction, propounded two sets of discovery,  reviewed the more than 546,000 pages of documents produced by Defendants, and successfully prosecuted and defended against multiple discovery motions, including obtaining an order to compel the deposition of Defendants' Chairman and highest-ranking executive. (*Id.*; *see, e.g.*, D.E. 71, 73, 89.)

Class Counsel also conducted four Rule 30(b)(6) depositions of Defendants' corporate representatives, along with interviews of important executive witnesses for class certification and settlement. (Ibrahim Decl., ¶22.) Further, Counsels' efforts also included lengthy settlement negotiations in multiple mediation sessions and through dozens of direct communications with counsel to achieve this Settlement. (Ibrahim Decl., ¶¶25-35.)

Finally, both Class Counsel have extensive experience in complex litigation spanning 35 years between them, including numerous trials as an Assistant U.S. Attorney,

15

a federal clerkship, complex litigation experience at large firms, including trials, and class action litigation experience. (Ibrahim Decl., ¶¶2-7; Almadani Decl., ¶¶2-8.) In sum, the class representatives and counsel have more than adequately represented the class.

### 2.    *The Proposal Was Negotiated at Arm's Length*

The second Rule 23(e)(2) factor looks at whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This is "described as [a] 'procedural' concern[ ], looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2), 2018 Advisory Comm. Notes. "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e), 2018 Advisory Comm. Notes.

The settlement here was the product of extensive and painstaking arm's length negotiations. The parties enlisted the assistance of Judge Irma Gonzalez, a highly respected retired federal district judge. The parties initially participated in four separate mediation sessions with Judge Gonzalez. After a general framework for a potential settlement was laid at these initial sessions, the parties met in person and began an ongoing and regular dialogue where they negotiated intensely all the detailed and intricate aspects of the settlement, provision by provision. In reaching the class settlement agreement, the parties were careful to negotiate the material terms of the settlement covering benefits for the class prior to negotiating class counsel's fees and costs. (*See* Ibrahim Decl., ¶34.) The direct negotiations between counsel occurred over eight (8) months in dozens of video conferences and phone calls. The parties then reengaged Judge Gonzalez for a final mediation session on May 4, 2022, where they finalized the settlement agreement. At the mediation, Judge Gonzalez specifically commented that she believed Class Counsel had achieved an excellent result for the three Classes, and she was impressed by the fact that Class Counsel had negotiated not only an unrestricted $10 gift card, but also *free shipping* valued at an additional $7.28 for a total value of $17.28 per gift card. (Ibrahim Decl. at ¶30; Almadani Decl. at ¶10.) The parties have satisfied the second Rule 23(e)(2) factor.

1

### 3.    *The Relief for the Class is Adequate Under Rule 23(e)(2)(C)*

2        Under the third Rule 23(e)(2) factor, the Court must consider whether "the relief

3  provided for the class is adequate, taking into account:  (i) the costs, risks, and delay of

4  trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the

5  class, including the method of processing class-member claims; (iii) the terms of any

6  proposed award of attorney's fees, including timing of payment; and (iv) any agreement

7  required to be identified under Rule 23(e)(3)[.]"  Fed. R. Civ. P. 23(e)(2)(C). Under this

8  factor, the relief "to class members is a central concern." Fed. R. Civ. P. 23(e)(2)(C),

9  Advisory Comm. Notes. As shown below, the Settlement satisfies these factors.

10                    *a.    The costs, risks, and delay of trial and appeal*

11        A "central concern" when evaluating a proposed class action settlement "relate[s]

12  to the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ. P. 23(e), 2018

13  Advisory Comm. Notes; *see also Graves v. United Industries Corp.*, No. 2:17-cv-06983-

14  CAS-SKx, 2020 WL 953210, at *7 (C.D. Cal. Feb. 24, 2020).

15        Here, the risk, expense, complexity, and likely duration of further litigation all

16  weigh in favor of approving the proposed Settlement. Plaintiffs are confident they would

17  be able to obtain class certification and successfully prove their claims at trial. They are

18  also confident that they have formulated a viable damages model based on a sound

19  marketing survey and well-settled and accepted economic methodologies. (*See* Tregillis

20  Decl.) However, juries are unpredictable and may not find Defendants' pricing and sales

21  practices deceptive despite the evidence. There is also a small risk that Plaintiffs' model

22  for computing classwide damages would not be acceptable to the Court or the Ninth

23  Circuit. *See*, *e.g.*, *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx),

24  2016 WL 1072129, at *12 (C.D. Cal. Mar. 15, 2016) (granting summary judgment based

25  on Plaintiffs' failure to demonstrate "a viable measure of restitution, such as a 'price

26  premium' model in which an expert isolates the amount of the price attributable to the

27  false representation.") While Plaintiffs here have a solid damage model consistent with

28  *Chowning*, litigation inherently carries risk. (*See* Tregillis Decl.)

Moreover, Plaintiffs would face years of litigation against experienced defense counsel. Without a settlement, this case (already over two years old) would force Plaintiffs to conduct further class discovery, successfully prosecute a motion for class certification and potentially oppose a Rule 23(f) petition to the Ninth Circuit, conduct merits discovery, successfully oppose summary judgment, undertake expert discovery, make pretrial disclosures and filings, and try the case. And, even if Plaintiffs prevail at trial, they may have to oppose a lengthy appeal. In contrast, a settlement ensures Class Members promptly receive the significant benefits negotiated for them.

Further, the expert and case-related costs alone in this type of class action, which is already expected to be approximately $250,000, would likely fall between $500,000 to $1,000,000 based on Class Counsel's experience. (Ibrahim Decl., ¶23.) Plaintiffs have obtained a significant benefit for all Class Members in the form of sizable Gift Cards that may be used to purchase any item on Defendants' websites. These Gift Cards may be used by class members without having to pay for shipping—an added benefit valued at $7.28 per class member that would be difficult for Plaintiffs to argue is legally recoverable if this case went to trial. Under the Settlement, the guaranteed, immediate, and automatic monetary benefit to the Class is in excess of $32.5 Million, which is better than 50 cents on the dollar when compared to what the Class may recover after a risky and lengthy discovery, motions, trial, and appeals process. (*See* Tregillis Decl. ¶¶ 52-62.)

