ALMADANI LAW
Yasin M. Almadani, State Bar No. 242798
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

AI LAW, PLC
Ahmed Ibrahim, State Bar No. 238739
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph.: 949-266-1240
Fax: 949-266-1280
aibrahim@ailawfirm.com

*Attorneys for Plaintiffs Farid Khan,
Haya Hilton, and Olivia Lee Individually
and on Behalf of All Others Similarly Situated*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FARID KHAN, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, and DOES 1-10, inclusive,<br><br>Defendants. | **CASE NO.: 2:20-cv-03332-GW (JEMx)**<br><br>Consolidated for Pretrial Purposes with:<br>No. 2:20-cv-04658-GW-JEM<br>No. 2:20-cv-04659-GW-JEM<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing Information:**<br><br>Date: December 19, 2022<br>Time: 8:30 a.m.<br>Courtroom: 9D<br>Judge: Hon. George H. Wu<br><br>Action Filed: April 9, 2020 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE THAT** on December 19, 2022 at 8:30 a.m. or as soon thereafter as counsel may be heard in Courtroom 9D of the above-captioned Court located on the 9th Floor at 350 West 1st Street, Los Angeles, California 90012, Plaintiffs Farid Khan, Haya Hilton, and Olivia Lee, on behalf of themselves and all others similarly situated ("Plaintiffs"), by and through their undersigned counsel of record, will and hereby do move pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for the Court to grant final approval of the Class Action Settlement Agreement and Release (the "Settlement") attached as Exhibit 1 to the concurrently filed Omnibus Declaration of Ahmed Ibrahim in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs, and Service Awards.

Specifically, Plaintiffs respectfully request that the Court (1) grant final approval of the Settlement; (2) finally certify the Settlement Class; (3) authorize the Settlement Administrator to administer the settlement benefits to members of the Class; (4) order Defendants to comply with the injunctive relief described in the Settlement; (5) enter the final order and judgment in the form attached as Exhibit H to the Settlement; and, (6) rule on Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards.

This motion will be heard concurrent with Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards, which will be separately filed.

This motion is made on the grounds that Plaintiffs have satisfied all the requirements for final approval of the proposed class action settlement under Rule 23(e).

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Omnibus Declaration of Ahmed Ibrahim in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs, and Service Awards (and exhibits thereto) ("Ibrahim Decl."), the Omnibus Declaration of Yasin Almadani in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs, and Service Awards (and exhibits thereto), the Declaration of Zach Cooley Regarding Execution of

Class Notice Plan (and exhibits thereto), the Order Granting Preliminary Approval of Class Settlement (and all amendments thereto) (D.E. 158, 162, 187),[1] the Court's Tentative Ruling on Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (later adopted as the final ruling of the Court) (D.E. 148, 157), the pleadings and papers on file herein, and any other written and oral arguments that may be presented to the Court.

Plaintiffs also rely on the evidence previously filed with the Court in connection with their Motion for Preliminary Approval of Class Action Settlement, which Plaintiffs incorporate herein by this reference. Plaintiffs have not re-filed this evidence to avoid duplicative filings and excessive materials for the Court and its staff. This evidence consists of the following:

1.     Declaration of Ahmed Ibrahim in Support of Motion for Preliminary Approval of Class Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice, and exhibits thereto (D.E. 133-1, 138-142);

2.     Stipulation in Support of Motion for Preliminary Approval of Class Settlement (D.E. 133-2, 143);

3.     Declaration of Yasin M. Almadani in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 133-3);

4.     Declaration of Christie K. Reed Regarding Proposed Class Notice Plan (D.E. 133-4);

5.     Declaration of Farid Khan in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 133-5);

6.     Declaration of Haya Hilton in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement

---

[1] "D.E." denotes "Docket Entry" followed by a docket control number. Page number cites refer to the pagination reflected in the blue PACER header at the top of each page.

*Plaintiffs' Motion for Final Approval of Class Settlement*                    *Case No. 20-cv-03332-GW (JEMx)*

1    Class, and Approval of Procedure For and Form of Notice (D.E. 133-6);

2           7.     Declaration of Olivia Lee in Support of Unopposed Motion for Preliminary

3    Approval of Class Action Settlement, Provisional Certification of California Settlement

4    Class, and Approval of Procedure For and Form of Notice (D.E. 133-7);

5           8.     Declaration of Christian Tregillis, CPA, ABV, CFF, CLP, in Support of

6    Motion for Preliminary Approval of Class Settlement (D.E. 144); and

7           9.     Supplemental Declaration of Yasin M. Almadani in Support of Motion for

8    Preliminary Approval of Class Action Settlement, Provisional Certification of California

9    Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 156).

Dated: November 14, 2022              Respectfully submitted,

                                      ALMADANI LAW

                                      */s/ Yasin M. Almadani*
                                      Yasin M. Almadani, Esq.


                                      AI LAW, PLC

                                      */s/ Ahmed Ibrahim*
                                      Ahmed Ibrahim, Esq.

                                      *Attorneys for Plaintiffs Individually and*
                                      *On Behalf of All Others Similarly Situated*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

I.    INTRODUCTION...........................................................................................1

II.   BACKGROUND AND PROCEDURAL HISTORY .......................................4

   A.   THE LAWSUITS.................................................................................4

   B.   DEFENDANTS' MOTION TO DISMISS .................................................4

   C.   WRITTEN DISCOVERY, DEPOSITIONS, AND WITNESS INTERVIEWS...................5

   D.   SETTLEMENT NEGOTIATIONS .........................................................6

   E.   THE TERMS OF THE SETTLEMENT ...................................................8

     1.   *The Settlement Class.*..............................................................8

     2.   *Settlement Consideration*........................................................8

   F.   THE COURT GRANTED PRELIMINARY APPROVAL OF THE SETTLEMENT .........................12

   G.   THE SETTLEMENT ADMINISTRATOR DISSEMINATED NOTICE TO THE CLASS AND THE REACTION OF THE CLASS HAS BEEN FAVORABLE ................................................14

III.  LEGAL STANDARD .................................................................................16

IV.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL....................18

   A.   THE SETTLEMENT CLASS SHOULD REMAIN CERTIFIED......................18

   B.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE .....................18

     1.   *The Strength of the Case.*.......................................................18

     2.   *The Risk, Expense, Complexity, and Likely Duration of Further Litigation.*...............19

     3.   *The Risk of Maintaining Class Action Status Throughout Trial.* ................................21

     4.   *The Amount Offered in the Settlement.*.................................21

     5.   *The Extent of Discovery Completed and the Stage of the Proceedings.*.......................22

     6.   *The Experience and Views of Counsel.*.................................22

     7.   *The Presence of a Governmental Participant.* ........................23

     8.   *The Reaction of the Members of the Class to the Proposed Settlement.* .......................23

i

1

9.     *The Class Is Adequately Represented by Plaintiffs and Counsel (Rule 23(e)(2)(A))* ... 23

2

10.     *The Proposal Was Negotiated at Arm's Length (Rule 23(e)(2)(B))* ......................... 24

3

11.     *The Relief for the Class is Adequate (Rule 23(e)(2)(C))*........................................... 25

4

12.     *The Proposal Treats Class Members Equitably (Rule 23(e)(2)(D))*......................... 31

5

C.   CLASS MEMBERS RECEIVED ADEQUATE NOTICE............................................................ 32

6

**V.   CONCLUSION**..............................................................................................................**33**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*In re Bluetooth Headset Prods. Liab. Litig.,*
654 F.3d 954, 947 (9th Cir. 2011) ...................................................... *passim*

*Briseno v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) .................................................... 26

*Campbell v. Facebook, Inc.,*
951 F.3d 1106 (9th Cir. 2020) .................................................... 16

*Chowning v. Kohl's Dep't Stores, Inc.,* No. CV 15-08673 RGK(SPx),
2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ........................................... 19

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) .................................................. 17

*Eisen v. Carlisle & Jacqueline,*
417 U.S. 156 (1974) ...................................................... 32

*Elkies v. Johnson & Johnson Servs., Inc.,* No. CV 17-7320-GW(JEMx),
2020 WL 10055593 (C.D. Cal. June 22, 2020) ........................................... 28

*In re Google Inc. Street View Elec. Commc'ns Litig.,*
21 F.4th 1102 (9th Cir. 2021) ........................................... 32

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) ........................................ 16,17,18

*Harris v. Vector Mktg. Corp.,* No. C-08-5198 EMC,
2011 WL 4831157 (N.D. Cal. Oct. 12, 2011) ........................................... 30

*Hefler v. Wells Fargo & Co.,* No. 16-cv-05479-JST,
2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ........................................... 31

*LaGarde v. Support.com, Inc.,* No. C12-0609 JSC,
2013 WL 1283325 (N.D. Cal. Mar. 26, 2013) ........................................... 30

*Lane v. Facebook, Inc.,*
696 F.3d 811 (9th Cir. 2012) ........................................... 21

*In re Lenovo Adware Litig.,* No. 15-MD-02624-HSG,
2019 WL 1791420 (N.D. Cal. Apr. 24, 2019) ........................................... 18

*Martin v. Marriott Int'l, Inc.,* No. CV 18-00494 JAO-RT,
2021 WL 4888973 (D. Haw. Oct. 19, 2021) ........................................... 30

*In re Mego Fin. Corp. Sec. Litig.,*
213 F.3d 454 (9th Cir. 2000) ........................................... 21,22