Moreover, by virtue of Plaintiffs' lawsuits, Defendants have agreed to change their business practices. They shall provide clear and conspicuous disclosures on their websites and email marketing campaigns so that customers understand that the original prices advertised on the sites are not intended to reflect the former prices at which Defendants' merchandise sold in the recent past. This injunctive relief, alone, is valued at $79.5 Million over the first five years. (Tregillis Decl., ¶¶63-69.) In sum, this first Rule 23(e)(2)(C) factor weighs heavily in favor of preliminary approval.

> b.    *The Claims Process and Distribution of Relief Are Effective*

The Court must next consider "the effectiveness of any proposed method of

distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C) and 2018 Advisory Comm. Notes. Additionally, "the court should be alert to whether the claims process is unduly demanding." *Id.*

Here, class members face no obstacles to receiving the benefits of the Settlement because those who do not opt out will *automatically* (without the need to file a claim) receive their Gift Cards with free shipping and no restrictions or expiration date. (*Supra,* §III.B.1.) Because Defendants are online-only retailers, all their customers had to create online profiles where they were required to provide their email addresses. The Gift Cards may thus be distributed to all Class Members electronically, eliminating the need for a claims process. (Reed Decl., ¶15.) Thus, this is far better than a traditional settlement where only a small fraction of class members benefit due to dependence on locating and reaching class members and requiring them to submit a claim.[5] Moreover, the Gift Cards give Class Members a large variety of attractive products, including thousands of products that would not require Class Members to incur any out-of-pocket cost.

### c.   The Attorneys' Fees Request Is Reasonable

The Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). The Ninth Circuit has interpreted the amended Rule 23(e)(2) as imposing an obligation on district courts to "examine whether the attorneys' fees arrangement shortchanges the class. In other words, the new Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-a-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)). In considering the proposed award of attorney's fees, the Court must scrutinize the settlement for any "subtle signs that class counsel have allowed pursuit of their own self-interests to infect the negotiations." *Id.* at 1023 (quoting *Bluetooth,* 654 F.3d at 947). Thus, the Court must evaluate the settlement for three such "subtle signs" of collusion between class and defense counsel:  "(1) when counsel receives

---

[5] *See In re Facebook Biometric Information Privacy Litig.*, 522 F. Supp. 3d 617, 622 (N.D. Cal. Feb. 26, 2021) (claims rate of "4-9% [] is typical for consumer class actions").

a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class." *Id.* at 1023.

As noted above, although this inquiry would normally occur at the final approval stage prior to the amendments to Rule 23(e), the rule now requires as the first step of the preliminary approval analysis to show "that the court will likely be able to (i) approve the proposal" under the final approval factors of Rule 23(e)(2), *see* Fed. R. Civ. P. 23(e)(1)(B)(i), which includes consideration of the factor under Rule 23(e)(2)(C)(iii).

Here, the proposed attorneys' fee arrangement does not "shortchange" the class in any way. The monetary value of the settlement, before adding the value of injunctive relief, is $32.5 Million. This is calculated by multiplying the total number of class members to date (1,882,885) by the $17.28 value of the Gift Cards ($10 Gift Card plus $7.28 value of free shipping that is normally charged by Defendants). Class Counsels' fees will not come out of the benefits to be paid to the Class, meaning that Class Members will receive their full benefits regardless of the attorneys' fees the Court allows. Moreover, the proposed fee amount is only **13.8%** of the total monetary settlement value before accounting for the value of injunctive relief. If injunctive relief is considered, the proposed fee amount will likely be **less than 4%** of the total settlement value. In either case, the fee request is well under the 25% "benchmark" for measuring presumptively acceptable fees in the Ninth Circuit. *Bluetooth*, 654 F.3d at 942. There is thus no concern here that Class Counsels' fees would reduce Class benefits or are otherwise unreasonable.

In addition, there is no reversion of any benefits payable under the Settlement to Defendants. (Settlement at §§ 2.1(a), 2.4, 2.5, 3.4.) Every Class Member who does not opt out will automatically receive an unrestricted Gift Card that will never expire. There is thus no risk of any benefit not being distributed to Class Members due to the failure to make a claim. Because there is no expiration date, there is also no risk that unredeemed Gift Cards will be returned to Defendants. Also, any unawarded attorneys' fees and costs

20

from the proposed $4.75 Million *will not* revert to Defendants. Rather, they will be awarded to a *cy pres* recipient connected to the claims at issue.

The proposed award of fees also does not "shortchange" the class and is properly balanced against the relief provided for the Class because, as explained above, Class Counsel have worked substantial hours and overcome many hurdles, including avoiding dismissal, successfully defeating Defendants' personal jurisdiction challenge, and overcoming Defendants' resistance to important discovery. Class Counsel have also taken an enormous risk by pursuing this case on contingency and advancing substantial costs— expected to be a quarter Million through settlement, if approved. *See Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320-GW(JEMX), 2020 WL 10055593, at *8 (C.D. Cal. June 22, 2020) (awarding 33 percent of the common fund because performance of work "on a contingency basis (for nearly two years) is an always-risky practice, particularly in a case that had to survive the number of challenges, and incur the amount of expenses.").

There is also nothing unusual about the timing of payment of attorneys' fees. Defendants are not obligated to pay fees until after the Settlement becomes final.

For these initial reasons, the proposed award of fees is properly balanced vis-à-vis the relief provided to the Class. There is no concern about disproportionality between the proposed fee award and benefits to be paid to the class because, the fee does not affect the Class benefits and there are no subtle signs of collusion under *Bluetooth*.

(A)   Class Counsel's Fee Request Is Not Disproportionate

The Settlement satisfies the first *Bluetooth* factor because Class Counsel will not be receiving a "disproportionate distribution of the settlement," *Bluetooth*, 654 F.3d at 947, as demonstrated by four points.