*Miguel-Sanchez v. Mesa Packing, LLC,* No. 20-CV-00823-VKD,
    2021 WL 1736807 (N.D. Cal. May 3, 2021) ............................................. 30

*Nat'l Rural Telecommunications Cooperative v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) ........................................................ 19,22

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir.1982) ................................................................. 16,17

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2015) ................................................................. 32

*In re Pacific Enters. Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ................................................................... 23

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414 (1968) ............................................................................... 21

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ................................................................. 21,32

*Shames v. Hertz Corp.,* No. 07-CV-2174-MMA(WMC),
    2012 WL 5392159 (S.D. Cal. 2012) ..................................................... 29

*Silber v. Mabon,*
    18 F.3d 1454 (9th Cir. 1994) ................................................................. 32

*Spann v. J.C. Penney Corp.,*
    211 F. Supp. 3d 1244–61 (C.D. Cal. 2016) .......................................... 29,30

*True v. Am. Honda Motor Co.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ................................................ 31

## FEDERAL STATUTES

28 U.S.C. § 1715 ................................................................................ 15

28 U.S.C. § 1711 ................................................................................ 14

## FEDERAL RULES

Fed. R. Civ. P. 12 ......................................................................... *4,5,18*

Fed. R. Civ. P. 23.......................................................................... *passim*

Fed. R. Civ. P. 30 ............................................................................... 6

iv

1

## STATE STATUTES

2

Cal. Bus. & Prof. Code §§ 17200, et seq. ........................................................... 4

Cal. Bus. & Prof. Code §§ 17500, et seq. ........................................................... 4

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Plaintiffs' Motion for Final Approval of Class Settlement*                    *Case No. 20-cv-03332-GW (JEMx)*

# I.    INTRODUCTION

On May 20, 2022, Plaintiffs Farid Khan, Haya Hilton, and Olivia Lee, on behalf of themselves and all others similarly situated, on the one hand ("Plaintiffs"), and Defendants Boohoo Group PLC ("Boohoo Group"), Boohoo.com USA, Inc., Boohoo.com UK Limited, Prettylittlething.com USA, Inc., Prettylittlething.com Limited, NastyGal.com USA, Inc., and Nasty Gal Limited (collectively "Defendants"), on the other hand, entered into a Class Action Settlement Agreement and Release (the "Settlement"). (*See* Ibrahim Decl. Ex. 1.) Plaintiffs now move for final approval of the Settlement.

Boohoo Group is the ultimate parent of Boohoo.com UK Limited, PrettyLittleThing.com UK Limited, and Nasty Gal Limited, which are internet retailers selling women's and men's clothing, footwear, accessories, and beauty products direct to consumers throughout the world, including the United States. Boohoo Group owns the three brands that are the subject of this litigation: Boohoo (which includes BoohooMAN) ("BH"), PrettyLittleThing ("PLT"), and Nasty Gal ("NG"). This litigation thus involves three class action lawsuits arising out of Defendants' pricing practices on their U.S. websites for each of these brands (collectively, the "Actions").[2]

Plaintiffs contend that during the respective class periods for each of the Actions, Defendants perpetually advertised nearly all the products on their U.S. websites with deceptive original prices (referred to in the complaints as "reference prices"). Plaintiffs allege the reference prices are deceptive because, as discovery in the Actions also confirms, Defendants rarely sell their merchandise at the reference prices. Instead, Defendants' reference prices are significantly discounted on a near daily basis by sitewide percentage-off "promotions" or sales (e.g., "50% Off Sitewide" or "Up to 70% Off Everything"). Customers are thus deceived into a false belief that they are receiving a deep discount, when in reality, they are receiving no such discount. As a result, Plaintiffs allege in the Actions that Defendants have misled customers by falsely inflating the value of their

---

[2] The three lawsuits are: (1) *Khan v. Boohoo.com USA Inc.*, No. 2:20-cv-03332-GW-JEMx ("**BH Action**"), (2) *Hilton v. PrettyLittleThing.com USA Inc.*, No. 2:20-cv-04658-GW-JEMx ("**PLT Action**"), and (3) *Lee v. NastyGal.com USA Inc.*, No. 2:20-cv-04659-GW-JEMx ("**NG Action**").

products and induced class members to buy items they would have never bought, or pay more than they otherwise would have paid, had they known the truth about Defendants' discounting practices. Defendants make no admissions of fact or law and deny liability.

The parties have entered into a Settlement that provides excellent relief for the classes of California purchasers from the U.S. websites of the three brands at issue (hereafter, the "Class Members" or the "Class"). The Settlement provides for each Class Member to receive a $10 gift card with free shipping (additionally valued at $7.28 per Class Member, for a total value of $17.28 per gift card) to use towards the purchase of any item on the site from which they made a purchase. The gift cards have ultimate flexibility. There are no expiration dates, blackout dates, minimum purchase requirements, or fees, and they may be used in conjunction with other offers and promotions. There are no restrictions on transferability and, when they are transferred to others, multiple gift cards may be combined together (i.e., "stacked"). Class Members who bought from more than one of the subject websites may receive multiple gift cards—one from each site from which they made a purchase (BH, PLT, and NG). These websites consistently include thousands of items available for $10 or less across a wide variety of product categories and styles, meaning that Class Members can use their gift cards without incurring any out-of-pocket expense or apply the gift cards toward a more expensive purchase, all with free shipping. The Class presently consists of more than 1.5 million individuals who collectively will be receiving over 1.9 million gift cards. Thus, the monetary value of the Settlement based on the gift card and free shipping is more than $33 Million to date.

One of the most important features of the Settlement is that, unlike other settlements where receipt of the benefits are dependent on the filing of a timely claim (usually resulting in less than 10% of the class benefiting), in this Settlement, all Class Members who do not affirmatively opt out will automatically receive the gift cards via email. Because the gift cards never expire, the benefits of the gift cards will forever remain with Class Members until they use them. There is no possibility of reversion to Defendants.

Even more importantly, the Settlement also provides impactful injunctive relief to

prevent future harm to California consumers. Defendants are required to fully disclose to California site visitors that their reference prices are not based on former prices, but rather are merely Defendants' own opinion of the full retail value of the item. Consumers thus will no longer be misled into believing that Defendants' reference prices are supposed to reflect the price at which the item was sold in the recent past. Under the Settlement, the required disclosures must be conspicuously displayed in bold font throughout the sites in multiple places wherever reference prices and discounts off reference prices are advertised. (Settlement, Ex. G) Moreover, these critical changes are not temporary; they must be maintained forever. The present value of this injunctive relief for the first five years alone is valued at an estimated $79.5 Million. (D.E. 144 (Tregillis Decl.) at ¶69.)

Class Counsels' proposed attorneys' fees and costs are a small fraction (4%) of the Settlement's monetary and non-monetary value—far less than the 25% benchmark—with no reversion to Defendants. The proposed $5,000 incentive awards to the class representatives are well within the norm.

In view of the risks of proceeding with this litigation through class certification, summary judgment, trial, and appeal, this is an excellent result for the Class.

The Court painstakingly reviewed the Settlement and the supporting materials provided by Plaintiffs and, on June 2, granted preliminary approval of the Settlement. (D.E. 158.) It did so after carefully considering all the same factors under Rule 23(e)(2) it must now again consider less than six months after its detailed and thorough ruling. (*See* D.E. 148.) No material facts have changed since that ruling that would justify the Court altering its analysis. The Class has now been provided notice of the Settlement. To date, no objections to the Settlement have been submitted and there have been only 21 requests for exclusion out of approximately 1.5 class members having received notice.

Accordingly, Plaintiffs respectfully request the Court to: (1) grant final approval of the Settlement; (2) finally certify the Settlement Class; (3) authorize the Settlement Administrator to administer the settlement benefits to members of the Class; (4) order Defendants to comply with the injunctive relief described in the Settlement; (5) enter final

order and judgment in the form attached as Exhibit H to the Settlement; and (6) rule on Plaintiffs' concurrently filed Motion for Attorneys' Fees, Costs, and Service Awards.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    The Lawsuits

The operative complaints in the Actions were filed on August 7, 2020, namely, the Second Amended Complaint ("SAC") in the BH Action, the First Amended Complaint ("FAC") in the PLT Action, and the FAC in the NG Action. (*See* BH D.E. 14; PLT D.E. 15; NG D.E. 15.) Plaintiffs assert claims in each of the Actions for violations of (1) the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), (2) the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"), and (3) the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), as well as (4) fraud (intentional misrepresentations), (5) fraudulent concealment, and (6) unjust enrichment. Plaintiffs seek damages and injunctive relief. On November 30, 2020, the Court consolidated the three cases for pretrial purposes and the parties have therefore made all their filings in the BH Action. (D.E. 38.)

### B.    Defendants' Motion to Dismiss

On September 4, 2020, Defendants filed a motion to dismiss and strike the operative complaints in each of the three Actions, pursuant to Rule 12(b)(2), 12(f), and 12(b)(6) of the Federal Rules of Civil Procedure. (*See*, *e.g.*, BH D.E. 22 and 25.) Defendants' motion covered a wide range of issues, including jurisdiction, standing, and pleading sufficiency. Defendants argued, among other things, that (1) the Court lacked personal jurisdiction over Boohoo Group, (2) Plaintiffs sued the wrong entities, (3) all non-California class allegations should be stricken, (4) Plaintiffs lacked standing, (5) Plaintiffs' pre-litigation CLRA notices were non-compliant, and (6) Plaintiffs' claims were not properly pled. (*See* D.E. 22 at 6-7.) Plaintiffs filed a comprehensive opposition, and a detailed declaration full of exhibits contesting Defendants' personal jurisdiction arguments. (D.E. 27.)