***First***, the attorneys' fees and costs are not coming out of the monetary benefits that will be distributed to the Class and, thus, do not at all reduce the benefits to the Class.

***Second***, the fee request is less than **13.8%** of the Settlement's monetary value alone, when the accepted benchmark in the Ninth Circuit taking into consideration both monetary and non-monetary relief is 25%. *See id*. at 942. Here, Class Counsel have worked hard to

negotiate a settlement whereby each Class Member in each of the three cases will *automatically* receive—without the need to file a claim—an unrestricted $10 Gift Card with free shipping (customarily charged by Defendants and valued at an additional $7.28) for a total value of $17.28 per Gift Card. As of April 30, 2022, Defendants estimate that there are 1,882,885 members of the putative classes among the three cases, and the classes continue to grow. (Stip. at ¶12, Ex. 1.) Multiplying the value of each Gift Card ($17.28) by the total number of class members to date (1,882,885) yields a total monetary value alone of $32,536,253 with no reversion to Defendants. (Tregillis Decl. at ¶¶53-62.).

Plaintiffs' proposed attorneys' fees and costs of $4.75 Million is thus a reasonable figure that is not disproportionate to the $32.5 Million recovery for the Class. Of requested amount, Plaintiffs estimate their costs of litigation—which include expert fees, deposition costs, mediation costs, and other fees and costs—to be approximately $250,000. (Ibrahim Decl., ¶23.) That leaves attorneys' fees of $4.5 Million, which is only **13.8%** of the minimum monetary value of the Settlement, independently paid without any adverse effect on Class Members' benefits. This is well within the accepted benchmark award of 25% in the Ninth Circuit for attorneys' fees even for "common fund" or "constructive common fund" cases where the benefit to the class is reduced by the fee award. *Id.*

**Third**, when the significant injunctive relief fiercely negotiated by Class Counsel is considered, as it should be, the attorneys' fees requested amount to approximately **4%** of total recovery, removing any concern of disproportionality, especially in light of the 25% customary benchmark in such cases.

"When determining the value of a settlement, courts consider the monetary and non-monetary benefits that the settlement confers." *Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-LB, 2016 WL 4916955, at *5 (N.D. Cal. Sept. 15, 2016); *see also Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) (upholding district court's approval of attorneys' fees where it was apparent that injunctive relief offered "generated benefits far beyond the cash settlement fund"); *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, *7 (N.D. Cal. Mar. 18, 2013)

*Plaintiffs' Motion for Preliminary Approval of Class Action Settlement*          *Case No. 20-cv-03332-GW (JEMx)*

(settlement value includes injunctive relief). Thus, for example, in *Miller v. Ghirardelli Chocolate Co.*, the Court included the value of Ghirardelli Chocolate removing various terms from its labels as part of the common fund from which to calculate attorneys' fees. No. 12-cv-04936-LB, 2015 WL 758094, at *1, 5 (N.D. Cal. Feb. 20, 2015).

Here, the Settlement provides for significant and meaningful injunctive relief. It requires Defendants to make full *and conspicuous* disclosure concerning their pricing practices so that California consumers will no longer be misled and may make fully informed purchasing decisions. The crux of each of Plaintiffs' class action lawsuit is that Defendants' advertisement of reference prices on the U.S. Websites is misleading because the reference prices signal to consumers that they are recent, former prices when they are not. As a result, customers were/are misled to believe that they were/are receiving a bargain or genuine discount based on recent former prices when this is not true.

Under the Settlement, Defendants must make clear and conspicuous disclosures that the original prices on their sites are *not former prices*, but instead merely reflect *Defendants' opinion* of the full value of the products. (Settlement at § 2.10.2(b).)

This disclosure is required to be conspicuously displayed in multiple places on *all* product pages—i.e., the point at which customers make their purchase selection. Defendants must also conspicuously display this disclosure on *all* website landing pages where a sale or promotion is advertised (including on banner displays if advertising a sale), accompanied by the language "*Discounts may not be based on former prices. See pricing policy.*" Importantly, the landing pages include the home pages of the websites where customers first land when typing in the web address onto their browser, along with any pages where customers click on an online advertisement or other link that directs them to a page displaying a promotion advertising a discount off an original price. (Settlement at § 2.10.2(c); Tregillis Decl. at ¶¶63-69.) Indeed, the landing pages are where customers see the sitewide sale or promotion being offered for a given day by Defendants. (*See* Ibrahim Decl., Ex. 4 (Deposition of Jonathan Haycock ("JH Dep.") at 30:8-18; Ex. 6 (Deposition of Samuel Brocklebank ("SB Dep.") at 45:2-13.)

Further, the disclosures must also be conspicuously displayed on all customer emails advertising discounts. (Settlement at §2.10.2, Ex. G; Tregillis Decl. at ¶¶ 65-67.) These emails are sent to individuals who have subscribed to receive marketing communications from Defendants. (Ibrahim Decl., Ex. 5 (Deposition of Murray Beckett ("MB Dep.") at 125:23-127:20; Ex. 3 (Deposition of Nicki Capstick ("NC Dep.") at 144:21-145:3.)

The disclosures must be conspicuous and not buried in Defendants' terms and conditions or other fine print. In fact, the disclosures cannot even be hidden in a "click to reveal" format. Rather, they must be permanently viewable on the pages under a bolded header "Pricing Policy." (Settlement at Ex. G; Tregillis Decl. ¶¶65-67.) Similarly, on the landing pages and emails, Defendants must conspicuously display the words "*Discounts may not be based on former prices. See pricing policy.*" in bold print centered at the top situated near the sale or promotion language (e.g., "50% OFF EVERYTHING"). (*Id*.) Customers may click on the "See pricing policy" link to view the full disclosure. (*Id*.)

It is also important to note that unlike other class settlements that require the defendants to provide accurate disclosures or disclaimers for only a limited time-period (e.g., 3 or 4 years), there is no such time limitation here—the disclosures are permanent.

Further. the Settlement provides added protection for California consumers visiting the U.S. Websites in the form of a provision titled "Compliance with the Law."  This clause requires Defendants to "agree that their comparison pricing practices in California . . . will not violate then-existing Federal or California law . . ." (Settlement at § 2.10.1.)