On November 16, 2020, the Court denied Defendants' Rule 12(f) motion to strike and Rule 12(b)(6) motion to dismiss in its entirety. (D.E. 34 at 6-16.) With regards to the

personal jurisdiction motion under Rule 12(b)(2), the Court found Plaintiffs "produced enough reason for the Court to conclude that they are entitled to an opportunity to take jurisdictional discovery to solidify a basis for a proper assertion of personal jurisdiction over" Boohoo Group. (D.E. 34 at 8-9.) The Court thus deferred ruling until after Plaintiffs conducted jurisdictional discovery.

After several status conferences and joint status reports, the Court established the parameters of allowable jurisdictional discovery and set a further briefing schedule and hearing to address personal jurisdiction. (D.E. 52.) On December 30, 2020, Plaintiffs propounded interrogatories, document demands, and requests for admission related to personal jurisdiction. (Ibrahim Decl. ¶10.) However, due to these considerable efforts, on January 15, 2021, Boohoo Group dropped its personal jurisdiction challenge. (D.E. 57.)

## C.    Written Discovery, Depositions, and Witness Interviews

In early 2021, Plaintiffs served written class discovery on Defendants in each of the Actions consisting of two sets of interrogatories and document demands, and one set of requests for admission. (Ibrahim Decl. ¶11.) Due to the inadequate responses, Plaintiffs were forced to file a lengthy motion to compel further discovery. (D.E. 67.) In April 2021, Magistrate Judge McDermott issued two separate orders granting Plaintiffs' motion, in significant part, and denying Plaintiffs' motion, in certain respects. (D.E. 71, 73.)

In March 2021, Plaintiffs responded to written class discovery consisting of interrogatories, document demands, and requests for admission. (Ibrahim Decl. ¶12.) Defendants also filed a motion to compel discovery. (D.E. 76.) However, on July 19, 2021, Judge McDermott denied the motion in its entirety, the only exception being that Plaintiffs were ordered to provide a verification confirming they had no documents responsive to one document demand. (D.E. 83.)

Not including voluminous spreadsheets and data, Defendants produced more than 546,000 pages of documents responsive to Plaintiffs' document demands. (Ibrahim Decl. ¶14.) Class Counsel and their team reviewed these documents to conduct depositions and prepare their class certification motion. (*Id.*)

In the meantime, in June 2021, Plaintiffs noticed the deposition of Boohoo Group's Executive Chairman. (Ibrahim Decl. ¶15.) On July 7, 2021, Defendants filed a motion for protective order to quash the deposition, which Plaintiffs opposed. (D.E. 78.) On July 28, 2021, Judge McDermott again sided with Plaintiffs, rejecting Defendants' arguments and concluding that "Plaintiffs have presented evidence that [the Executive Chairman] has unique personal non-repetitive knowledge of facts relevant to this suit and to class certification[.]" (D.E. 89 at 3.) He was thus ordered to appear for deposition. (*Id.*)

In late January and early February 2022, Plaintiffs deposed four Rule 30(b)(6) corporate representatives designated on behalf of the BH, PLT, and NG brands to testify concerning class topics central to the allegations of wrongdoing. (Ibrahim Decl. ¶17, Ex. 2; *see also* D.E. 138-142.) In addition, Plaintiffs' counsel conducted an additional three deposition-like interviews of key defense witnesses on relevant topics. (*Id.*)

**D.     Settlement Negotiations**

The parties commenced settlement negotiations by agreeing to private mediation before the Honorable Irma Gonzalez (Ret.) from the U.S. District Court for the Southern District of California. (Ibrahim Decl. ¶22.) The parties initially participated in three mediation sessions on May 20, 21, and 27, 2021. (*Id.*) The parties scheduled a fourth session with Judge Gonzalez on June 1, 2021. (*Id.*) Although the case did not settle, a general framework for a potential settlement was laid at these initial sessions. (*Id.*) The parties then reengaged settlement negotiations in September 2021, beginning with an in-person meeting. (*Id.* at ¶23.) Counsel for the parties then began an ongoing and regular dialogue over the remainder of 2021 in dozens of video conferences and phone calls. (*Id.*) In these direct sessions, the parties negotiated all the detailed and intricate aspects of the Settlement, provision by provision, beginning with a memorandum of understanding delineating the material terms of the parties' agreement. (*Id.*)

Importantly, the parties did not discuss or negotiate Plaintiffs' counsel's request for attorneys' fees and costs until all other material terms, including the amount of the Gift Cards and free shipping, were agreed upon. (*Id.* at ¶24, Ex. 3.) As shown in a draft

6

memorandum of understanding circulated on October 28, 2021 (the "Draft MOU"), the parties had reached agreement on what they believed to be the material terms of the Settlement Agreement, but had yet to discuss attorneys' fees and costs, as reflected by the "TBDs" ("To Be Decided") after the items "Attorneys' Fees," "Costs," "Class Administration," and "Incentive Payments." (*Id.* at ¶¶24-25, Ex. 3.) In other words, the Draft MOU reflects the final version of the memorandum of understanding containing the material terms of the settlement agreed to by the parties prior to the negotiation of attorneys' fees and costs. (*Id.*) Attorney's fees and costs were the final material items in the memorandum of understanding to be negotiated and agreed upon, as reflected in the final version (the "Final MOU"). (*Id.* at ¶26, Ex. 4.)

Immediately after reaching the Final MOU, on November 3, 2022, the parties informed the Court that they had "reached a settlement in principle." (D.E. 116 at 2.) The parties then used the Final MOU to draft the material terms of the Settlement Agreement and continued to work on the finer points, as well, such as, for example, the types of notices, the dates of various notice and filing periods, the language of the notices and mock-ups, the unlikely events that would trigger termination rights, etc. (Ibrahim Decl. ¶27.)

Plaintiffs then conducted depositions and interviews of Defendants' witnesses in January and February 2022, as described above. (Ibrahim Decl. ¶28.) The parties continued intense back and forth dialogue and negotiations over numerous videoconferences to address additional details of the settlement in February through May 2022. (*Id.* at ¶29.)

The parties then reengaged Judge Gonzalez for a fifth and final mediation session on May 4, 2022 for her independent assessment of the agreement to further ensure that it was fair, reasonable, and adequate. (*Id.* at ¶30.) In this session, the parties presented her with a near final draft of the Settlement which, among other things, contained the provisions for proposed attorneys' fees and costs. (*Id.*) Judge Gonzalez had spent considerable time on the case and commented that Plaintiffs' counsel had achieved an

excellent result for the Class and the request for attorneys' fees seemed fair. (*Id.*) The parties then worked together to finalize the exhibits to the Settlement, including class notices and the exhibits showing the changes required of Defendants under the injunctive relief provisions of the Settlement. (*Id.* at ¶31.) On May 20, 2022, the parties executed the final settlement agreement. (*Id.* at Ex. 1.)

### E.    The Terms of the Settlement

#### 1.    *The Settlement Class.*

The Settlement defines the classes whose claims are being resolved as follows:

- For the BH Action, "all individuals in California who made a purchase on the Boohoo U.S. Websites during the Class Period." (Settlement at § 1.3.1.) The class period is "from April 9, 2016, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

- For the PLT Action, "all individuals in California who made a purchase on the PLT U.S. Website during the Class Period." (Settlement at § 1.3.1.) The class period is "from May 19, 2016, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

- For the NG Action, "all individuals in California who made a purchase on the Nasty Gal U.S. Website during the Class Period." (Settlement at § 1.3.1.) The class period is "from March 1, 2017, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

#### 2.    *Settlement Consideration*

##### a.    *Monetary Benefits to the Class*

Under the Settlement, each Class Member who does not timely opt out of the Settlement "shall automatically receive" a $10 gift card to include free shipping (additionally valued at $7.28 per gift card) for single use on each U.S. website from which one or more "Qualifying Purchases" were made during the Class Period (the "Gift Card"). (Settlement at § 2.1; D.E. 133-2, 142 (Stipulation in Support of Motion for Preliminary Approval of Class Settlement ("Stip.")) at ¶13, Ex. 2.) The Settlement covers purchases from https://us.boohoo.com and/or https://boohooman.com/us (the "BH Websites"), https://prettylittlething.us (the "PLT Website"), and https://nastygal.com (the "NG Website") (collectively, the "U.S. Websites"), which include their associated mobile

phone applications. (*Id.*) "Qualifying Purchase" is defined as "the purchase of any product by a California resident from the Boohoo U.S. Websites, the PLT U.S. Website, or the Nasty Gal U.S. Website within the Class Period." (*Id.* at § 1.22.) The Gift Cards have the following important attributes:

- All class members who do not opt out will automatically receive the Gift Card via email without the need to file a claim. (Settlement at §§ 2.1 and 2.1(a)(ii).)

- Each Gift Card has a face value of $10.00 plus free shipping and handling (Settlement at §2.1(a)(i)), which provides Class Members considerable choice and variety in using the Gift Cards without having to incur any out-of-pocket costs. "On any given day, Defendants generally have thousands of styles that may be purchased for $10 or less with a wide variety of styles across many different categories on their websites." (Stip. at ¶19; D.E. 144 (Tregillis Decl.) at ¶¶ 57-59.)