In sum, any customer making a purchase on one of the U.S. Websites will now be made aware of the truth—namely, that Defendants' percentage off promotions, discounts, or sale markdowns are not intended to be based on the former price at which their products sold in the recent past, but rather, are merely based on Defendants' own *opinion* of the value of their products. This is significant because although Defendants do typically sell their products at the full, original price advertised on the sites for a short period (one or two weeks) when the product is first introduced to the sites, the product typically will not

sell at that price for the remaining life of the product, which could be months or years. Customers now will be informed about what the alleged discounts truly mean. Accordingly, the Actions have achieved one of their goals, which was to stop Defendants from displaying reference prices that misleadingly give the impression of former prices and to bring Defendants into compliance with the law. *See* Cal. Bus. & Prof. Code § 17501.

As far as the value, according to Plaintiffs' highly experienced and qualified damages expert, the injunctive relief is worth $79.5 Million over the course of the next five years. (Tregillis Decl., ¶¶63-69.) This figure is calculated by taking into account the damages for the year 2021 (the most recent year for which Plaintiffs have data) assuming the websites are not changed and continue to mislead consumers, which are approximately $20 million. (*Id.*) If the amount of sales in the future is the same—considering the trend of increased sales, but also the potential decrease in sales with the elimination of deception—then the future value of an injunction is $20 million per year, which, if discounted to present value, amounts to $79.5 Million to California consumers over five years. (*Id.*) Notably, because Defendants are required to maintain these changes perpetually, the injunctive relief negotiated in the Settlement is actually worth much more.

Therefore, when the minimum value of injunctive relief ($79.5 Million) is combined with the minimum value of monetary relief ($32.5 Million), the proposed attorneys' fees of $4.5 Million amount to about **4%** of the value provided to the Class, which is clearly not disproportionate under the current acceptable benchmark of 25%.

**Fourth**, the proposed fee award is also not disproportionate to the amount of the Settlement because the Gift Cards are not "coupons" within the meaning of the Class Action Fairness Act (CAFA), 28 U.S.C. § 1711, *et seq.*

CAFA requires courts (1) to apply "heightened scrutiny" to settlements that award "coupons" to class members, and (2) to base fee awards on the redemption value of the coupons, rather than on their face value. *In re EasySaver Rewards Litig.*, 906 F.3d 747, 754–55 (9th Cir. 2018) (citing 28 U.S.C. § 1712). "Thus, delineating settlements that award cash or cash-equivalent certificates from those awarding coupons affects the

calculation of attorneys' fees." *Seegert v. Lamps Plus, Inc.*, 377 F. Supp. 3d 1127, 1130 (S.D. Cal. 2018) (citing *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182–86 (9th Cir. 2013)). The determination that the class is being provided with "coupon" relief may also bear upon the overall fairness and adequacy of the settlement at preliminary approval. *See id.* at 1133; *see also In re HP Inkjet*, 716 F.3d at 1178 (CAFA "invites increased judicial scrutiny of coupon settlements generally."); 28 U.S.C. § 1712(e) ("In a proposed settlement under which class members would be awarded coupons, the court may approve the settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members.").

Congress did not define the term "coupon" when promulgating CAFA. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 950 (9th Cir. 2015). However, the Ninth Circuit has since outlined three factors to guide the inquiry of whether proposed class relief is a coupon: "(1) whether class members have to 'hand over more of their own money before they can take advantage of' a credit, (2) whether the credit is valid only 'for select products or services,' and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable." *Easysaver*, 906 F.3d at 755 (quoting *Online DVD*, 779 F.3d at 951). Applying this inquiry, the Gift Cards here are clearly not "coupons."

*First*, class members do not have to hand over more of their own money before they are able to take advantage of the Gift Card. There is no minimum purchase requirement and customary shipping charges are waived. Moreover, there are thousands of products available for $10 or less on each of the sites, across a wide variety of product styles and categories, including tops, pants, dresses, skirts, shorts, swimwear, underwear, activewear, lingerie, sleepwear, footwear, accessories, and so on.[6] (Stip. at ¶19; Tregillis Decl. at ¶¶57-

---

[6] It is also important to the analysis that the Gift Cards are usable for the same type of purchases where the class members were deceived and shortchanged; the compensation is thus "related to the harm suffered[.]" *See Hendricks v. Ference*, 754 F. App'x 510, 512-13 (9th Cir. 2018) (affirming district court ruling that award of vouchers to use only for cans of tuna "was not a form of coupon relief" because "[s]upplying missing tuna or providing a replacement for a defective product may be accomplished most efficiently by way of a voucher, and the use of a voucher to deliver an in-kind settlement to class members will not by itself transform a non-coupon settlement into a coupon settlement subject to CAFA.")

59.) Indeed, in contrast to more upscale retailers, one of Defendants' major selling points is that they offer clothing at cheaper price points. (SB Dep. at 85:2-15.) *See Taylor v. Shutterfly, Inc.*, No. 5:18-CV-00266-BLF, 2021 WL 5810294, at *10 (N.D. Cal. Dec. 7, 2021) (promotional codes for future online purchase on photography website not coupons where they could be used to purchase products from site without making additional purchases). Furthermore, the sheer variety of items available online to Class Members—which is far greater than the variety a brick-and-mortar store can accommodate—along with the convenience of shopping from home with free delivery makes the Gift Cards an incredible value. Thus, the first factor decidedly shows that the Gift Cards are not coupons.

*Second*, the Gift Cards are valid for *all,* not merely "select," products on Defendants' websites. As noted, Class Members would be able to use the Gift Cards to purchase thousands of different products available under $10 across a wide range of categories and which constitute a substantial percentage of the total available products on each site. (Stip. at ¶19.) But Class Members are also free to choose from any of the thousands of products on the websites and apply their $10 and free shipping towards those products, too. Furthermore, this is not a case where the only products available to class members are specialty items, or in a narrow category or industry of products or services. (*Id.*) On the contrary, the Gift Cards may be used to buy a wide range of clothing, shoes, accessories, and beauty products, which are everyday products that people normally would buy. (*Id.*) *See Johnson v. Ashley Furniture Indus., Inc.*, No. 13cv2445 BTM(DHB), 2016 WL 866957, at *6 (S.D. Cal. Mar. 7, 2016) ($25 vouchers for use at furniture chain not coupons because sufficient variety of products available). Therefore, the second *Online DVD* factor also weighs in favor of the conclusion that the Gift Cards are not coupons.