- There is no requirement for Class Members to pay any shipping charges when a Gift Card is used, but because Defendants do not normally offer free shipping and are thus incurring a significant cost as a result of this benefit, the Gift Cards must be used in one transaction. (Stip. at ¶13.) The value of this benefit is at least $7.28 based on Defendants' customary shipping and handling charges on average per order across the U.S. Websites during the Class Period. (Settlement at §2.1(a)(i)(xi); Stip. at ¶13, Ex. 2; D.E. 144 (Tregillis Decl.) at ¶¶ 60-62.)

- The Gift Cards have no expiration date. Defendants have no right to cancel the Gift Cards and they cannot revert to Defendants under any circumstance. (Settlement at §2.1(a)(iii).)

- There is no minimum purchase requirement to use the Gift Cards and they may be used toward any purchase. (*Id.* at §2.1(a)(iv).)

- There are no blackout dates restricting use. (*Id.* at §2.1(a)(vi).)

- The Gift Cards may be used with other offers and promotions. (*Id.* at §2.1(a)(vii).)

- The Gift Cards may be freely transferred or given to others. (*Id.* at §2.1(a)(viii).)

- The Gift Cards are stackable, meaning that multiple Gift Cards from the same website may be combined to use in a single transaction. (*Id.* at §2.1(a)(ix).)

- There are no fees for inactivity or any other reason. (*Id.* at §2.1(a)(xii).)

- The Gift Cards may be used on the website from which a Class Member made his or her purchase. (*Id.* at §2.1(a)(i).) For example, if a Class Member bought from the PLT Website, she will receive one Gift Card to use on the PLT Website only. (*Id.*)

- If Class Members bought from multiple sites, they may receive multiple Gift Cards—one for each website from which a purchase was made (with BH and BoohooMAN counting as one site). (*Id.* at §2.1(a)(v).) Class Members may thus be entitled to a total of three (3) Gift Cards if they made a purchase on all three sites.

- Lost Gift Cards will be replaced upon request. (*Id.* at §2.1(a)(xiii).)

   *b.* *Injunctive Relief Benefits to the Class*

  The Settlement provides for significant injunctive relief whereby Defendants agreed

to implement (and did implement), within 14 days after the Court's entry of the Preliminary Approval Order, certain changes to the marketing and advertising on the U.S. Websites. (Settlement at §2.10.) Specifically, Defendants were required to make clear and conspicuous disclosures on their product display pages whenever they advertise a discount off the original or full price (i.e., what Plaintiffs refer to as "reference prices" in the Actions). (*Id.*) The disclosures advise the customer that the original price advertised is not intended to be a former price, but instead merely reflects Defendants' opinion of the full value, as follows:

> *Our percentage off promotions, discounts, or sale markdowns are customarily based on our own opinion of the value of this product, which is not intended to reflect a former price at which this product has sold in the recent past. This amount represents our opinion of the full retail value of this product today based on our own assessment after considering a number of factors.*
>
> *That's why before checking out, it's important you acknowledge that you understand this. Cool with that? Great, happy shopping!*

(Settlement at § 2.10.2(b).) Both the disclosure and the original price on the product display page must have an asterisk to alert the customer to the fact that the disclaimer relates to the displayed original price. (*Id.* at § 2.10.2(a), (c).) The disclosure cannot be hidden in a "click to reveal" format; rather, it must be always viewable under the header "Pricing Policy" without the need for customers to click to open it. (*Id.* at § 2.10.2(a).) This full disclosure must also be displayed on the terms and conditions of each of the U.S. Websites. (*Id.* at § 2.10.2(e).)

In addition, Defendants must include a short disclosure on all landing pages, all product display pages, and all emails sent to customers containing advertisements of discounts from an original or full price. (*Id.* at § 2.10.2(d).) The short disclaimer must state: "*Discounts may not be based on former prices. See pricing policy.*" (*Id.*) The phrase "See pricing policy" must have a hyperlink taking the customer directly to the full pricing policy disclaimer set forth above. (*Id.*)

These changes must be consistent with Exhibit G to the Settlement, which provides a visual mockup of what the changes will look like on the U.S. Websites. (Settlement at §2.10.2, Ex. G.) Importantly, these mockups show that the disclosures shall be visible to

*Plaintiffs' Motion for Final Approval of Class Settlement*                    *Case No. 20-cv-03332-GW (JEMx)*

customers to satisfy the conspicuousness requirement. (*Id.* at Ex. G.) As shown on Exhibit G, Defendants shall include the short form disclaimer in the *center* of the top banner on the home landing page of their websites and product display pages where they advertise their percent-off promotion for a given day (including on the mobile application version); moreover, the short form disclaimer shall be *bolded*, and the font size of the short form disclaimer must be large enough to match the discount messaging that it accompanies. (*Id.* at Ex. G.) Exhibit G also shows that the short form disclaimer shall be bolded, centered, and of equal font size to the accompanying promotional message on all emails sent to customers advertising a sale or discount off an original price. (*Id.* at Ex. G.)

There is no end date on the required disclosures, i.e., they shall be maintained forever on the subject websites. (*See id.* at §2.10.2.)

Further. the settlement also contains a provision titled "Compliance with the Law." (*Id.* at §2.10.1.) This clause requires Defendants to "agree that their comparison pricing practices in California . . . will not violate then-existing Federal or California law . . ." (*Id.*)

   c. *Attorneys' Fees, Costs, Service Awards, and Settlement Administration Costs*

As noted, the Settlement provides a monetary value of $17.28 per Class Member consisting of $10 Gift Cards with free shipping valued at $7.28 per person. For the 1,534,208 Class Members known at present (accounting for an estimated total of 1,919,215 gift cards), this computes to a total monetary value of the Settlement in the approximate sum of $33 Million. (Cooley Decl. ¶6.) Importantly, this does not account for the value of injunctive relief (D.E. 144 (Tregillis Decl.) at ¶¶53-62), which has an estimated value of an additional $79.5 Million over the next five years. (*Id.* at ¶¶63-69.)

In consideration of obtaining these significant benefits for the Class, the many hours spent by Class Counsel, the significant funds Class Counsel has spent on litigation costs, including experts, in litigating this case, and the risks taken by Class Counsel, the Settlement provides that Class Counsel may seek an award of attorneys' fees and costs up to $4,750,000 with no opposition from Defendants. (Settlement at § 2.4(b).) Class Counsel's total litigation costs through final approval are $243,514. (Ibrahim Decl. ¶52.)

Therefore, Class Counsel's fee request amounts to 13.65% of the $33 Million monetary value recovered for the Class, not considering the value of the injunctive relief. (*See id.*) If the value of the injunctive relief is considered, Class Counsel's request for fees is 4% of the overall value provided to the Class. (*See id.*)

As discussed in further detail in the concurrently filed declarations of Class Counsel and Motion for Attorneys' Fees, Costs, and Service Awards, Class Counsel have collectively put in 3,659 hours working on the Actions. (Ibrahim Decl. ¶¶49-51, Ex. 6; Almadani Decl. Ex. 1; Wang Decl. Ex. 1.)

Furthermore, the parties agree that if the Court awards an amount less than $4,750,000, the difference will *not revert* to Defendants. (Settlement at §2.5.) Instead, it will be donated to *cy pres*—either the National Consumer Law Center (NCLC) (as proposed by Plaintiffs) or the Better Business Bureau (BBB) (proposed by Defendants), or divided equally between the two organizations, as determined by the Court in its discretion. (*Id.* at § 2.5.) If the Court finds that neither organization should receive the funds, the unawarded fees will be donated to an organization chosen by the Court. (*Id.*)

The Settlement further provides that each of the three class representatives may seek an incentive award not to exceed $5,000 with no opposition from Defendants. (*Id.* at §2.3.)

Defendants also agree to pay all costs associated with settlement administration in the amount of $350,000. (*Id.* at § 2.4(a).) This amount was based on an estimate prepared by Kurtzman Carlson Consultants LLC ("KCC"), the selected settlement administrator, to execute the notice and administration plan set forth in the Settlement. (Ibrahim Decl. ¶35.) The entire $350,000 is to be used with no reversion back to Defendants. (*See* Settlement at §3.4(f), Ex. J.)

## F.   The Court Granted Preliminary Approval of the Settlement

On June 1, 2022, the Court, in a detailed tentative ruling later adopted as the final ruling, granted Plaintiffs' Motion for Preliminary Approval of the Class Settlement. (D.E. 148, 157.) The Court conducted a thorough analysis of the requirements of Rule 23(a) and (b) and concluded that it appeared Plaintiffs were able to show all the necessary factors

under Rule 23(a) and 23(b)(3) to support certification, for settlement purposes, of all three proposed California classes for each of the three websites at issue. (D.E. at 148 at 3-7.)

With regards to the terms of the Settlement, the Court stated it "has little trouble agreeing that preliminary approval of the settlement is appropriate here." (D.E. 148 at 7.) The Court acknowledged that under the recent amendments to Rule 23(e), the first step of the analysis requires the parties to show "that the court will likely be able to" satisfy the Rule 23(e)(2) factors—the same factors that must be satisfied here on final approval. (*Id.*) Because the Court has already applied all the Rule 23(e) factors in favor of approving the settlement and nothing has changed since the Court's decision, the analysis at final approval is the same. For example, the Court, without prejudging whether final approval of the Settlement would be appropriate, stated with regards to preliminary approval that:

- The Class has been adequately represented by class counsel based on the "plentiful evidence demonstrating the work Plaintiffs and their counsel have undertaken in bringing and supporting this litigation." (D.E. 148 at 6.) Counsel "easily" meets the "qualifications" requirement. (*Id.*)

- The Settlement was negotiated at "arms-length" as shown by the multiple mediation sessions before retired United States District Judge Irma Gonzalez and the fact that attorneys' fees were not discussed until the material terms of the Settlement had been agreed upon. (*Id.* at 8.)