*Finally*, the Gift Cards provide ultimate flexibility. There are no expiration dates, minimum purchase requirements, blackout dates, restrictions on use with other offers or promotions, or restrictions on transferability. The Gift Cards are also stackable[7] and Gift

---

[7] The only restriction on stacking is that, to prevent "fraud and commercial activity," Defendants may trigger the Settlement Administrator to investigate stacking requests of $500 or more. (Settlement at §2.1(a)(x).)

Cards that are lost may be replaced upon request. In short, the highly flexible nature of the Gift Cards supports a finding that they are not coupons. *Russell v. Kohl's Dep't Stores, Inc.*, 755 F. App'x 605, 608 (9th Cir. 2018) (gift cards not coupons where they "were transferrable, stackable, usable with other Kohl's promotions, and large enough to allow class members to buy more than 1750 items . . . without spending their own money.")

To summarize, because the Gift Cards are not "coupons," the calculation of Class Counsels' attorneys' fees should be based on the monetary value of the Gift Cards—which, at a minimum, is $32.5 Million without even accounting for the benefits conferred on the Class from injunctive relief. Furthermore, because the Gift Cards are not "coupons," the relief under the Settlement should also be found to be fair, adequate, and reasonable.

(B)     The Clear Sailing Provision Is Not Collusive

As concerning the second *Bluetooth* factor, while the Settlement contains a "clear sailing" provision whereby Defendants agree not to oppose Class Counsels' request for attorneys' fees and costs in an amount that does not exceed $4.75 Million, the mere presence of such a provision does not render a settlement collusive. *See*, *e.g.*, *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1260–61 (C.D. Cal. 2016). To the contrary, several facets of the Settlement in this case demonstrate that there was no collusion whatsoever.

*First*, as discussed above in section II.D, *supra*, this Settlement was negotiated at arms-length through eight-plus months of direct negotiations between counsel and with the assistance of a highly respected retired district judge, in five separate mediation sessions. Significantly, the parties' last session with Judge Gonzalez occurred on May 4, 2022, where she was presented with the near final draft of the Settlement, which contained the attorneys' fees and costs and clear sailing provision, and she specifically commented that she found the fee request to be fair. (Ibrahim Decl., ¶¶30-31) *see Bluetooth*, 654 F.3d at 948 (presence of mediator is a factor weighing in favor of non-collusiveness).

*Second*, Class Counsel negotiated attorneys' fees only after the material terms of the Settlement covering benefits for the Class had been agreed upon by the parties. (Ibrahim Decl., ¶¶34); *see Shames v. Hertz Corp.*, No. 07-CV-2174-MMA (WMC), 2012

28

WL 5392159, at *13 (S.D. Cal. 2012) (objection to clear sailing agreement overruled because fee amount was negotiated separately and after the class settlement was finalized).

*Third*, under the Settlement, unawarded fees do not revert to Defendants. Instead, if the Court decides not to award class counsel the full amount of fees and costs of $4.75 Million, any amount short of $4.75 Million will be awarded to one, or both, of the *cy pres* organizations proposed by the parties, or if found by the Court not to be acceptable, to a *cy pres* organization selected by the Court. (Settlement at §2.5.) This, too, is a factor courts find is an indication of an absence of collusion even where the class settlement has a clear sailing provision. *See*, *e.g.*, *Spann*, 211 F. Supp. 3d at 1260–61 (even though the settlement contained a clear sailing provision, "the absence of a kicker provision stating that all fees not awarded would revert to defendant[ ], weighs against a finding of collusion.") (internal quotations omitted). Therefore, there was no collusion under the second *Bluetooth* factor.

(C)     There is No Reversion of Fees to Defendants

The third and final *Bluetooth* factor also does not support a finding of collusion because, as already discussed in the previous section, the Settlement does not contain a "kicker" or "reverter" clause that returns unawarded fees to the defendant. *Bluetooth*, 654 F.3d at 947. Rather, any unawarded fees will be paid to a *cy pres* recipient. Designating one or more *cy pres* beneficiaries in a class settlement for attorneys' fees not awarded by the Court is one well established method of mitigating against collusion between class counsel and defense counsel. *See id.* (provision whereby "all fees not awarded would revert to defendants *rather than be added to the cy pres fund* or otherwise benefit the class" was an indicia of collusion) (emphasis added); *Martin v. Marriott Int'l, Inc.*, No. CV 18-00494 JAO-RT, 2021 WL 4888973, at *5 (D. Haw. Oct. 19, 2021) (no collusion in part because unawarded fees designated to *cy pres* beneficiary); *Miguel-Sanchez v. Mesa Packing, LLC*, No. 20-CV-00823-VKD, 2021 WL 1736807, at *13 (N.D. Cal. May 3, 2021) (same); *LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 WL 1283325, at *10 (N.D. Cal. Mar. 26, 2013) (danger of collusion undercut by plaintiff's counsel's offer to reduce fee request by directing $200,000 to *cy pres*); *Harris v. Vector Mktg. Corp.*, No.

C-08-5198 EMC, 2011 WL 4831157, at *7 (N.D. Cal. Oct. 12, 2011) (inference of unfairness could have been avoided by diverting unawarded attorney's fees to *cy pres*).

In addition, given that there are over 1.8 million class members, dividing unawarded attorneys' fees equally among class members would result in *de minimis* additional recovery for each class member. *See Easysaver,* 906 F.3d at 761-62 (no abuse of discretion in approval of distribution of $3 million in unclaimed settlement funds to *cy pres* recipients where distribution of this amount to more than 1 million class members would result in "de minimis" recovery.) Directing any such funds to a *cy pres* recipient thus puts them to a more beneficial use for consumers similarly situated to the Class.