- The Settlement provides adequate relief to class members based on the $10 Gift Card available to all class members with free shipping valued at $7.28 per person, which "Plaintiffs have understandably valued at $32.5 Million," along with substantial and meaningful injunctive relief. (*Id.* at 8.)

- The $4.75 Million sought for attorneys' fees and costs raised no concerns as it amounted to "less than 14% of the monetary value calculated for the settlement," is non-reversionary with any unawarded sums going to *cy pres*, and is "not drawn from a 'common fund' and therefore will not reduce the money available to class

members[.]" (*Id.* at 9-10.)[3]

• After applying the relevant case law and considering the specific attributes of the Settlement, the monetary benefits should not "be considered a 'coupon' settlement." (*Id.* at 11.)[4]

• The notice plan "is the best notice practicable under the circumstances, and satisfies due process." (*Id.* at 12.)[5]

On June 3, the Court entered a formal order granting preliminary approval (D.E. 158), which was amended twice to address scheduling and other technical issues. (D.E. 162, 187.)

### G. The Settlement Administrator Disseminated Notice to the Class and the Reaction of the Class Has Been Favorable

The Court appointed KCC as the Settlement Administrator in connection with the Settlement. (D.E. 158 at ¶13.) As described below, KCC executed on the class notice plan outlined in the Settlement and approved by the Court, which consists of (1) e-mail notice, (2) postcard notice by mail, (3) publication notice in the *Los Angeles Times* to satisfy the CLRA, (4) a long form notice posted on a dedicated class settlement website, and (5) notice to public officials as required under the Class Action Fairness Act (28 U.S.C. § 1711, *et seq.*) (CAFA). (Cooley Decl. ¶2; *see also* D.E. 133-4.)

More specifically, on or about September 9, 2022, KCC established a dedicated website for this class settlement at www.BoohooCAPricingSettlement.com where KCC

---

[3] The Court nonetheless was careful not to prejudge the issue, fully leaving the door open for objectors to raise any legitimate concerns and reserving decision concerning the exact amount of the award for final approval. (*See* D.E. 148 at 10 & n.10.)
[4] Again the Court reserved final decision on this issue for this final approval state. (D.E. 148 at 11 (noting that "facts suggest" Settlement was, "generally-speaking," not to be viewed as a "coupon" settlement).
[5] In its tentative ruling (which was later adopted as the ruling of the Court), the Court provided "several nits/suggestions concerning the proposed preliminary approval order and the various forms of proposed Notice[.]" (D.E. 148 at 12.) The parties adopted all of these suggestions and revised the proposed preliminary approval order and class notices. (*See* D.E. 149, 152, 153, 157.) Plaintiffs also provided "corroborating evidence" that the agreement on fees post-dated agreement on other material terms of the Settlement in response to the Court's question in footnote 11 by filing a supplemental declaration, which included documentation demonstrating that fees were not discussed until material terms in a memorandum of understanding had been agreed upon. (D.E. 156; *see also* Ibrahim Decl. ¶¶24-27, Exs. 3-4.)

14

posted the long-form class notice and other important documents relating to the case (e.g., operative complaints, the Settlement, etc.), and included answers to frequently asked questions. (Cooley Decl. ¶11.) Visitors are also able to submit opt-out requests and find e-mail and phone contact information for class counsel and the settlement administrator. (*Id.*) Also on September 9, KCC established and continues to maintain a 24-7 toll-free telephone hotline for potential class members to call and obtain information about the Settlement. (*Id.*)

Defendants identified 1,534,208 persons on the Class List. (Cooley Decl. ¶6.) Based on this list, on September 16, 2022, KCC caused notice of the proposed class action to be e-mailed to 1,517,269 email addresses. (*Id.* at ¶7, Ex. C.) Of these e-mails, only 37,709 were deemed to be unsuccessfully delivered. (*Id.*)

Then on September 26, 2022, KCC printed and mailed out 102,923 postcard notices to class members who were deemed an unsuccessful e-mail delivery or for whom KCC did not receive a valid e-mail address. (Cooley Decl. ¶8, Ex. D.) Since then, KCC has received only 4,031 Postcard Notices returned by the U.S. Postal Service with undeliverable addresses. (*Id.* at ¶9.)

On September 9, 16, 21, and 30, KCC also caused notice of the Settlement to be published in the *Los Angeles Times*. (Cooley Decl. ¶10, Ex. E.)

On June 1, 2022, KCC provided notice as required under 28 U.S.C. § 1715 under CAFA to the U.S. Attorney General and the CAFA Coordinator within the Office of the Attorney General for the State of California. (Cooley Decl. ¶¶3-4, Ex. B.)

Opt-out requests must be postmarked no later than November 28, 2022. (D.E. 187 at 2.) As of the date of filing this Motion, from the approximately 1.5 million class members who have been successfully notified of the Settlement, KCC has received only twenty-one (21) total requests for exclusion. (Cooley Decl. ¶¶7-9, 13, Ex. G.)

Objections to the Settlement must be postmarked by November 28, 2022. (D.E. 158 at ¶¶21-22; D.E. 187 at 2.) As of the current date, Class Counsel has received zero (0) objections to the Settlement and is not aware of any objections having been submitted to

15

the Court or Defendants. (Ibrahim Decl. ¶36; *see also* Cooley Decl. ¶14.)

As noted, there is no claims process because the Settlement provides that all class members who did not timely request to be excluded from the Settlement will automatically be entitled to receive a Gift Card by e-mail. (Cooley Decl. ¶15.) Accordingly, after final approval, KCC will oversee the distribution of Gift Cards to class members. (*Id.*) KCC will also be responsible for administering a targeted social media campaign to remind class members to use their gift cards. (*Id.* at ¶16.)

Finally, in addition to KCC fielding questions from class members, Class Counsel have also received numerous e-mail inquiries from class members and have devoted time to communicate with class members to answer these inquiries and requests for information. (Ibrahim Decl. ¶37.)

## III.   LEGAL STANDARD

Settlement of a class action lawsuit requires court approval. *See* Fed. R. Civ. P. 23(e). Before a district court grants approval, it must determine that the settlement would be "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); Fed. R. Civ. P. 23(e)(2). The Ninth Circuit previously instructed district courts that, in determining whether or not to approve a class settlement in accordance with Rule 23(e), the Court could consider any or all of the following factors, if applicable:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.1982); *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020). This list of factors was not intended to be exhaustive, and the Court was required to consider the applicable factors in the context of the case before the Court. *Id.* at 625.

Amendments to Rule 23 that took effect in December 2018 have formalized the consideration somewhat further. Now, in order for a Court to determine that a settlement is "fair, reasonable, and adequate," the Court must first consider whether:

(A)   the class representatives and counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

      (i) the costs, risks, and delay of trial and appeal;

      (ii) the effectiveness of any proposed method of distributing relief;

      (iii) the terms of any proposed award of attorney's fees and costs; and

      (iv) any agreement required to be identified;

(D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). As is apparent, these rule-based mandatory considerations overlap with certain of the factors the Ninth Circuit previously established as permissible to consider.

Despite the importance of fairness, the Court should also be mindful of the Ninth Circuit's "strong judicial policy" favoring the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625 ("Finally, it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation[.]") While balancing all these interests, the Court's inquiry is ultimately limited "to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Officers for Justice,* 688 F.2d at 625. The Court, in evaluating the agreement of the parties, should not reach the merits of the case or form conclusions about the underlying questions of law or fact. *See id.*

"It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026. "The settlement must stand or fall in its entirety." *Id.* The court may not delete, modify, or rewrite particular

17

provisions of a settlement. *See id.* "Settlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Id.* at 1027.

## IV. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

### A. The Settlement Class Should Remain Certified

The Court explained in its June 2022 ruling on Plaintiffs' Motion for Preliminary Approval why certification of the Class for settlement purposes was warranted. (D.E. 148 at 3-7.) No facts that would affect these requirements have changed since the Court's ruling, and this Motion incorporates by reference the prior analysis as set forth in the Motion for Preliminary Approval (D.E. 133), the Court's ruling (D.E. 148), and the Preliminary Approval Order. (D.E. 158, 162, 187.) Plaintiffs incorporate by this reference all the evidence the submitted in support of their Motion for Preliminary Approval. (*See* Notice of Motion, *supra*.) Accordingly, the Court need not revisit class certification here, and the Class should remain certified for settlement. *See In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2019 WL 1791420, at *4 (N.D. Cal. Apr. 24, 2019).

### B. The Settlement is Fair, Reasonable, and Adequate

Although the pre-amendment factors traditionally recognized by the Ninth Circuit arguably do not need to be considered in deciding whether the settlement is fair, reasonable, and adequate, Plaintiffs discuss and apply these factors below in the interests of completeness. This is followed by a review of the factors specifically enumerated in the amended Rule 23(e)(2). As shown below, application of these factors demonstrates that the Settlement before the Court is fair, reasonable, and adequate.