### 4.    *The Proposal Treats Class Members Equitably.*

The final Rule 23(e)(2) factor turns on whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23(e)(2)(D), 2018 Advisory Committee Notes. Thus, under this factor, courts consider whether the Settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *8 (N.D. Cal. Dec. 18, 2018); *see also True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010).

No such concerns exist in this case. All Class Members, no matter which of the four subject websites they bought from, what they bought, or whether they still have their order confirmations, will all be treated the same: they will each receive a $10 Gift Card with free shipping for each brand's website from which they bought merchandise. *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD, 2020 WL 520616, at *7 (S.D. Cal. Jan. 31, 2020) (factor met at preliminary approval because "the settlement treats each class member equally" where each class member could make the same claim). This equal treatment makes sense because all Class Members were uniformly exposed to the

same deceptive discounting practice during the respective class period.

That the Settlement provides for the class representatives to each receive a $5,000 incentive award does not improperly grant them preferential treatment. Rather, it is an appropriate amount to compensate them for their time and dedication to the case, and the total payment for the three class representatives of $15,000 constitutes a miniscule fraction of the total minimum monetary value of the settlement of $32.5 Million. *See Online DVD*, 779 F.3d at 947-48 (upholding $5,000 incentive awards that were 417 times larger than $12 gift cards because the awards were only 0.17% of the total $27 Million settlement fund); *Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO (SPx), 2019 WL 13027266, at *7 (C.D. Cal. Dec. 30, 2019) ($5,000 incentive award "presumptively reasonable").

**B.    Provisional Certification of the Settlement Class Should Be Granted.**

*1.    The Proposed Class Satisfies the Prerequisites of Rule 23(a)*

**Numerosity.**  Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable . . ."  Here, this requirement is easily met because there are in excess of 1.8 million class members. (Stip. at ¶12, Ex. 1.)

**Commonality.**  Rule 23(a)(2) requires that the case present "questions of law or fact common to the class." The putative class must show that their claims "depend upon a common contention of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality has been "construed permissively," and its requirements deemed "minimal." *Hanlon*, 150 F.3d at 1019-20. It does not "mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) (internal quotations omitted).

For their claims under the UCL, FAL, and CLRA, Plaintiffs need only "show that members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (internal quotations omitted). "This inquiry does not require

individualized proof of deception reliance and injury." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) (internal quotations omitted).

Similarly, Plaintiffs' California consumer protection claims based on the *omission* of material information are also actionable. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *see also Warner Const. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294 (1970) (summarizing the three situations under California law where there is a duty to disclose in the absence of fiduciary or confidential relations).

Within this legal framework, Plaintiffs' claims share numerous overarching questions of law or fact. The key common questions driving this litigation include whether Defendants advertised reference prices and discounts off the reference prices during the class periods, whether Defendants' representations and omissions were likely to deceive, whether they were material, whether Defendants owed a duty to disclose, and whether Plaintiffs and the Class are entitled to damages. (*See* BH D.E. 14 at ¶41.) These questions are capable of classwide resolution. In other words, determining the truth or falsity of one or more of these questions will resolve issues "central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. This case, therefore, satisfies commonality.

**Typicality.**   Rule 23(a)(3) requires the putative class to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." To meet the typicality requirement, Plaintiffs must show that: (1) "other members have the same or similar injury"; (2) "the action is based on conduct which is not unique to the named plaintiffs"; and (3) "other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).

Here, Plaintiffs' and the putative class members' claims all arise from Defendants' uniform misrepresentations and/or failures to disclose material facts. Each of the class representatives, just like all other Class Members, purchased Defendants' products during the class period, were exposed to the same deceptive reference prices and promotions on Defendants' websites, did not receive the truth from Defendants about the reference prices and promotions, and relied on the inflated reference prices and promotions in making their

purchases. (Khan Decl., ¶¶2-9; Hilton Decl., ¶¶2-9; Lee Decl., ¶¶2-9.)

*Adequacy.* Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class." "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1020).

As explained above and established by the declarations of the class representatives and Class Counsel, both questions are easily satisfied. (Khan Decl., ¶¶10-15; Hilton Decl., ¶¶10-15; Lee Decl., ¶¶10-15; Almadani Decl., ¶¶2-10; Ibrahim Decl., ¶¶2-35.)

### 2. The Proposed Class Satisfies Rule 23 Predominance and Superiority

*Predominance.* As noted, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members . . ." This "inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). "[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Id.* "When common questions present a significant aspect of a case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022. Here, common issues predominate both as to questions of liability and damages.

### Common Issues Relating to Liability Predominate

Common issues predominate over individualized inquiries as it relates to Defendants' liability for Plaintiffs' claims for violation of the UCL, FAL, and CLRA, and for common law fraud and unjust enrichment. As alleged in the operative complaints, Plaintiffs' claims are premised on whether the reference prices and sales advertised on

each of the three websites at issue are false or misleading. (BH D.E. 14 at ¶¶1, 15-19; PLT D.E. 15 at ¶¶1, 15-20; NG D.E. 15 at ¶¶1, 14-18.) According to Plaintiffs, the reference prices advertised on the sites are misleading and deceptive because they do not represent the former price at which the product sold in the recent past. (*Id.*)

Here, the misleading reference prices (also referred to by Defendants as "original" or "full" prices) were *uniformly* displayed on the sites across *all* products sold during the class periods at issue. (NC Dep. at 37:22-39:5, 75:18-22, 129:7-18; MB Dep. at 50:23-51:23, 76:23-77:15, 92:1-92:3; SB Dep. at 47:8-48:13; Ibrahim Decl., Ex. 156.) Similarly, the misleading sitewide promotions available on the sites for a given day were advertised on the home landing page of each of the sites during the class periods. (NC Dep. at 61:9-13, 75:18-22, 97:19-98:13; JH Dep. at 30:8-18; MB Dep. at 28:4-10, 37:24-38:24, 56:20-57:4; SB Dep. at 45:2-13, 54:1-16, 98:10-18.) The same reference prices and promotions were displayed on the websites to all consumers in the U.S. (NC Dep. at 28:22-29:24, 61:9-13, 97:19-98:13; JH Dep. at 29:19-30:3; MB Dep. at 37:24-38:24, 56:20-57:4.)