#### 1. *The Strength of the Case.*

Plaintiffs have a strong case. They defeated Defendants' Rule 12(b)(6) and 12(f) motion to dismiss. Defendant Boohoo Group dropped its Rule 12(b)(2) personal jurisdiction challenge. As shown in their Motion for Preliminary Approval, Plaintiffs also developed a highly persuasive evidentiary record in discovery demonstrating that Defendants ran near daily sales and discounts on the U.S. Websites, uniform class

18

exposure to the allegedly false reference prices and fake discounts, and that the advertised reference prices and discounts were not based on former prices. (*See* D.E. 133 at 40-43.) Defendants' advertised reference prices are instead based merely on their *opinion* of what the full retail value of their products are. (*Id.*) But prior to the Settlement requiring Defendants to make changes to the U.S. Websites, Defendants did not disclose this to California consumers. (D.E. 133 at 43.)

### 2.   *The Risk, Expense, Complexity, and Likely Duration of Further Litigation.*

Despite the strength of Plaintiffs' case, continuing to pursue litigation in lieu of settlement poses significant risk, expense, complexity, and delay in resolution. *See Nat'l Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.") For the reasons stated in the prior section, Plaintiffs are confident they would be able to obtain class certification and successfully prove their claims at trial. They are also confident that they have formulated a viable damages model based on a sound marketing survey and well-settled and accepted economic methodologies. (*See* D.E. 144 (Tregillis Decl.).) However, juries are unpredictable and may not find Defendants' pricing and sales practices deceptive despite the evidence. There is also a small risk that Plaintiffs' model for computing classwide damages would not be acceptable to the Court or the Ninth Circuit. *See, e.g.*, *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL 1072129, at \*12 (C.D. Cal. Mar. 15, 2016) (granting summary judgment based on the plaintiffs' failure to demonstrate "a viable measure of restitution, such as a 'price premium' model in which an expert isolates the amount of the price attributable to the false representation.") While Plaintiffs here have a strong damage model that fully addresses the concerns raised by *Chowning* (D.E. 144 (Tregillis Decl.)), litigation inherently carries a risk.

Moreover, Plaintiffs would face years of litigation against experienced defense counsel from a large international firm. Without a settlement, this case (already more than two and a half years old) would force Plaintiffs to conduct further class discovery,

19

prosecute a motion for class certification, potentially oppose a Rule 23(f) petition to the Ninth Circuit, conduct merits discovery, successfully oppose summary judgment, undertake expert discovery, make pretrial disclosures and filings, and try the case. And even if Plaintiffs prevail at trial, they would have to overcome post-trial motions and may have to oppose a lengthy appeal. In contrast, a settlement ensures Class Members promptly receive the significant benefits negotiated for them.

Litigation costs also pose a significant risk. The expert and case-related costs alone in this type of class action, which are already $243,514, would likely fall between $500,000 to $1,000,000 based on Class Counsel's experience. (Ibrahim Decl. ¶19.) Plaintiffs have obtained a significant benefit for all Class Members in the form of sizable Gift Cards that may be used to purchase any item on Defendants' websites. These Gift Cards may be used by class members without having to pay for shipping—an added benefit valued at $7.28 per class member that would be difficult for Plaintiffs to argue is legally recoverable if this case went to trial. Under the Settlement, the guaranteed, immediate, and automatic monetary benefit to the Class is approximately $33 Million, which is better than 50 cents on the dollar when compared to what the Class may recover after a risky and lengthy discovery, motions, trial, and appeals process. (*See* D.E. 144 (Tregillis Decl.) at ¶¶52-62.)

Further, by virtue of Plaintiffs' lawsuits, Defendants have agreed to change their business practices on their U.S. Websites as to California consumers. They are required to provide clear and conspicuous disclosures on their websites and e-mail marketing campaigns so that customers understand that the original prices advertised on the sites are not intended to reflect the former prices at which Defendants' merchandise sold in the recent past. This injunctive relief, alone, is valued at $79.5 Million over the first five years. (D.E. 144 (Tregillis Decl.) at ¶¶63-69.)

The Court recognized all these risks of continued litigation in its preliminary approval ruling and thus weighed this factor in favor of preliminarily approving the Settlement. (D.E. 148 at 10-11.) Nothing has changed that would alter the Court's prior

1    assessment.

2                    **3.    The Risk of Maintaining Class Action Status Throughout Trial.**

3         Plaintiffs have not obtained class certification other than for settlement purposes.

4    Although they are confident a motion for class certification would be granted, even if this

5    occurred, there is no guarantee that further developments in the case would not have

6    caused consideration anew of that conclusion. This risk factor is therefore no worse than

7    neutral with respect to whether the Settlement should be given final approval.

8                    **4.    The Amount Offered in the Settlement.**

9         "Basic to [the process of deciding whether a proposed compromise is fair and

10   equitable] in every instance . . . is the need to compare the terms of the compromise with

11   the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer*

12   *Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). Thus, in determining whether the

13   relief offered by way of settlement is fair, the Ninth Circuit has suggested that the Court

14   compare the settlement to the parties' "estimates of the maximum [recovery] in a

15   successful litigation." *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir.

16   2000); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *but see*

17   *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) ("While a district court must of

18   course assess the plaintiffs' claims in determining the strength of their case relative to the

19   risks of continued litigation, it need not include in its approval order a specific finding of

20   fact as to the potential recovery for each of the plaintiffs' causes of action.") (omitting

21   internal citation).

22        Here, the monetary benefits of the Settlement consisting of $10 Gift Cards with free

23   shipping valued at $7.28 for 1,919,215 Gift Cards for over 1.5 million class members

24   generates a total monetary value of $33 Million. As noted, this is better than 50 cents on

25   the dollar when compared to what class members could have hoped to achieve with a full

26   victory according to Plaintiffs' damage model based on California sales. (D.E. 144

27   (Tregillis Decl.) at ¶¶22-29, 32-54, 60-62.) Significantly, these benefits are automatically

28   awarded to class members without the need to make a claim, and there is no possibility of

reversion. In addition, the Settlement provides for relevant and meaningful injunctive relief for the Class by requiring Defendants to conspicuously disclose—forever with no expiration date—that their reference prices are not based on former prices, but are instead based on Defendants' own opinion of the full retail value. (Settlement at ¶¶2.10-2.10.2(h).) These settlement terms have apparently been received favorably by the Class, as there have been only twenty-one (21) exclusion requests to date out of a total of approximately 1.5 million class members. Therefore, this factor weighs in favor of final approval.

### 5.   *The Extent of Discovery Completed and the Stage of the Proceedings.*

"In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459. Nevertheless, here, the Settlement was completed after Plaintiffs had reached a relatively advanced stage of discovery. As the Court recognized in its preliminary approval ruling, "[d]iscovery efforts were considerable, both in terms of written discovery and depositions (and informal interviews)." (D.E. 148 at 6.) More specifically, class counsel reviewed over 546,000 pages of documents produced by Defendants. Plaintiffs obtained extensive written discovery responses and also responded to Defendants' written discovery. Plaintiffs also litigated multiple discovery disputes before the Magistrate Judge in which Plaintiffs mostly prevailed. They took four corporate representative depositions and conducted an additional three deposition-like interviews of key defense witnesses on relevant topics. Plaintiffs thus had sufficient information about the case to make an informed decision about settlement.

### 6.   *The Experience and Views of Counsel.*

In assessing the adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties. *See* Nat'l Rural, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation[.]") (internal quotations and citations omitted). The basis for such reliance is that "[p]arties represented by

competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

Here, both Class Counsel have extensive experience in complex litigation, spanning 35 years between them, including numerous trials as an Assistant U.S. Attorney, a federal clerkship, complex litigation experience at large firms, including trials, and class action litigation experience. (Ibrahim Decl. ¶¶38-45; Almadani Decl. ¶¶2-7; Wang Decl.) Indeed, in July, Class Counsel obtained a jury verdict resulting in a $3.7 Million judgment in this District in a complex commercial litigation matter, including a finding of fraud and punitive damages by clear and convincing evidence. (Ibrahim Decl. ¶43.) The Court here stated Plaintiffs' counsel "easily meets the 'qualifications' requirement." (D.E. 148 at 6.) This factor therefore weighs in favor of approving the Settlement.

### 7.     The Presence of a Governmental Participant.

No governmental entity participated in the settlement of this case. The settlement administrator did, however, provide notice to the U.S. Attorney General and the CAFA Coordinator within the Office of the Attorney General for the State of California. (Cooley Decl. ¶¶3-4.) This factor is therefore neutral.

### 8.     The Reaction of the Members of the Class to the Proposed Settlement.

As noted, with an estimated 1.5 million class members receiving notice of the Settlement, to date, only twenty-one (21) have opted out of the Settlement and there have been no objections. This de minimis opt-out rate reflects an overwhelmingly positive reaction to the Settlement.

### 9.     The Class Is Adequately Represented by Plaintiffs and Counsel (Rule 23(e)(2)(A))

As discussed above, Plaintiffs and their counsel are well qualified and have fought tirelessly for the Class in this litigation. The Court has already recognized the "plentiful evidence demonstrating the work Plaintiffs and their counsel have undertaken in bringing and supporting this litigation" and their qualifications. (D.E. 148 at 6.) Therefore, this

factors weighs in favor of final approval.

### 10. The Proposal Was Negotiated at Arm's Length (Rule 23(e)(2)(B))

This second Rule 23(e)(2)(B) factor is "described as [a] 'procedural' concern[], looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2), 2018 Advisory Comm. Notes. "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e), 2018 Advisory Comm. Notes.