Indeed, common evidence in the form of Defendants' promotional calendars, enables Plaintiffs to demonstrate the specific false discounts to which the Class was exposed on a daily basis for the class period for all four U.S. Websites. (NC Dep. at 61:9-62:1, 75:18-76:4, 94:8-95:1, 97:19-98:13, 148:18-149:17; JH Dep. at 39:9-18; MB Dep. at 34:1-16, 37:24-38:24; SB Dep. at 45:2-13, 54:1-16, 98:10-18; Ibrahim Decl., Exs. 43-46, 48-49, 71-74.). Common evidence in the form of sales transaction data from the class period for the four subject websites is also available. It captures every sales transaction, reference price advertised to the purchaser for each transaction, the actual amount paid by the purchaser, and other pertinent information. (Stip. at ¶¶2-7.) Defendants also produced an email showing that the pricing and marketing strategy described above comes directly from the Chairman of the parent company. (Ibrahim Decl., Ex. 7.)

As is also established from discovery, the daily sale or promotion Defendants typically advertise on their websites are a sitewide percentage off discount (e.g., "50% OFF EVERYTHING") that is automatically applied or applied after the customer enters a

promo code displayed on the site, or an "up to" a certain percentage off discount for all products on the sites (e.g., "UP TO 70% OFF EVERYTHING"). (JH Dep. at 31:16-32:22; SB Dep. at 118:7-16, 119:2-15.) Importantly, where Defendants run an "up to" promotion, Defendants still provide sitewide discounts relatively consistent with the deep discounts customarily offered. (Stip. at ¶¶8-11.) In short, deep sales were and are perpetually run on the U.S. Websites.

Also important to the predominance analysis, no consumers received any disclosure telling them the truth, namely, that the advertised reference prices are not former prices, that advertised discounts are not based on former prices, and that the references prices are merely Defendants' opinion of the full retail value of the product at issue. (NC Dep. at 113:1-14, 118:2-17, 123:3-17, JH Dep. at 19:6-19, 20:6-21:21, 25:4-17, 44:3-9; MB Dep. at 143:8-25, 148:7-19; SB Dep. at 47:8-49:13, 55:10-25, 57:6-14, 88:15-91:1; Ibrahim Decl., Exs. 39, 42, 134, 142, 156, 158, 159.)

As a result, relevant to Plaintiffs' statutory claims and common law fraud claim based on affirmative misrepresentations, *all putative class members were exposed to the same false representations*. Likewise, relevant to Plaintiffs' statutory claims and common law fraudulent concealment claims based on *omissions* of material facts, *no putative class members were exposed to any disclosures explaining the truth about the advertised reference prices and promotions on the sites*.

Furthermore, common issues predominate because discovery confirms that Defendants' pricing practices were, and are, misleading to consumers. The confirmed reality is that the products offered for sale on the sites *always* sell at a discount *not* based on actual, former prices. According to Defendants, other than the first week or two when an item is first introduced to their sites, that item would not typically sell at the full reference price for the remainder of the time it was offered for sale on the sites, which could be for months or years.[8]  (NC Dep. at 113:1-115:5, 135:15-136:12; JH Dep. at 39:19-

---

[8] The only exception to this that were identified were by the PLT witnesses who pointed out there were infrequent scenarios where customers forgot to enter the promotion code to apply the discount available on a given day or there were technical glitches. (NC Dep. at 68:11-70:3; JH Dep. at 38:1-19,)

40:2, 54:6-12, 54:20-55:6, 70:13-71:14; SB Dep. at 83:15-24, 85:16-86:2, 92:8-14.) Defendants did not include a disclaimer to consumers on their sites explaining that the reference prices are not intended to be former prices; instead, according to Defendants, the advertised reference prices merely constitute Defendants' *opinion* of what the full retail value of their products are, which are based on factors that have very little, if anything, to do with their own former prices. (JH Dep. at 19:6-19, 20:6-21:21, 25:4-17, 44:3-9, 65:3-17; SB Dep. at 88:15-91:1.) This is significant because Defendants' items are sold exclusively through their own websites. (JH Dep. at 67:9-68:3; MB Dep. at 26:14-27:7.) Thus, they cannot claim that the reference prices are based on the market price of what other companies charge for their items. *People v. Superior Court (J.C. Penney Corp.)*, 34 Cal. App. 5th 376, 409 (2019) ("[W]hen a retailer sells in-house goods, the retailer's *actual* prices regarding those goods constitute their market prices" and hence, the retailer's actual prices "provide an adequate basis for determining whether the retailer's advertised former price claims comply with section 17501.") (emphasis in original).

Finally, although each of Plaintiffs' claims require proof of reliance, it is well-settled that Plaintiffs need not demonstrate individualized reliance on specific misrepresentations. *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009). Rather, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* The test for materiality is whether "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* at 327. These principles also apply to Plaintiffs' common law and statutory claims premised on omissions. *See Daniel,* 806 F.3d at 1225.

Here, Defendants concede that they engage in the pricing and discount practices at issue in this case to drive traffic to their sites and increase sales. (NC Dep. at 98:14-99:4; MB Dep. at 33:11-19.) The survey findings of Plaintiffs' marketing expert also confirms that Defendants' representations concerning their pricing and discounts are material to customers' purchasing decisions, a concept confirmed by previous studies and literature. (Tregillis Decl. at ¶¶22-29.) Indeed, there is no plausible argument that pricing is not

material to purchasing decisions. *Konik v. Cable*, No. CV 07-763 SVW (RZX), 2009 WL 10681970, at *18 (C.D. Cal., Dec. 2, 2009) ("Certainly an objectively reasonable man would consider the price of the cable service as a critical factor in deciding whether to become a TWC subscriber.") (citing *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 277 (2001) ("The price almost always is the most important term of the bargain.")).