Here, the Settlement was the product of extensive and painstaking arm's length negotiations. The parties enlisted the assistance of Judge Irma Gonzalez, a highly respected retired federal district judge. The parties initially participated in four separate mediation sessions with Judge Gonzalez. After a general framework for a potential settlement was laid at these initial sessions, the parties met in person and began an ongoing and regular dialogue where they negotiated intensely all the detailed and intricate aspects of the Settlement, provision by provision. In reaching the class settlement agreement, the parties were careful to negotiate the material terms of the Settlement covering benefits for the class prior to negotiating class counsel's fees and costs. (*See* Ibrahim Decl. ¶¶24-27, Exs. 3-4.) The direct negotiations between counsel occurred over eight (8) months in dozens of video conferences and phone calls. The parties then reengaged Judge Gonzalez for a final mediation session on May 4, 2022, where they finalized the settlement agreement. At the mediation, Judge Gonzalez specifically commented that she believed Class Counsel had achieved an excellent result for the three Classes, and she was impressed by the fact that Class Counsel had negotiated not only an unrestricted $10 Gift Card, but also free shipping valued at an additional $7.28 for a total value of $17.28 per gift card. (Ibrahim Decl. at ¶30; Almadani Decl. at ¶12.)

Based on these facts, at preliminary approval, the Court has already stated that it "is quite comfortable concluding that the fairness, reasonableness, and adequacy of the settlement is support[ed] by the course and manner of negotiations here." (D.E. 148 at 8.)

This factor therefore weighs in favor of final approval.

**11.    *The Relief for the Class is Adequate (Rule 23(e)(2)(C))***

Under the third Rule 23(e)(2) factor, the Court must consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)[.]" Fed. R. Civ. P. 23(e)(2)(C). The Settlement satisfies these factors.

*a.    The First, Second, and Fourth Rule 23(e)(2)(C) Factors Favor Final Approval*

First, as already discussed above in section IV.B.2, *supra*, the "costs, risks, and delay of trial and appeal" support final approval.

Second, the proposed method of distributing relief to the Class also favors final approval because under the Settlement, they automatically receive by e-mail the benefits of the Gift Card award and free shipping if they did not exclude themselves from the Class. Because Defendants are online-only retailers, all their customers had to create online profiles where they were required to provide their e-mail addresses. The Gift Cards may thus be distributed to all Class Members electronically, eliminating the need for a claims process. (Cooley Decl. ¶15.) Thus, this is far better than a traditional settlement where only a small fraction of class members benefit due to dependence on locating and reaching class members and requiring them to submit a claim.

Third, other than the Settlement itself, there is no agreement required to be identified under Rule 23(e)(3). (Ibrahim Decl. ¶32.)

*b.    The Attorneys' Fees Request Is Reasonable*

The Settlement should be given final approval because Class Counsel's fee request is reasonable and justified. The Ninth Circuit has interpreted the amended Rule 23(e)(2) as imposing an obligation on district courts to "examine whether the attorneys' fees arrangement shortchanges the class. In other words, the new Rule 23(e) makes clear that

25

courts must balance the 'proposed award of attorney's fees' vis-a-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)). In considering the proposed award of attorney's fees, the Court must scrutinize the settlement for any "subtle signs that class counsel have allowed pursuit of their own self-interests to infect the negotiations." *Id.* at 1023 (quoting *Bluetooth,* 654 F.3d at 947). Thus, the Court must evaluate the settlement for three such "subtle signs" of collusion between class and defense counsel: "(1) when counsel receives a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class." *Id.* at 1023.

The Court performed this analysis at preliminary approval and found no reason to question the amount of the proposed fee and cost award in view of the fact that:

- the proposed award "amounts to less than 14% of the monetary value calculated for the settlement";

- the fee award "is not drawn from a 'common fund' and therefore will not reduce the money available to class members";

- "any amount of fees *not* awarded by the Court [will] be distributed to one or more *cy pres* instead of returning that amount to the defendants"; and

- Any fees would be awarded only "after the settlement becomes final."

(D.E. 148 at 10.) The Court also found no concerns of collusive activity, including with regards to the presence of a "clear sailing" provision in the Settlement given the assistance of Judge Gonzalez in mediating the dispute. (D.E. 148 at 10 n.11.) Further, as noted earlier, the Court determined the Settlement should not be considered a "coupon" settlement and, therefore, the fee award would not need to based on the redemption value of the Gift Cards

at issue. (D.E. 148 at 11.)[6] Nothing has changed in the months since the Court's preliminary approval ruling that would require the Court to alter this analysis. The Court should therefore again find that application of Rule 23(e)(2)(C)(iii) favors approval of the Settlement.

Although the Court has already thoroughly considered the terms of the proposed fee award and its bearing on the adequacy of the relief provided for the Class, Plaintiffs will reiterate the reasons why the proposed award does not "shortchange" the class in any way. As noted, the monetary value of the settlement, before adding the value of injunctive relief, is $33 Million. This is calculated by multiplying the total number of gift cards for distribution (1,919,215) by the $17.28 value of the Gift Cards ($10 Gift Card plus $7.28 value of free shipping that is normally charged by Defendants). Class Counsels' fees will not come out of the benefits to be paid to the Class, meaning that Class Members will receive their full benefits regardless of the attorneys' fees the Court allows. Moreover, the proposed fee amount is only **13.65%** of the total monetary settlement value before accounting for the value of injunctive relief. If injunctive relief is considered, the proposed fee amount will likely be **less than 4%** of the total settlement value. In either case, the fee request is well under the 25% "benchmark" for measuring presumptively acceptable fees in the Ninth Circuit. *Bluetooth*, 654 F.3d at 942. There is thus no concern here that Class Counsels' fees would reduce Class benefits or are otherwise unreasonable.

In addition, there is no reversion of any benefits payable under the Settlement to Defendants. (Settlement at §§ 2.1(a), 2.4, 2.5, 3.4.) Every Class Member who does not opt out will automatically receive an unrestricted Gift Card that will never expire. There is thus no risk of any benefit not being distributed to Class Members due to the failure to make a claim. Because there is no expiration date, there is also no risk that unredeemed Gift Cards will be returned to Defendants. Also, any unawarded attorneys' fees and costs

---

[6] Because nothing has changed with regards to the attributes of the Gift Cards to render them "coupons" since the Court's preliminary approval ruling in June, the Court should simply readopt its analysis here at final approval. Although unnecessary to reiterate all the reasons why the Gift Cards are not "coupons" under CAFA in light of the Court's detailed analysis, Plaintiffs have included a section in their concurrently filed Motion for Attorneys' Fees addressing this topic.

27

from the proposed $4.75 Million *will not* revert to Defendants. Rather, they will be awarded to a *cy pres* recipient connected to the claims at issue.

The proposed award of fees also does not "shortchange" the class and is properly balanced against the relief provided for the Class because, as explained above, Class Counsel have worked substantial hours and overcome many hurdles. Class Counsel have also taken an enormous risk by pursuing this case on contingency and advancing substantial costs amounting to $243,514. *See Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320-GW(JEMX), 2020 WL 10055593, at *8 (C.D. Cal. June 22, 2020) (awarding 33 percent of the common fund because performance of work "on a contingency basis (for nearly two years) is an always-risky practice, particularly in a case that had to survive the number of challenges, and incur the amount of expenses.").

There is also nothing unusual about the timing of payment of attorneys' fees. Defendants are not obligated to pay fees until after the Settlement becomes final.

The proposed fee award also satisfies the *Bluetooth* factors.

*First*, Class Counsel is not receiving a disproportionate distribution of the Settlement. As an initial matter, the attorneys' fees and costs are not coming out of the monetary benefits that will be distributed to the Class and, thus, do not at all reduce the benefits to the Class. But moreover, even if they were coming out of the Settlement, the fee request is less than 13.6% of the Settlement's monetary value, well below the accepted benchmark of 25% in the Ninth Circuit.

In addition, when the significant injunctive relief fiercely negotiated by Class Counsel is considered, as it should be,[7] the attorneys' fees requested amount to

---

[7] "When determining the value of a settlement, courts consider the monetary and non-monetary benefits that the settlement confers." *Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-LB, 2016 WL 4916955, at *5 (N.D. Cal. Sept. 15, 2016); *see also Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) (upholding district court's approval of attorneys' fees where it was apparent that injunctive relief offered "generated benefits far beyond the cash settlement fund"); *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, *7 (N.D. Cal. Mar. 18, 2013) (settlement value includes injunctive relief). Thus, for example, in *Miller v. Ghirardelli Chocolate Co.*, the Court included the value of Ghirardelli Chocolate removing various terms from its labels as part of the common fund from which to calculate attorneys' fees. No. 12-cv-04936-LB, 2015 WL 758094, at *1, 5 (N.D. Cal. Feb. 20, 2015).