### *Common Issues Relating to Damages Predominate*

At least where class certification is contested, the plaintiffs are merely required to show that class damages match their theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 1433 (2013); *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (explaining that *Comcast* stands "only for the proposition that 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability'" and any "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages.") (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013). "[T]he mere fact that there might be differences in damage calculations is not sufficient to defeat class certification." *Pulaski,* 802 F.3d at 987. "Class wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Lambert*, 870 F.3d at 1183 (quoting *Pulaski*, 802 F.3d at 989).

Here, Plaintiffs submit a damage analysis of their highly qualified and experienced expert economist, Christian Tregillis. Mr. Tregillis performed a calculation of the aggregate estimated losses of the Class utilizing the findings of a survey prepared by Plaintiffs' marketing expert. (Tregillis Decl., ¶¶30-52.) He calculated the estimated price premium between what consumers who were exposed to the deceptive reference prices and discount promotions would be willing to pay for Defendants' products versus what they would pay if they were told the true reference price (i.e., the prices at which Defendants typically sold the product in the recent past) and true discount. (*Id.*) He also

confirmed that the methodology is tied to Plaintiffs' theory of liability. (*Id.* at ¶¶25, 32, 40.) Plaintiffs' damage methodology therefore satisfies the predominance requirement under *Comcast*. *See Lambert*, 870 F.3d at 1184 (the question at class certification is only whether the plaintiff "has presented a workable method."); *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 543 (N.D. Cal. 2015) ("At class certification, Plaintiffs need only show that damages can be determined and attributed to their theory of liability.")

    **Superiority.**   Rule 23(b)(3) also requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The class action method is considered superior if "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Here, due to the sheer number of Class Members (over 1.8 million) combined with the relatively small amount of damages at issue for each Class Member, it is not economically feasible to litigate this case through individual lawsuits.

    For the foregoing reasons, Plaintiffs have satisfied the requirements of Rule 23(a) and (b)(3). Plaintiff's request to certify the proposed settlement classes should be granted.

### 3.   *Injunctive Relief Class Prerequisites Under Rule 23 Are Satisfied*

    Plaintiffs also meet the requirements of Rule 23(b)(2), which permits certification for injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Predominance and superiority are self-evident" under Rule 23(b)(2). *Dukes*, 564 U.S. at 363. Here, Plaintiffs' available remedies include injunctive relief. Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(2). Because Defendants are required to make changes to the websites that would be uniformly applicable to every Class Member who visits the site, the injunctive relief here applies "generally to the class." The Settlement thus provides meaningful injunctive relief to redress Plaintiffs' claims. Absent the Settlement, this type of relief would only be available to the Class after prevailing at trial.

### C.    The Notice Plan Should Be Approved.

"Before the district court approves a class settlement under Rule 23(e), it is 'critical' that class members receive adequate notice." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019). For notice to a class proposed to be certified for purposes of settlement under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice may be made by United States mail, electronic means, or another type of appropriate means. *Id.* "The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." *Id.*

Plaintiffs' notice program satisfies these requirements. KCC, a highly experienced class administration firm, will be the settlement administrator. (Reed Decl., ¶¶5-6.) Because Defendants are online-only retailers, Class Members can be adequately notified of the Settlement by email at the address on file with Defendants. (*Id.*, ¶8-9; Settlement at §3.4(b).) Where there is no email address or the settlement administrator determines that notice has not been delivered by email, that Class Member will receive a postcard notice by mail. (*Id.*, ¶10-13; Settlement at §3.4(c).) Publication notice will also be disseminated on the *Los Angeles Times* digital edition once a week for four consecutive weeks to satisfy the CLRA requirements. (*Id.*, ¶14; Settlement at §§1.21, 3.4(d)); Cal. Civ. Code § 1781(d) & (e). KCC will also create a settlement website posting a copy of the Full Notice (Settlement at Ex. C), operative complaints for each of the Actions, Settlement, and Preliminary Approval Order. (*Id.*, ¶9, 19; Settlement at §3.4(a).) Finally, the settlement administrator will handle dissemination of the notice to public officials required by CAFA. (Settlement at § 3.3.)

The notice procedures will accurately inform Class Members of the salient terms of the Settlement, the Class to be certified, the final approval hearing, and the rights of all parties. The various notices all provide information on how Class Members can object and opt out of the Class, along with information about appearing at the final approval hearing. (Settlement at Exs. B-E.) Class Members are informed about how they can receive a Gift Card—namely, that they will automatically receive their Gift Card(s) if they do not opt out. (Settlement at Ex. C at 5-7.) They are informed about the amount of the class representatives' proposed incentive awards and Class Counsels' attorneys' fee request. (Settlement at Ex. C at 6.) The notice also provides the contact information of Class Counsel. (Settlement at Ex. C at 7-8.) The Parties here have created the forms of notice, which will satisfy both the substantive and manner of distribution requirements of Rule 23 and due process. (*See* Settlement, Exs. B-E, I.)

In sum, these proposed methods of giving notice are appropriate because they provide a fair opportunity for Class Members to obtain full disclosure of the conditions of the Settlement and to make an informed decision regarding the proposed Settlement. Thus, the notices and notice procedures amply satisfy the requirements of due process.

But moreover, the Settlement goes beyond simply notifying the class of the Settlement and how they can receive the benefits of the Settlement. It requires Defendants and the Settlement Administrator to remind Class Members through multiple avenues that they have received their Gift Cards. (Settlement at §§ 3.4(f)-(h), Ex. J.)

## VI.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court enter the [Proposed] Preliminary Approval Order attached as Exhibit A to the Settlement.

Dated: May 23, 2022                    Respectfully submitted,

                                       ALMADANI LAW

                                       /s/ Yasin M. Almadani
                                       Yasin M. Almadani, Esq.


                                       AI LAW, PLC

                                       /s/ Ahmed Ibrahim
                                       Ahmed Ibrahim, Esq.

                                       *Attorneys for Plaintiffs Individually and*
                                       *On Behalf of All Others Similarly Situated*

41