28

approximately **4%[8]** of the total recovery. (D.E. 144 (Tregillis Decl.) at ¶¶63-69.). Indeed, the Settlement provides for significant and meaningful injunctive relief. It requires Defendants to make full *and conspicuous* disclosure concerning their pricing practices so that California consumers will no longer be misled and may make fully informed purchasing decisions. Defendants must make clear and conspicuous disclosures that the original prices on their sites are *not former prices*, but instead merely reflect *Defendants' opinion* of the full value of the products. (Settlement at § 2.10.2(b).) This disclosure is required to be present on all four sites (on both the desktop and mobile versions) and conspicuously displayed in multiple places, such as landing pages, product pages (the point at which customers make their purchase selection), and marketing e-mails sent to customers advertising discounts. (*See* Settlement at §2.10.2)

*Second*, the "clear sailing" provision in the Settlement does not render the Settlement collusive. The Court agreed with Plaintiffs that the mere presence of such a provision "is not automatically cause for concern under the particular circumstances here." (D.E. 148 at 10 n.11); *see also Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1260–61 (C.D. Cal. 2016). That is because this Settlement was negotiated at arms-length through eight-plus months of direct negotiations between counsel and with the assistance of a highly respected retired district judge in five separate mediation sessions. Significantly, the parties' last session with Judge Gonzalez occurred on May 4, 2022, where she was presented with the near final draft of the Settlement, which contained the attorneys' fees and costs and clear sailing provision, and she specifically commented that she found the fee request to be fair. (Ibrahim Decl. ¶¶30); *see Bluetooth*, 654 F.3d at 948 (presence of mediator is a factor weighing in favor of non-collusiveness). Further, Class Counsel negotiated attorneys' fees only after the material terms of the Settlement covering benefits for the Class had been agreed upon by the parties. (Ibrahim Decl. ¶¶24-27, Exs. 3-4); *see Shames v. Hertz Corp.*, No. 07-CV-2174-MMA (WMC), 2012 WL 5392159, at *13 (S.D.

---

[8] This is based on a minimum value of $79.5 Million for the injunctive relief over the course of the next five years—a conservative valuation given that the relief negotiated for the Class is permanent with no expiration date. (D.E. 144 (Tregillis Decl.) at ¶¶63-69.)

29

Cal. 2012) (objection to clear sailing agreement overruled because fee amount was negotiated separately and after the class settlement was finalized). It is also significant that the Settlement provides that unawarded fees do not revert to Defendants and instead go to *cy pres*. (Settlement at §2.5.) This, too, is a factor courts find is an indication of an absence of collusion even where the class settlement has a clear sailing provision. *See*, *e.g.*, *Spann*, 211 F. Supp. 3d at 1260–61 (even though the settlement contained a clear sailing provision, "the absence of a kicker provision stating that all fees not awarded would revert to defendant[ ], weighs against a finding of collusion.") (internal quotations omitted). Therefore, there was no collusion under the second *Bluetooth* factor.

*Third*, as already discussed in the prior paragraph, the Settlement does not contain a "kicker" or "reverter" clause that returns unawarded fees to Defendants. Rather, any unawarded fees will be paid to a *cy pres* recipient. Designating one or more *cy pres* beneficiaries in a class settlement for attorneys' fees not awarded by the Court is one well established method of mitigating against collusion between class counsel and defense counsel. *See Bluetooth*, 654 F.3d at 947 (provision whereby "all fees not awarded would revert to defendants *rather than be added to the cy pres fund* or otherwise benefit the class" was an indicia of collusion) (emphasis added); *Martin v. Marriott Int'l, Inc.*, No. CV 18-00494 JAO-RT, 2021 WL 4888973, at *5 (D. Haw. Oct. 19, 2021) (no collusion in part because unawarded fees designated to *cy pres* beneficiary); *Miguel-Sanchez v. Mesa Packing, LLC*, No. 20-CV-00823-VKD, 2021 WL 1736807, at *13 (N.D. Cal. May 3, 2021) (same); *LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 WL 1283325, at *10 (N.D. Cal. Mar. 26, 2013) (danger of collusion undercut by plaintiff's counsel's offer to reduce fee request by directing $200,000 to *cy pres*); *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 4831157, at *7 (N.D. Cal. Oct. 12, 2011) (inference of unfairness could have been avoided by diverting unawarded attorney's fees to *cy pres*).[9]

---

[9] It should also be noted that since there are approximately 1.5 million class members, dividing unawarded attorneys' fees equally among class members would result in *de minimis* additional recovery for each class member. *See Easysaver*, 906 F.3d at 761-62 (no abuse of discretion in approval of distribution of $3 million in unclaimed settlement
*(footnote cont'd on next page)*

1  Therefore, the Settlement also easily satisfies the third *Bluetooth* factor.

2               **12.**    ***The Proposal Treats Class Members Equitably (Rule 23(e)(2)(D))***

3          The final Rule 23(e)(2) factor turns on whether the proposed settlement "treats class

4  members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of

5  concern could include whether the apportionment of relief among class members takes

6  appropriate account of differences among their claims, and whether the scope of the

7  release may affect class members in different ways that bear on the apportionment of

8  relief." Fed. R. Civ. P. 23(e)(2)(D), 2018 Advisory Committee Notes. Thus, under this

9  factor, courts consider whether the Settlement "improperly grant[s] preferential treatment

10  to class representatives or segments of the class." *Hefler v. Wells Fargo & Co.*, No. 16-

11  cv-05479-JST, 2018 WL 6619983, at *8 (N.D. Cal. Dec. 18, 2018); *see also True v. Am.*

12  *Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010).

13          No such concerns exist in this case. All class members, no matter which of the four

14  subject websites they bought from, what they bought, or whether they still have their order

15  confirmations, will all be treated the same: they will each receive a $10 Gift Card with

16  free shipping for each brand's website from which they bought merchandise. This equal

17  treatment makes sense because all class members were uniformly exposed to the same

18  deceptive discounting practice during the respective class period. The Court agreed with

19  Plaintiffs that this factor favors approval of the Settlement. (D.E. 148 at 9 ("[T]he Court

20  sees no obvious major concern that the terms of the proposed settlement do not 'treat[]

21  class members equitably relative to each other.' Fed. R. Civ. P. 23(e)(2)(D). The Court

22  certainly does not believe the added-complexity of pegging claims to the value of the

23  item(s) purchased by the class members following their one or more exposures to the

24  pricing practices is necessary to achieve a fair, reasonable or adequate settlement.")

25          Finally, that the Settlement provides for the class representatives to each receive a

26  $5,000 incentive award does not improperly grant them preferential treatment. Rather, it

27

28  funds to *cy pres* recipients where distribution of this amount to more than 1 million class
members would result in "de minimis" recovery.) Directing any such funds to a *cy pres*
recipient thus puts them to a more beneficial use for consumers similarly situated to the
Class.

is an appropriate amount to compensate them for their time and dedication to the case, and the total payment for the three class representatives of $15,000 constitutes a miniscule fraction of the total minimum monetary value of the settlement of $33 Million. *See Online DVD*, 779 F.3d at 947-48 (upholding $5,000 incentive awards that were 417 times larger than $12 gift cards because the awards were only 0.17% of the total $27 Million settlement fund); *In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1115 n.6 (9th Cir. 2021) (rejecting argument concerning alleged violation of Rule 23(e)(2)(D) in part because district court "approved the settlement's provision for service awards to the named plaintiffs, but service awards are compensation 'for work done on behalf of the class' throughout litigation, not damages awarded for substantive claims") (quoting *Rodriguez*, 563 F.3d at 958).

### C.     Class Members Received Adequate Notice.

Final approval is proper if the Court determines that notice to the Class was "the best notice that is practicable under the circumstances[.]" Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974). Rule 23 specifically permits notice to be provided by "electronic means" and "United States mail" as it was here. Fed. R. Civ. P. 23(c)(2)(B). Though Rule 23 mandates that reasonable efforts are made to reach all class members, it does not require that each individual actually receive notice. *See Silber v. Mabon*, 18 F.3d 1454 (9th Cir. 1994) (the standard for class notice is "best practicable" notice, not "actually received" notice). The content of notice "must clearly and concisely state in plain, easily understood language" essential settlement information, such as the nature of the action, the class definition, how and when class members may request exclusion, and the binding effect of a class judgment. Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).

At preliminary approval, the Court approved the proposed notice plan, which called for a multi-prong program by KCC. (*See* D.E. 148 at 11-12.) The proposed plan contemplated notice via (1) e-mail notice, (2) postcard notice by mail, (3) publication notice in the *Los Angeles Times* to satisfy the CLRA, (4) a long-form notice posted on a

dedicated class settlement website, and (5) notice to public officials as required under CAFA. (*See* Cooley Decl.; D.E. 133-4.)

As summarized above in section II.G, *supra*, KCC successfully executed on this plan as the Court directed, as summarized in the concurrently filed declaration from KCC. (*See* Cooley Decl. ¶¶2-12.) The content of the notice documents provided all the requisite information in plain, easily understood language. (*See* Cooley Decl. Exs. C-F (attaching copies of the notice documents).) Out of more than 1.5 million notices disseminated, there have been only twenty-one (21) opt-outs, and to date, no objections have been received.

Accordingly, notice to the Class of the Settlement satisfies Rule 23(c)(2)(B).

# V.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court: (1) grant final approval of the Settlement; (2) finally certify the settlement Class; (3) authorize KCC to administer the settlement benefits to members of the Class; (4) order Defendants to comply with the injunctive relief described in the Settlement; (5) enter the final order and judgment in the form attached as Exhibit H to the Settlement; and, (6) rule on Plaintiffs' motion for attorneys' fees, costs, and incentive awards, filed concurrently herewith.


Dated: November 14, 2022                    Respectfully submitted,

                                            ALMADANI LAW

                                            */s/ Yasin M. Almadani*
                                            Yasin M. Almadani, Esq.


                                            AI LAW, PLC

                                            */s/ Ahmed Ibrahim*
                                            Ahmed Ibrahim, Esq.

                                            *Attorneys for Plaintiffs Individually and*
                                            *On Behalf of All Others Similarly Situated*

33