ALMADANI LAW
Yasin M. Almadani, State Bar No. 242798
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

AI LAW, PLC
Ahmed Ibrahim, State Bar No. 238739
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph.:   949-266-1240
Fax:   949-266-1280
aibrahim@ailawfirm.com

*Attorneys for Plaintiffs Farid Khan,*
*Haya Hilton, and Olivia Lee Individually*
*and On Behalf of All Others Similarly Situated*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| FARID KHAN, an individual, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, and DOES 1-10, inclusive,<br><br>        Defendants. | **CASE NO.: 2:20-cv-03332-GW (JEMx)**<br><br>Consolidated for Pretrial Purposes with:<br>No. 2:20-cv-04658-GW-JEM<br>No. 2:20-cv-04659-GW-JEM<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**<br><br>**Hearing Information:**<br><br>Date:        December 19, 2022<br>Time:        8:30 a.m.<br>Courtroom:  9D<br>Judge:      Hon. George H. Wu<br><br>Action Filed:  April 9, 2020 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE THAT** on December 19, 2022 at 8:30 a.m. or as soon thereafter as counsel may be heard in Courtroom 9D of the above-captioned Court located on the 9th Floor at 350 West 1st Street, Los Angeles, California 90012, Plaintiffs Farid Khan, Haya Hilton, and Olivia Lee, on behalf of themselves and all others similarly situated ("Plaintiffs"), by and through their undersigned counsel of record, will and hereby do move for an order pursuant to Rules 23(h) and 54(d) of the Federal Rules of Civil Procedure, granting the following relief:

1.     An award to Yasin Almadani and his firm Almadani Law, and Ahmed Ibrahim and his firm AI Law, PLC ("Class Counsel") of $4,506,486.00 in attorneys' fees;

2.     An award to Class Counsel of $243,514.00 in litigation costs and expenses;

3.     An award of $350,000 in Settlement Administration Expenses to the Court-appointed Settlement Administrator, Kurtzman Carson Consultants LLC ("KCC"); and

4.     Service awards of $5,000 each to Plaintiffs Farid Khan, Haya Hilton, and Olivia Lee.

This motion will be heard concurrent with Plaintiffs' Motion for Final Approval of Class Action Settlement, which will be separately filed.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Omnibus Declaration of Ahmed Ibrahim in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs, and Service Awards (and exhibits thereto) ("Ibrahim Decl."), the Omnibus Declaration of Yasin Almadani in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs, and Service Awards (and exhibits thereto) ("Almadani Decl."), the Declaration of Daniel Wang in Support of Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards ("Wang Decl."), the Declaration of Zach Cooley Regarding Execution of Class Notice Plan (and exhibits thereto) ("Cooley Decl."), the Order Granting Preliminary Approval of Class Settlement (and all amendments thereto) (D.E. 158, 162,

187),[1] the Court's Tentative Ruling on Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (later adopted as the final ruling of the Court) (D.E. 148, 157), the pleadings and papers on file herein, and any other written and oral arguments that may be presented to the Court.

Plaintiffs also rely on the evidence previously filed with the Court in connection with their Motion for Preliminary Approval of Class Action Settlement, which Plaintiffs incorporate herein by this reference. Plaintiffs have not re-filed this evidence to avoid duplicative filings and excessive materials for the Court and its staff. This evidence consists of the following:

1.    Declaration of Ahmed Ibrahim in Support of Motion for Preliminary Approval of Class Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice, and exhibits thereto (D.E. 133-1, 138-142);

2.    Stipulation in Support of Motion for Preliminary Approval of Class Settlement (D.E. 133-2, 143);

3.    Declaration of Yasin M. Almadani in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 133-3);

4.    Declaration of Christie K. Reed Regarding Proposed Class Notice Plan (D.E. 133-4);

5.    Declaration of Farid Khan in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 133-5);

6.    Declaration of Haya Hilton in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 133-6);

---

[1] "D.E." denotes "Docket Entry" followed by a docket control number. Page number cites refer to the pagination reflected in the blue PACER header at the top of each page.

7.     Declaration of Olivia Lee in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 133-7);

8.     Declaration of Christian Tregillis, CPA, ABV, CFF, CLP, in Support of Motion for Preliminary Approval of Class Settlement (D.E. 144); and

9.     Supplemental Declaration of Yasin M. Almadani in Support of Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of California Settlement Class, and Approval of Procedure For and Form of Notice (D.E. 156).

Dated: November 14, 2022          Respectfully submitted,

ALMADANI LAW

*/s/ Yasin M. Almadani*
Yasin M. Almadani, Esq.

AI LAW, PLC

*/s/ Ahmed Ibrahim*
Ahmed Ibrahim, Esq.

*Attorneys for Plaintiffs Individually and*
*On Behalf of All Others Similarly Situated*

1

2

**TABLE OF CONTENTS**

3

I.   INTRODUCTION ........................................................................................... 1

4

5

II.  BACKGROUND AND PROCEDURAL HISTORY ........................................ 2

6

A.  THE LAWSUITS ..................................................................................... 2

7

B.  DEFENDANTS' MOTION TO DISMISS ..................................................... 2

8

C.  WRITTEN DISCOVERY, DEPOSITIONS, AND WITNESS INTERVIEWS .......... 3

9

D.  SETTLEMENT NEGOTIATIONS ............................................................... 4

10

E.  THE TERMS OF THE SETTLEMENT ........................................................ 5

11

12

1.  The Settlement Class. ................................................................. 5

13

2.  Settlement Consideration ........................................................... 6

14

F.  THE COURT GRANTED PRELIMINARY APPROVAL OF THE SETTLEMENT ................. 10

15

16

G.  THE SETTLEMENT ADMINISTRATOR DISSEMINATED NOTICE TO THE CLASS AND THE REACTION OF THE CLASS HAS BEEN FAVORABLE ........................................................ 11

17

18

III. THE COURT SHOULD AWARD THE REQUESTED ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS ........................................................... 11

19

A.  THE FEE REQUEST IS JUSTIFIED UNDER THE PERCENTAGE OF THE BENEFIT METHOD 11

20

21

1.  Plaintiffs' Fee Request is Reasonable Because It Is Well Below the 25 Percent Benchmark .................................................................................... 13

22

23

2.  The Vizcaino Factors Support Plaintiffs' Fee Request ...................................... 14

24

3.  The Request for Fees and Costs Is Fair and Reasonable Under a Lodestar Cross-Check .................................................................................... 18

25

26

4.  Class Counsel's Fees Should Be Measured Based On the Full Value of the Settlement Because It Is Not a Coupon Settlement .................................... 31

27

28

B.  CLASS COUNSEL'S OUT-OF-POCKET EXPENSES ARE REASONABLE AND COMPENSABLE .................................................................................... 32

i

C.   THE REQUESTED SERVICE AWARDS FOR PLAINTIFFS ARE REASONABLE ................ 34

IV. CONCLUSION ....................................................................................................... 35

1

## **TABLE OF AUTHORITIES**

2

## **CASES**

**Page(s)**

3

*In re Activision Sec. Litig.*,

4
    723 F. Supp. 1373 (N.D. Cal. 1989) ........................................................ 12

5

*Addison v. Monarch & Assocs., Inc., No. EDCV 14-358-GW*
    (CWX), 2018 WL 6616662 (C.D. Cal. Jan. 25, 2018) .............................. 16

6

*In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09 MDL 2007-GW,

7
    2014 WL 12591624 (C.D. Cal. Jan. 10, 2014) ................................. 12,13,18

8

*Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO(SPx),

9
    2019 WL 13027266 (C.D. Cal. Dec. 30, 2019) ........................................ 35

10

*In re Bluetooth Headset Prods. Liability Litig.*,
    654 F.3d 935 (9th Cir. 2011) ..................................................... 11,13 ,14 ,19

11

12

*Brady Mktg. Co. Inc. v. Kai U.S.A. Ltd., No. 3:16-cv-*
    1878-MO, 2018 ......................................................................................... 22

13

*Chalmers v. City of Los Angeles*,

14
    796 F.2d 1205–11 (9th Cir. 1986) ........................................................... 19

15

*Chowning v. Kohl's Dep't Stores, Inc., No. CV 15-08673 RGK*
    (SPx), 2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) .................... 16,25 ,33

16

*Comcast Corp. v. Behrend*,

17
    569 U.S. 27 (2013) ................................................................................... 34

18

*Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB*
    (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) .............................. 21

19

*Dyer v. Wells Fargo Bank, N.A.*,

20
    303 F.R.D. 326 (N.D. Cal. 2014) ............................................................. 32

21

*In re EasySaver Rewards Litig.*,

22
    906 F.3d 747–55 (9th Cir. 2018) ......................................................... 31,32

23

*Elkies v. Johnson & Johnson Servs., Inc., No. CV 17-7320-GW*
    (JEMX), 2020 WL 10055593 (C.D. Cal. June 22, 2020) .......................... 17

24

*Farrell v. Bank of Am. Corp., N.A.*,

25
    827 F. App'x 628 (9th Cir. 2020) ............................................................ 13

26

*French v. City of Los Angeles, No. EDCV 20-00416 JGB*
    (SPx), 2022 WL 2189649 (C.D. Cal. May 10, 2022) .............................. 23

27

*Gergetz v. Telenav, Inc., No. 16-CV-04261-BLF*,

28
    2018 WL 4691169 (N.D. Cal. Sept. 27, 2018) ........................................ 30

*In re Google Inc. Street View Elec. Commc'ns Litig.*,
  21 F.4th 1102 (9th Cir. 2021) ..................................................... 34

*Gutierrez v. Stericycle, Inc.,* No. LA CV
  15-08187JAK (JEMx), 2019 WL 12470143 (C.D. Cal. Mar. 22, 2019) .... 30

*Gutierrez v. Wells Fargo Bank, N.A.,* No. C 07-05923 WHA,
  2015 WL 2438274 (N.D. Cal. May 21, 2015) ........................................ 22

*Harris v. Marhoefer*,
  24 F.3d 16 (9th Cir. 1994) ......................................................... 32

*Hefler v. Wells Fargo & Co.,* No. 16-CV-05479-JST,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ...................................... 21

*Hopkins v. Stryker Sales Corp.,* No. 11-CV-02786-LHK,
  2013 WL 496358 (N.D. Cal. Feb. 6, 2013) ........................................ 33

*In re HP Inkjet Printer Litig.*,
  716 F.3d 1173–86 (9th Cir. 2013) ............................................... 31

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539–571 (9th Cir. 2019) ............................................ 29,30

*Jasper v. C.R. England, Inc.,* No. CV 08-5266-GW
  (CWX), 2014 WL 12577426 (C.D. Cal. Nov. 3, 2014) ..................... *passim*

*Kerr v. Screen Extras Guild, Inc.*,
  526 F.2d 67–70 (9th Cir. 1975) ................................................ 29

*Laffitte v. Robert Half Int'l Inc.*,
  1 Cal. 5th 480 (2016) .......................................................... 12,26

*In re Lenovo Adware Litig.,* No. 15-MD-02624-HSG,
  2019 WL 1791420 (N.D. Cal. Apr. 24, 2019) ...................................... 22

*Mangold v. California Pub. Util. Comm'n*,
  67 F.3d 1470 (9th Cir. 1995) ..................................................... 12

*Martin v. FedEx Ground Package Sys., Inc.,* No. C 06-6883 VRW,
  2008 WL 5478576 (N.D. Cal. Dec. 31, 2008) ...................................... 30

*McKinney-Drobnis v. Oreshack*,
  16 F.4th 594 (9th Cir. 2021) ..................................................... 32

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ..................................................... 34

*Mendoza v. Hyundai Motor Co., Ltd.,* No. 15-CV-01685-BLF,
  2017 WL 342059 (N.D. Cal. Jan. 23, 2017) ...................................... 33

iv

*Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) .............................................................. 12,18

*Moreno v. City of Sacramento*,
   534 F.3d 1106 (9th Cir. 2008) ................................................... 26

*In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD,
   2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .......................... 14

*No. 12-cv-04936-LB*,
   2015 WL 758094 (N.D. Cal. Feb. 20, 2015) ............................ 14

*Nwabueze v. AT & T Inc.*, No. C 09-01529 SI,
   2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ......................... 13

*In re Omnivision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................... 33

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ..................................... 31,32 ,35

*Parkinson v. Hyundai Motor Am.*,
   796 F. Supp. 2d 1160 (C.D. Cal. 2010) ................................... 19

*Parkinson*,
   796 F. Supp. 2d .......................................................... 26

*Paul, Johnson, Alston, & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989) ............................................. 12,19

*Rodriguez v. Evergreen Prof'l Recoveries, Inc.*, No. C19-0184-JCC,
   2021 WL 2577130 (W.D. Wash. June 23, 2021) ..................... 34

*Seegert v. Lamps Plus, Inc.*,
   377 F. Supp. 3d 1127 (S.D. Cal. 2018) .................................. 31

*Sheikh v. Tesla, Inc.*, No. 17-CV-02193-BLF,
   2018 WL 5794532 (N.D. Cal. Nov. 2, 2018) .......................... 31

*Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-LB,
   2016 WL 4916955 (N.D. Cal. Sept. 15, 2016) ......................... 13

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
   896 F.2d 403 (9th Cir. 1990) .................................... 19,20 ,21

*Van Vranken v. Atlantic Richfield Co.*,
   901 F. Supp. 294 (N.D. Cal.1995) ....................................... 31,35

*Vincent v. Air W., Inc.*,
   557 F.2d 759 (9th Cir. 1977) ............................................. 11

v

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..................................................... 12,13 ,18 ,30

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ...................................................... 12,18 ,29 ,30

*Welch v. Metro. Life Ins. Co.*,
    480 F.3d 942 (9th Cir. 2007) ...................................................... 19

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th 224 (2001) ...................................................... 30

*Wit v. United Behav. Health*,
    578 F. Supp. 3d 1060 (N.D. Cal. 2022) ...................................... 22

## **FEDERAL STATUTES**

28 U.S.C. § 1711 ........................................................................ 31

28 U.S.C. § 1712 ........................................................................ 31

## **FEDERAL RULES**

Fed. R. Civ. P. 12 ................................................................ *passim*

Fed. R. Civ. P. 23 ................................................................ *passim*

Fed. R. Civ. P. 30 ................................................................ *4,25,28*

## **STATE STATUTES**

Cal. Bus. & Prof. Code §§ 17200, et seq. ....................................... 2

Cal. Bus. & Prof. Code §§ 17500, et seq. ....................................... 2

Cal. Civil Code § 1021.5 ............................................................. 3

## I.     INTRODUCTION

Plaintiffs respectfully submit this motion for an award of attorneys' fees, litigation costs, and class representative service awards to compensate them and Class Counsel for their work in achieving a class action settlement which affords excellent monetary benefits and injunctive relief for the classes of California purchasers from the U.S. websites of the three brands at issue, Boohoo/BoohooMAN, PrettyLittleThing, and Nasty Gal (hereafter, the "Class Members" or the "Class").

As detailed below, for more than two and half years, Class Counsel have tirelessly and skillfully litigated this consolidated class action, overcoming significant obstacles put in their way by Defendants and their highly experienced large international firm lawyers. Among other things, Plaintiffs defeated Defendants' Rule 12(b)(6) and 12(f) challenges (prevailing on every issue), survived Defendants' personal jurisdiction challenge, engaged in substantial written discovery, including the review of over 500,000 pages of documents and depositions and informal interviews of Defendants' corporate representatives, prevailed in several hotly contested discovery motions, and engaged in lengthy and firm settlement negotiations covering approximately a year of intensive direct communications and five mediation sessions before a retired federal district judge. Class Counsel accomplished all this while risking the substantial costs they incurred—nearly a quarter-million dollars in out-of-pocket expenses—and thousands of attorney hours spent on a contingency basis in a challenging case where there was no guarantee of success.

Plaintiffs therefore seek an award of attorneys' fees based on a percentage of the non-reversionary settlement whose monetary benefits for the Class are valued at $33 million. Plaintiffs are requesting $4,506,486 for 13.65% of the monetary value of the settlement, well below the long-settled acceptable benchmark in the Ninth Circuit of 25%. In addition, Plaintiffs request $243,514 for litigation costs incurred by Class Counsel, $350,000 to Kurtzman Carson Consultants, LLC ("KCC") for the costs of settlement administration, and service awards of $5,000 for each of the three named plaintiffs for the essential roles they played in achieving this settlement. Moreover, because Class Counsel

negotiated a settlement that does *not* draw their attorneys' fees and any costs or the class representative's service awards from a common fund shared with Class Members, awarding the amounts requested above will in no way negatively affect the Class Members. In short, because the requested attorneys' fees, costs, and class representative service awards are fair, reasonable, and adequate, the Court should grant this motion.

## II.   BACKGROUND AND PROCEDURAL HISTORY

### A.   The Lawsuits

The operative complaints in the Actions were filed on August 7, 2020, namely, the Second Amended Complaint ("SAC") in the BH Action, the First Amended Complaint ("FAC") in the PLT Action, and the FAC in the NG Action. (*See* BH D.E. 14; PLT D.E. 15; NG D.E. 15.) Plaintiffs assert claims in each of the Actions for violations of (1) the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), (2) the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"), and (3) the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), as well as (4) fraud (intentional misrepresentations), (5) fraudulent concealment, and (6) unjust enrichment. Plaintiffs seek damages and injunctive relief. On November 30, 2020, the Court consolidated the three cases for pretrial purposes and the parties have therefore made all their filings in the BH Action. (D.E. 38.)

### B.   Defendants' Motion to Dismiss

On September 4, 2020, Defendants filed a motion to dismiss and strike the operative complaints in each of the three Actions, pursuant to Rule 12(b)(2), 12(f), and 12(b)(6) of the Federal Rules of Civil Procedure. (*See*, *e.g.*, BH D.E. 22 and 25.) Defendants' motion covered a wide range of issues, including jurisdiction, standing, and pleading sufficiency. Defendants argued, among other things, that (1) the Court lacked personal jurisdiction over Boohoo Group, (2) Plaintiffs sued the wrong entities, (3) all non-California class allegations should be stricken, (4) Plaintiffs lacked standing, (5) Plaintiffs' pre-litigation CLRA notices were non-compliant, and (6) Plaintiffs' claims were not properly pled. (*See* D.E. 22 at 6-7.) Plaintiffs filed a comprehensive opposition, and a detailed declaration full

of exhibits contesting Defendants' personal jurisdiction arguments. (D.E. 27.)

On November 16, 2020, the Court denied Defendants' Rule 12(f) motion to strike and Rule 12(b)(6) motion to dismiss in its entirety. (D.E. 34 at 6-16.) With regards to the personal jurisdiction motion under Rule 12(b)(2), the Court found Plaintiffs "produced enough reason for the Court to conclude that they are entitled to an opportunity to take jurisdictional discovery to solidify a basis for a proper assertion of personal jurisdiction over" Boohoo Group. (D.E. 34 at 8-9.) The Court thus deferred ruling until after Plaintiffs conducted jurisdictional discovery.

After several status conferences and joint status reports, the Court established the parameters of allowable jurisdictional discovery and set a further briefing schedule and hearing to address personal jurisdiction. (D.E. 52.) On December 30, 2020, Plaintiffs propounded interrogatories, document demands, and requests for admission related to personal jurisdiction. (Ibrahim Decl., ¶10.) However, due to these considerable efforts, on January 15, 2021, Boohoo Group dropped its personal jurisdiction challenge. (D.E. 57.)

## C.    Written Discovery, Depositions, and Witness Interviews

In early 2021, Plaintiffs served written class discovery on Defendants in each of the Actions consisting of two sets of interrogatories and document demands, and one set of requests for admission. (Ibrahim Decl., ¶17.) Due to the inadequate responses, Plaintiffs were forced to file a lengthy motion to compel further discovery. (D.E. 67.) In April 2021, Magistrate Judge McDermott issued two separate orders granting Plaintiffs' motion, in significant part, and denying Plaintiffs' motion, in certain respects. (D.E. 71, 73.)

In March 2021, Plaintiffs responded to written class discovery consisting of interrogatories, document demands, and requests for admission. (Ibrahim Decl., ¶12.) Defendants also filed a motion to compel discovery. (D.E. 76.) However, on July 19, 2021, Judge McDermott denied the motion in its entirety, the only exception being that Plaintiffs were ordered to provide a verification confirming they had no documents responsive to one document demand. (D.E. 83.)

Not including voluminous spreadsheets and data, Defendants produced more than

1    546,000 pages of documents responsive to Plaintiffs' document demands. (Ibrahim Decl.,

2    ¶14.) Class Counsel and their team reviewed these documents to conduct depositions and

3    prepare their class certification motion. (*Id.*)

4         In the meantime, in June 2021, Plaintiffs noticed the deposition of Boohoo Group's

5    Executive Chairman. (Ibrahim Decl., ¶15.) On July 7, 2021, Defendants filed a motion for

6    protective order to quash the deposition, which Plaintiffs opposed. (D.E. 78.) On July 28,

7    2021, Judge McDermott again ruled in favor of Plaintiffs, rejecting Defendants' arguments

8    and concluding that "Plaintiffs have presented evidence that [the Executive Chairman] has

9    unique personal non-repetitive knowledge of facts relevant to this suit and to class

10    certification[.]" (D.E. 89 at 3.) He was thus ordered to appear for deposition. (*Id.*)

11         In late January and early February 2022, Plaintiffs deposed four Rule 30(b)(6)

12    corporate representatives designated on behalf of the BH, PLT, and NG brands to testify

13    concerning class topics central to the allegations of wrongdoing. (Ibrahim Decl., ¶17, Ex.

14    2; *see also* D.E. 138-142.) In addition, Plaintiffs' counsel conducted an additional three

15    deposition-like interviews of key defense witnesses on relevant topics. (*Id.*)

16       **D.   Settlement Negotiations**

17         The parties commenced settlement negotiations by agreeing to private mediation

18    before the Honorable Irma Gonzalez (Ret.) from the U.S. District Court for the Southern

19    District of California. (Ibrahim Decl., ¶22.) The parties initially participated in three

20    mediation sessions on May 20, 21, and 27, 2021. (*Id.*) The parties scheduled a fourth

21    session with Judge Gonzalez on June 1, 2021. (*Id.*) Although the case did not settle, a

22    general framework for a potential settlement was laid at these initial sessions. (*Id.*) The

23    parties then reengaged settlement negotiations in September 2021, beginning with an in-

24    person meeting. (*Id.* at ¶23.) Counsel for the parties then began an ongoing and regular

25    dialogue over the remainder of 2021 in dozens of video conferences and phone calls. (*Id*.)

26    In these direct sessions, the parties negotiated all the detailed and intricate aspects of the

27    Settlement, provision by provision, beginning with a memorandum of understanding

28    delineating the material terms of the parties' agreement. (*Id.*)

In the interim, Plaintiffs conducted depositions and interviews of Defendants' witnesses in January and February 2022, as described above. (Ibrahim Decl. ¶28.) The parties continued intense back and forth dialogue and negotiations over numerous videoconferences to address additional details of the settlement in February through May 2022. (*Id.* at ¶29.) The Parties did not discuss or negotiate plaintiffs' counsel's request for attorneys' fees and costs until all other material terms, including the amount of the gift cards and free shipping, were agreed upon. (*Id.* at ¶¶24-27, Exs. 3-4.)

The parties then reengaged Judge Gonzalez for a fifth and final mediation session on May 4, 2022 for her independent assessment of the agreement to further ensure that it was fair, reasonable, and adequate. (*Id.* at ¶30.) In this session, the parties presented her with a near final draft of the Settlement which, among other things, contained the provisions for proposed attorneys' fees and costs. (*Id.*) Judge Gonzalez had spent considerable time on the case and commented that Plaintiffs' counsel had achieved an excellent result for the Class and the request for attorneys' fees seemed fair. (*Id.*; Almadani Decl. ¶12.) The parties then worked together to finalize the exhibits to the Settlement, including class notices and the exhibits showing the changes required of Defendants under the injunctive relief provisions of the Settlement. (*Id.*) On May 20, 2022, the parties executed the final settlement agreement. (*Id.* at Ex. 1.)

### E.    The Terms of the Settlement

#### 1.    *The Settlement Class.*

The Settlement defines the classes whose claims are being resolved as follows:

- For the BH Action, "all individuals in California who made a purchase on the Boohoo U.S. Websites during the Class Period." (Settlement at § 1.3.1.) The class period is "from April 9, 2016, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

- For the PLT Action, "all individuals in California who made a purchase on the PLT U.S. Website during the Class Period." (Settlement at § 1.3.1.) The class period is "from May 19, 2016, through the date Defendants make changes to their websites that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

- For the NG Action, "all individuals in California who made a purchase on the Nasty Gal U.S. Website during the Class Period." (Settlement at § 1.3.1.) The class period is "from March 1, 2017, through the date Defendants make changes to their websites

that are agreed upon by the Parties and approved by the Court in the Preliminary Approval Order." (Settlement at § 1.6.1.)

### 2. Settlement Consideration

#### a. Monetary Benefits to the Class

Under the Settlement, each Class Member who does not timely opt out of the Settlement "shall automatically receive" a $10 gift card to include free shipping (additionally valued at $7.28 per gift card) for single use on each U.S. website from which one or more "Qualifying Purchases" were made during the Class Period (the "Gift Card"). (Settlement at § 2.1; D.E. 133-2, 142 (Stipulation in Support of Motion for Preliminary Approval of Class Settlement ("Stip.")) at ¶13, Ex. 2.) The Settlement covers purchases from https://us.boohoo.com and/or https://boohooman.com/us (the "BH Websites"), https://prettylittlething.us (the "PLT Website"), and https://nastygal.com (the "NG Website") (collectively, the "U.S. Websites"), which include their associated mobile phone applications. (*Id.*) "Qualifying Purchase" is defined as "the purchase of any product by a California resident from the Boohoo U.S. Websites, the PLT U.S. Website, or the Nasty Gal U.S. Website within the Class Period." (*Id.* at § 1.22.) The Gift Cards have the following important attributes:

- All class members who do not opt out will automatically receive the Gift Card via email without the need to file a claim. (Settlement at §§2.1 and 2.1(a)(ii).)

- Each Gift Card has a face value of $10.00 plus free shipping and handling (Settlement at §2.1(a)(i)), which provides Class Members considerable choice and variety in using the Gift Cards without having to incur any out-of-pocket costs. "On any given day, Defendants generally have thousands of styles that may be purchased for $10 or less with a wide variety of styles across many different categories on their websites." (Stip. at ¶19; D.E. 144 (Tregillis Decl.) at ¶¶ 57-59.)

- There is no requirement for Class Members to pay any shipping charges when a Gift Card is used, but because Defendants do not normally offer free shipping and are thus incurring a significant cost as a result of this benefit, the Gift Cards must be used in one transaction. (Stip. at ¶13.) The value of this benefit is at least $7.28 based on Defendants' customary shipping and handling charges on average per order across the U.S. Websites during the Class Period. (Settlement at §2.1(a)(i)(xi); Stip. at ¶13, Ex. 2; D.E. 144 (Tregillis Decl.) at ¶¶ 60-62.)

- The Gift Cards have no expiration date. Defendants have no right to cancel the Gift Cards and they cannot revert to Defendants under any circumstance. (Settlement at §2.1(a)(iii).)

- There is no minimum purchase requirement to use the Gift Cards and they may be used toward any purchase. (*Id.* at §2.1(a)(iv).)

- There are no blackout dates restricting use. (*Id*. at §2.1(a)(vi).)
- The Gift Cards may be used with other offers and promotions. (*Id*. at §2.1(a)(vii).)
- The Gift Cards may be freely transferred or given to others. (*Id*. at §2.1(a)(viii).)
- The Gift Cards are stackable, meaning that multiple Gift Cards from the same website may be combined to use in a single transaction. (*Id*. at §2.1(a)(ix).)
- There are no fees for inactivity or any other reason. (*Id*. at §2.1(a)(xii).)
- The Gift Cards may be used on the website from which a Class Member made his or her purchase. (*Id*. at §2.1(a)(i).) For example, if a Class Member bought from the PLT Website, she will receive one Gift Card to use on the PLT Website only. (*Id.*)
- If Class Members bought from multiple sites, they may receive multiple Gift Cards—one for each website from which a purchase was made (with BH and BoohooMAN counting as one site). (*Id*. at §2.1(a)(v).) Class Members may thus be entitled to a total of three (3) Gift Cards if they made a purchase on all three sites.
- Lost Gift Cards will be replaced upon request. (*Id*. at §2.1(a)(xiii).)

### b.   *Injunctive Relief Benefits to the Class*

The Settlement provides for significant injunctive relief whereby Defendants agreed to implement (and did implement), within 14 days after the Court's entry of the Preliminary Approval Order, certain changes to the marketing and advertising on the U.S. Websites. (Settlement at §2.10.) Specifically, Defendants were required to make clear and conspicuous disclosures on their product display pages whenever they advertise a discount off the original or full price (i.e., what Plaintiffs refer to as "reference prices" in the Actions). (*Id*.) The disclosures advise the customer that the original price advertised is not intended to be a former price, but instead merely reflects Defendants' opinion of the full value, as follows:

> *Our percentage off promotions, discounts, or sale markdowns are customarily based on our own opinion of the value of this product, which is not intended to reflect a former price at which this product has sold in the recent past. This amount represents our opinion of the full retail value of this product today based on our own assessment after considering a number of factors.*
>
> *That's why before checking out, it's important you acknowledge that you understand this. Cool with that? Great, happy shopping!*

(Settlement at § 2.10.2(b).) Both the disclosure and the original price on the product display page must have an asterisk to alert the customer to the fact that the disclaimer relates to the displayed original price. (*Id*. at § 2.10.2(a), (c).) The disclosure cannot be hidden in a "click to reveal" format; rather, it must be always viewable under the header

7

"Pricing Policy" without the need for customers to click to open it. (*Id.* at § 2.10.2(a).) This full disclosure must also be displayed on the terms and conditions of each of the U.S. Websites. (*Id.* at § 2.10.2(e).)

In addition, Defendants must include a short disclosure on all landing pages, all product display pages, and all emails sent to customers containing advertisements of discounts from an original or full price. (*Id.* at § 2.10.2(d).) The short disclaimer must state: "*Discounts may not be based on former prices. See pricing policy.*" (*Id.*) The phrase "See pricing policy" must have a hyperlink taking the customer directly to the full pricing policy disclaimer set forth above. (*Id.*)

These changes must be consistent with Exhibit G to the Settlement, which provides a visual mockup of what the changes will look like on the U.S. Websites. (Settlement at §2.10.2, Ex. G.) Importantly, these mockups show that the disclosures shall be visible to customers to satisfy the conspicuousness requirement. (*Id.* at Ex. G.) As shown on Exhibit G, Defendants shall include the short form disclaimer in the *center* of the top banner on the home landing page of their websites and product display pages where they advertise their percent-off promotion for a given day (including on the mobile application version); moreover, the short form disclaimer shall be *bolded*, and the font size of the short form disclaimer must be large enough to match the discount messaging that it accompanies. (*Id.* at Ex. G.) Exhibit G also shows that the short form disclaimer shall be bolded, centered, and of equal font size to the accompanying promotional message on all emails sent to customers advertising a sale or discount off an original price. (*Id.* at Ex. G.)

There is no end date on the required disclosures, i.e., they shall be maintained forever on the subject websites. (*See id.* at §2.10.2.)

Further. the settlement also contains a provision titled "Compliance with the Law." (*Id.* at §2.10.1.) This clause requires Defendants to "agree that their comparison pricing practices in California . . . will not violate then-existing Federal or California law . . ." (*Id.*)

        *a.    Attorneys' Fees, Costs, Service Awards, and Settlement Administration Costs*

As noted, the Settlement provides a monetary value of $17.28 per Class Member

8

consisting of $10 Gift Cards with free shipping valued at $7.28 per person. For the 1,534,208 Class Members known at present (accounting for an estimated total of 1,919,215 gift cards), this computes to a total monetary value of the Settlement in the approximate sum of $33 Million. (Cooley Decl. ¶6.) Importantly, this does not account for the value of injunctive relief (D.E. 144 (Tregillis Decl.) at ¶¶53-62), which has an estimated value of an additional $79.5 Million over the next five years. (*Id.* at ¶¶63-69.)

In consideration of obtaining these significant benefits for the Class, the many hours spent by Class Counsel, the significant funds Class Counsel have spent on litigation costs, including experts, and the risks taken by Class Counsel in terms of time, money, and resources, the Settlement provides that Class Counsel may seek an award of attorneys' fees and costs up to $4,750,000 with no opposition from Defendants. (Settlement at § 2.4(b).) Class Counsel's total litigation costs to date are $243,514. (Ibrahim Decl. ¶53.) Therefore, Class Counsel's fee request of $4,506,486 amounts to 13.65% of the $33 Million monetary value recovered for the Class, *not* considering the value of the injunctive relief. (*See id.*) If the value of the injunctive relief is considered, Class Counsel's request for fees is 4% of the overall value provided to the Class. (*See id.*)

As discussed in further detail in section III.B.3, *infra,* Class Counsel have collectively put in 3,659 hours working on the Actions. (Ibrahim Decl. ¶52.)

Furthermore, the parties agree that there would be no reverter of fees back to Defendants. That is, if the Court awards an amount less than $4,750,000, the difference will *not revert* to Defendants. (Settlement at §2.5.) Instead, it will be donated to *cy pres*— either the National Consumer Law Center (NCLC) (as proposed by Plaintiffs) or the Better Business Bureau (BBB) (proposed by Defendants), or divided equally between the two organizations, as determined by the Court in its discretion. (*Id.* at § 2.5.) If the Court finds that neither organization should receive the funds, the unawarded fees will be donated to an organization chosen by the Court. (*Id.*)

The Settlement further provides that each of the three class representatives may seek an incentive award not to exceed $5,000 with no opposition from Defendants. (*Id.* at §2.3.)

Defendants also agree to pay all costs associated with settlement administration in the amount of $350,000. (Settlement at § 2.4(a).) This amount was based on an estimate prepared by Kurtzman Carlson Consultants LLC ("KCC"), the selected settlement administrator, to execute the notice and administration plan set forth in the Settlement. (Ibrahim Decl. ¶35.) The entire $350,000 is to be used—in settlement administration as well as promotion of the Gift Cards to Class Members—with no reversion back to Defendants. (*See* Settlement at §3.4(f), Ex. J.)

## F.     The Court Granted Preliminary Approval of the Settlement

On June 1, 2022, the Court, in a detailed tentative ruling later adopted as the final ruling, granted Plaintiffs' Motion for Preliminary Approval of the Class Settlement. (D.E. 148, 157.) The Court conducted a thorough analysis of the requirements of Rule 23(a) and (b) and found that all three proposed California classes for each of the three websites at issue should be preliminarily certified for settlement purposes. (D.E. at 148 at 3-7.)

With regards to the Settlement terms, the Court stated it "has little trouble agreeing that preliminary approval of the settlement is appropriate here." (D.E. 148 at 7.) The Court noted that the Class has been adequately represented by Class Counsel based on the "plentiful evidence demonstrating the work Plaintiffs and their counsel have undertaken in bringing and supporting this litigation" and Class Counsel "easily" meeting the "qualifications" requirement. (*Id.* at 6.) It noted that the Settlement provides adequate relief to the Class, which "Plaintiffs have understandably valued at $32.5 Million," and stated the Settlement furnished substantial and meaningful injunctive relief. (*Id.* at 8.)

The Court also expressed its view that the $4.75 Million sought for attorneys' fees and costs would likely not raise concerns as it amounted to "less than 14% of the monetary value calculated for the settlement," is non-reversionary with any unawarded sums going to *cy pres*, and is "not drawn from a 'common fund' and therefore will not reduce the money available to class members[.]" (D.E. 148 at 9-10.) Nevertheless, the Court was careful to not prejudge the issue, fully leaving the door open for objectors to raise any legitimate concerns and reserving decision concerning the exact amount of the award for

*Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards*                    *Case No. 20-cv-03332-GW (JEMx)*

final approval. (*See* D.E. 148 at 10 & n.10.) After applying the relevant case law and considering the specific attributes of the Settlement, the Court expressed its view that a settlement such as this one would likely not "be considered a 'coupon' settlement," while again reserving its final decision on the issue for this final approval stage. (D.E. 148 at 11 (noting that "facts suggest" Settlement was, "generally-speaking," not to be viewed as a "coupon" settlement.)

On June 3, the Court entered a formal order granting preliminary approval (D.E. 158), which was amended twice to address scheduling and other technical issues. (D.E. 162, 187.)

### G.  The Settlement Administrator Disseminated Notice to the Class and the Reaction of the Class Has Been Favorable

The Court appointed KCC as the Settlement Administrator in connection with the Settlement. (D.E. 158 at ¶13.) KCC executed on the class notice plan outlined in the Settlement and approved by the Court, which consists of (1) e-mail notice, (2) postcard notice by mail, (3) publication notice in the *Los Angeles Times* to satisfy the CLRA, (4) a long-form notice posted on a dedicated class settlement website, and (5) notice to public officials as required under CAFA. (Cooley Decl. ¶2.) As of the date of filing this Motion, from the approximately 1.5 million class members who have been successfully notified of the Settlement, KCC has received only twenty-one (21) total requests for exclusion. (Cooley Decl. ¶6.) To date, Class Counsel has received zero (0) objections to the Settlement and is not aware of any objections having been submitted to the Court. (Ibrahim Decl. ¶36; *see also* Cooley Decl. ¶14.)

## III.  THE COURT SHOULD AWARD THE REQUESTED ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS

### A.  The Fee Request Is Justified Under the Percentage of the Benefit Method

It is well established that "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of [its] litigation, including attorneys' fees." *Vincent v. Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *see also In re Bluetooth Headset Prods. Liability*

---

11

*Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). This rule, known as the "common fund doctrine," is designed to prevent unjust enrichment by distributing the costs of litigation among those who benefit from the efforts of the litigants and their counsel. *See Paul, Johnson, Alston, & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989).

Because jurisdiction here is based upon diversity, California law controls whether an attorney is entitled to fees and the method of calculating such fees. *See, e.g., Mangold v. California Pub. Util. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995). "California has long recognized, as an exception to the general American rule that parties bear the costs of their own attorneys, the propriety of awarding an attorney fee to a party who has recovered or preserved a monetary fund for the benefit of himself or herself and others." *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 488-89 (2016). In awarding fees in connection with a common fund, courts generally use either a percentage of the benefit method or a "lodestar" method. *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994). "The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts." *Laffitte*, 1 Cal. 5th at 504.

Nevertheless, "[d]espite this discretion, use of the percentage method in common fund cases appears to be dominant." *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09 MDL 2007-GW(PJWX), 2014 WL 12591624, at *5 (C.D. Cal. Jan. 10, 2014) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002), and *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)); *Paul, Johnson*, 886 F.2d at 272. The advantages of using the percentage method have been thoroughly described by many courts. *See, e.g., In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1374-77 (N.D. Cal. 1989) (collecting authority and describing benefits of the percentage method over the lodestar method). The ultimate goal under either method of determining fees is to reasonably compensate counsel for their efforts in creating the common fund. *See Paul, Johnson*, 886 F.2d at 271-72. California courts and the Ninth

Circuit have approved a number of factors which may be relevant to the Court's decision, including: (1) the results achieved, (2) the risk of litigation, (3) the skill required and the quality of work, (4) the contingent nature of the fee and the financial burden carried by the plaintiffs, and (5) the benefit of settlement to the public. *In re Aftermarket Auto. Lighting*, 2014 WL 12591624, at *5 (citing *Vizcaino*, 290 F.3d at 1048-50). The Ninth Circuit has explained these factors should not be used as a rigid checklist or weighed individually, but rather should be evaluated in light of the totality of the circumstances. *Id.* As set forth below, an analysis of these factors demonstrates that the requested fee award is reasonable.

### 1.   *Plaintiffs' Fee Request is Reasonable Because It Is Well Below the 25 Percent Benchmark*

The benchmark award of attorneys' fees in "common fund" or "constructive common fund" cases is 25%. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). When assessing the value of a fund, "the Court should look to the maximum settlement amount that could be claimed." *Nwabueze v. AT & T Inc.*, No. C 09-01529 SI, 2013 WL 6199596, at *11 (N.D. Cal. Nov. 27, 2013).

Here, the monetary value of the settlement, before adding the value of injunctive relief, is $33 Million. This is calculated by multiplying the total number of gift cards top be distributed (1,919,215) by the $17.28 value of the Gift Cards ($10 Gift Card plus $7.28 value of free shipping that is normally charged by Defendants). Accordingly, the proposed fee award is only **13.65%** of the total monetary settlement value. Importantly, because Class Counsels' fees will not come out of the benefits to be distributed to the Class, Class Members will receive their full benefits regardless of the attorneys' fees the Court allows.

Moreover, this proposed fee amount is only **13.65%** of the total monetary settlement value *before* accounting for the value of injunctive relief. "When determining the value of a settlement, courts consider the monetary and non-monetary benefits that the settlement confers." *Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-LB, 2016 WL 4916955, at *5 (N.D. Cal. Sept. 15, 2016); *see also Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) (upholding district court's approval of attorneys' fees where it was apparent that injunctive relief offered "generated benefits far

beyond the cash settlement fund"); *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, *7 (N.D. Cal. Mar. 18, 2013) (settlement value includes injunctive relief). Thus, for example, in *Miller v. Ghirardelli Chocolate Co.*, the Court included the value of Ghirardelli Chocolate removing various terms from its labels as part of the common fund from which to calculate attorneys' fees. No. 12-cv-04936-LB, 2015 WL 758094, at *1, 5 (N.D. Cal. Feb. 20, 2015).

Here, according to Plaintiffs' highly experienced and qualified damages expert, the injunctive relief is worth $79.5 Million over the course of the next five years. (D.E. 144 (Tregillis Decl.) at ¶¶63-69.) This figure is calculated by taking into account the damages for the year 2021 (the most recent year for which Plaintiffs have data) assuming the websites are not changed and continue to mislead consumers, which are approximately $20 million. (*Id.*) If the amount of sales in the future is the same—considering the trend of increased sales, but also the potential decrease in sales with the elimination of deception—then the future value of an injunction is $20 million per year, which, if discounted to present value, amounts to $79.5 Million to California consumers over five years. (*Id.*) Notably, because Defendants are required to maintain these changes perpetually, the injunctive relief negotiated in the Settlement is actually worth much more.

Therefore, when the minimum value of injunctive relief ($79.5 Million) is combined with the minimum value of monetary relief ($33 Million), the proposed attorneys' fees of just over $4.5 Million amount to approximately **4%** of the value provided to the Class.

In either case, the fee request is well under the 25% "benchmark" for measuring presumptively acceptable fees in the Ninth Circuit. *Bluetooth*, 654 F.3d at 942. Class Counsels' proposed fees are therefore reasonable for this initial reason.

### 2. The Vizcaino Factors Support Plaintiffs' Fee Request

#### a. Class Counsel Achieved an Excellent Result

Applying the first *Vizcaino* factor referenced above, Class Counsel have achieved excellent results for the Class. Under the Settlement, Class Members who have not affirmatively opted out will receive a $10 Gift Card with *free shipping* valued at $7.28 per

Class Member automatically in their e-mail inboxes without the need to file a claim. The Gift Cards do not expire, and there are no blackout dates, minimum purchase requirements or fees, and they may be used in conjunction with other offers and promotions. There are no restrictions on transferability and, when they are transferred to others, multiple Gift Cards may be combined together (i.e., "stacked"). Class Members who bought from more than one of the subject websites may receive multiple Gift Cards—one from each site from which they made a purchase (BH/BoohooMan, PLT, and NG). These websites consistently include thousands of items available for $10 or less across a wide variety of product categories and styles, meaning that Class Members can use their Gift Cards without incurring any out-of-pocket expense or apply the Gift Cards toward a more expensive purchase, all with free shipping.

Moreover, the Settlement also provides impactful injunctive relief by requiring Defendants to post visible disclosures on Defendants' websites and mobile applications designed to prevent future harm to California consumers from the deceptive pricing and markdown practices that are the subject of the Actions. Defendants must explain on their landing pages and on each individual page listing a product for sale that their reference prices *are not based on former prices*, but rather are *merely Defendants' own opinion* of the full retail value of the item. Consumers thus will no longer be misled into believing that Defendants' reference prices are supposed to reflect the price at which the item was sold in the recent past. Under the Settlement, the required disclosures must be *conspicuously* displayed in bold font throughout the sites in multiple places wherever reference prices and discounts off reference prices are advertised. (*See* Settlement, §§ 2.10.1, 2.10.2(a)-(d) and Ex. G; D.E. 144 (Tregillis Decl.) ¶¶65-67) Importantly, these critical changes are not temporary; they must be maintained forever.

       b.    *The Risk of Litigation Also Supports the Fee Request*

Although Plaintiffs' case is strong, Class Counsel has pursued this litigation, pouring in thousands of hours and $243,514 in litigation costs for over two and a half years without any guarantee of success. Continuing to pursue this litigation in lieu of settlement

poses significant risk, expense, complexity, and delay in resolution. To be clear, as they noted at preliminary approval and now again at this final approval stage, Class Counsel is confident they would be able to obtain class certification and successfully prove their claims at trial. They are also confident that they have formulated a viable damages model based on a sound marketing survey and well-settled and accepted economic methodologies. (*See* D.E. 144 (Tregillis Decl.).) However, juries are unpredictable and may not find Defendants' pricing and sales practices deceptive despite the evidence. There is also a small risk that Plaintiffs' model for computing classwide damages would not be acceptable to the Court or the Ninth Circuit. *See*, *e.g.*, *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL 1072129, at *12 (C.D. Cal. Mar. 15, 2016) (granting summary judgment based on the plaintiffs' failure to demonstrate "a viable measure of restitution, such as a 'price premium' model in which an expert isolates the amount of the price attributable to the false representation.") While Plaintiffs here have a strong damage model that fully addresses the concerns raised by *Chowning* (D.E. 144 (Tregillis Decl.)), litigation inherently carries a risk.

Furthermore, Plaintiffs would face years of litigation against experienced defense counsel armed with substantial resources. In addition to the considerable efforts in discovery and motion practice Class Counsel has already put into the case, they would face continuing risk and expense in having to conduct further class discovery, prosecute a motion for class certification and potentially oppose a Rule 23(f) petition to the Ninth Circuit, conduct merits discovery, successfully oppose summary judgment, undertake expert discovery, make pretrial disclosures and filings, and try the case. And even if Plaintiffs prevail at trial, they would have to overcome post-trial motions and may have to oppose a lengthy appeal.

c.    *The Skill of Counsel and Work Performed Support the Fee Request*

With regards to this third factor identified above, the Court has already found in its preliminary approval ruling that "[t]here is plentiful evidence demonstrating the work Plaintiffs and their counsel have undertaken in bringing and supporting this litigation."

16

(D.E. 148 at 6.) Plaintiffs survived Defendants' Rule 12(b)(6) and Rule 12(f) challenges. Their work contesting Defendants' personal jurisdiction arguments and initiating jurisdictional discovery led Defendants to drop their challenge. Class Counsel reviewed more than 500,000 pages of Defendants' discovery, prevailed in multiple discovery motions—including successfully compelling the parent company Chairman and CEO to sit for deposition, and took many depositions and interviews of company representatives across all four brands at issue (BH/BoohooMan, PLT, and NG). As the Court also recognized, "[t]he negotiation process for this settlement agreement was both lengthy and arduous." (D.E. 148 at 6.) The amount of work required to accomplish the foregoing cannot go ignored, as Class Counsel collectively put in 3,659 hours between the three attorneys working on this matter. (Ibrahim Decl. ¶¶49-52, Ex. 6; Almadani Decl. Ex. 1; Wang Decl. Ex. 1.) This factor, therefore, weighs in favor of granting the fee request.

> d.   *The Risks Class Counsel Has Undertaken By Pursuing this Case on a Contingency Basis Along With the Financial Burdens Also Support the Fee Request*

Class Counsel has remarkably achieved this result for the Class while risking nearly three years of their time covering 3,659 hours of work, and substantial financial resources. Class Counsel have done so with no guarantee of success on a contingency basis against Defendants represented by a team of experienced and skilled attorneys from a large international law firm. Class Counsel incurred $243,514 in litigation costs, including significant expert costs, to help overcome anticipated objections to their damage model based on marketing surveys for each of the three brands at issue in what would have been a highly contested class certification motion and, even if successful, a Rule 23(f) petition, summary judgment motion, trial, and appeal.

In the face of these risks and challenges, Class Counsel's fee request is justified. *See Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320-GW(JEMX), 2020 WL 10055593, at *8 (C.D. Cal. June 22, 2020) (awarding 33 percent of the common fund because performance of work "on a contingency basis (for nearly two years) is an always-risky practice, particularly in a case that had to survive the number of challenges, and incur

the amount of expenses.").

                        e.        *The Settlement Provides a Significant Benefit to California Consumers*

As described above, the Settlement provides meaningful injunctive relief on the U.S. Websites to prevent members of the public in California visiting the U.S. Websites—i.e., both customers and non-customers browsing the sites and considering purchases—from being misled that the reference prices are based on former prices. California consumers, therefore, are protected from being incorrectly led to believe that the sales and discounts on the sites are sales and discounts off of an original price or a price at which the merchandise advertised on the sites had previously sold for. As a result of the Settlement, it is made clear that Defendants' advertised prices are based merely on Defendants' own opinion of the full retail value of the item. California members may thereby make informed purchasing decisions.

For these reasons, Plaintiffs respectfully request the Court to grant the proposed award of fees in the parties' Settlement.

        **3.**        ***The Request for Fees and Costs Is Fair and Reasonable Under a Lodestar Cross-Check***

Although not required, a lodestar cross-check can confirm that the percentage requested is reasonable. *Jasper v. C.R. England, Inc.*, No. CV 08-5266-GW(CWX), 2014 WL 12577426, at *9 (C.D. Cal. Nov. 3, 2014); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a perspective on the reasonableness of a given percentage award"). Indeed, under Ninth Circuit precedent, the Court "need not necessarily engage in such a cross-check to reach its conclusion that the sought fees are reasonable under the circumstances." *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09 MDL 2007-GW(PJWX), 2014 WL 12591624, at *6 (C.D. Cal. Jan. 10, 2014) (citing *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) and *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994)). Under the lodestar method, a court calculates the fee award by

multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure using a multiplier, if necessary, to account for relevant factors such as the risks associated with representation, the quality of representation, the benefit obtained for the class, and the complexity and novelty of the issues presented. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *Jasper*, 2014 WL 12577426, at *9.

Here, the request for attorneys' fees and costs does not cut into the compensation to the Class Members and is far below the acceptable benchmark 25% of the settlement value. Hence, a lodestar cross-check does not appear necessary to assess fairness to the Class Members and reasonableness of the fees. Nevertheless, the request for attorneys' fees is fair and reasonable under the lodestar method, as discussed below.

### a.   Class Counsel's Hourly Rates are Reasonable

Courts may find hourly rates reasonable based on evidence of other courts approving similar rates or other attorneys engaged in similar litigation charging similar rates. *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal. 2010). When determining a reasonable hourly rate, courts generally consider several factors, including: (1) the experience, skill, and reputation of the attorney requesting fees; (2) the prevailing rate in the community for comparable attorneys; and (3) the novelty or difficulty of the issues presented. *Addison v. Monarch & Assocs., Inc.*, No. EDCV 14-358-GW(CWX), 2018 WL 6616662, at *3 (C.D. Cal. Jan. 25, 2018) citing *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210–11 (9th Cir. 1986). The court may consider "affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, rate determination in other cases, particularly those setting a rate for plaintiffs' attorney rate, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

Here, Class Counsel's hourly rates range from $475 to $850, which are fair and

reasonable considering the skilled and vigorous representation Plaintiffs have received. Plaintiffs are represented by two boutique Los Angeles/Orange County law firms that specialize in trials involving complex business litigation, class actions, government facing litigation, and high-stakes plaintiffs' cases. (Almadani Decl. ¶6; Ibrahim Decl. ¶¶38-39.) These firms are led by Class Counsel, Yasin M. Almadani and Ahmed Ibrahim, who are extremely experienced, skilled, and reputable. (*See id.*)

Mr. Almadani is a 2004 graduate of Berkeley Law School who has been practicing law for over 18 years. (Almadani Decl. ¶ 3.) Mr. Almadani served as a judicial law clerk in the Southern District of Florida, practiced complex civil litigation at prestigious firms, including Winston & Strawn, and served as an Assistant United States Attorney in the criminal sections of the Eastern and Central Districts of California for over eight (8) years. (*Id.* at ¶ 4.) Over his career, Mr. Almadani has gained considerable trial experience and has never lost a trial. (*Id.* at ¶ 5.)

Mr. Ibrahim graduated from law school in 2005 from the University of California, Hastings College of the Law and has been practicing law for over 17 years. (Ibrahim Decl. ¶38.) Mr. Ibrahim began his career in the commercial litigation department of Snell & Wilmer where he spent over five (5) years. (*Id.*) He has focused his career on high-stakes, complex civil litigation on both the plaintiffs' and defense side, including class actions, and has helped garnered results collectively worth over $100 Million. (*Id.* at ¶¶38-45.)

Messrs. Almadani and Ibrahim founded their law practices in 2018 and 2019, respectively, with the objective to lead high-stakes cases with an efficient, hands-on approach that avoids the traditional army of associates. (Almadani Decl. at ¶6; Ibrahim Decl. ¶44.) To accomplish this, Mr. Almadani and Mr. Ibrahim carefully select and accept only a limited number of cases at any given time and personally prosecute those cases, devoting the considerable time, energy, and resources each case requires for optimal results for their clients. (*Id.*)

Recently, Mr. Almadani and Mr. Ibrahim tried to verdict in this District a contentious civil fraud case involving a complex EB-5 financing structure for a Manhattan

hotel project, and secured over $3.7 Million for their client, including a stipulated $1 Million in punitive damages after winning across the board on every issue at trial. (Almadani Decl. at ¶7; Ibrahim Decl. ¶43.) Mr. Almadani and Mr. Ibrahim have prosecuted this case with the same intensity and have turned away paid work to give this hotly contested case the time and resources it required. (Almadani Decl. at ¶8; Ibrahim Decl. ¶43.)

Rather than staffing the matter with an army of lawyers and staff, Mr. Almadani and Mr. Ibrahim took a more efficient approach with a three-attorney team: Mr. Almadani, Mr. Ibrahim, and attorney Daniel Wang. (Almadani Decl. at ¶9; Ibrahim Decl. ¶44.) Mr. Wang graduated from Case Western Reserve University School of Law in 2010 and has been practicing law for over 11 years. (Wang Decl. at ¶2.) His casework has involved both transactional work and litigation, including consumer-facing matters. (*Id.*) Mr. Wang is currently based in the Seattle, Washington area. (*Id.*)

Class Counsel Almadani and Ibrahim worked in tandem to closely oversee every aspect of the litigation at a partner level while assigning associate-level tasks to Mr. Wang and supervising his work. (Almadani Decl. at ¶9; Ibrahim Decl. ¶47; Wang Decl. at ¶3.) Class Counsel also utilized administrative assistance on a contract basis, as needed, to keep fees and costs manageable. (*Id.*) Mr. Almadani and Mr. Ibrahim's hourly rate is $850, while Mr. Wang's hourly rate is $475 for work done on this matter. (Almadani Decl. at ¶ 10; Ibrahim Decl. at ¶¶47-48, 50, Ex. 5; Wang Decl. at ¶4.)

These hourly rates are consistent with those charged by attorneys in the consumer law field within this Circuit and with similar levels of experience. *See, e.g., Fitzhenry-Russell v. Keurig Dr Pepper Inc.*, *et al*, No. 5:17-cv-00564 (N.D. Cal. Feb 03, 2017) (ECF Nos. 327-1, 350) (finding reasonable partner hourly rates up to $894 and associate hourly rates up to $658); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (finding reasonable hourly rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates, and $245 to $350 for paralegals); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,

No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (finding reasonable hourly rates up to $1,600 for partners, up to $790 for associates, and up to $490 for paralegals); *In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2019 WL 1791420, at *9 (N.D. Cal. Apr. 24, 2019) (finding reasonable hourly rates of $365 to $950 for attorneys); *Gutierrez v. Wells Fargo Bank*, N.A., No. C 07-05923 WHA, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (finding reasonable partner hourly rates up to $975 and associate hourly rates up to $495 in a consumer class action); *Tom v. Com Dev USA, LLC*, No. 16-cv-1363 PSG (GJSx), 2017 WL 10378629, at *8 (C.D. Cal. Dec. 4, 2017) (finding reasonable range of hourly rates from $325 to $750 based on level of experience); *Wit v. United Behav. Health*, 578 F. Supp. 3d 1060, 1079 (N.D. Cal. 2022) (finding reasonable partner/counsel hourly rates ranging from $625 to $1,145 and associate hourly rates ranging from $450 to $650). (*See also* Almadani Decl. at ¶10; Ibrahim Decl. at ¶¶47-48, 50, Ex. 5.)

Class Counsel's hourly rates are also consistent with rates identified in The Real Rate Report, a publication used by courts in this Circuit to assess reasonableness of attorney rates. *See, e.g., Judson v. Goldco Direct, LLC*, No. CV 19-6798 PSG (PLAx), 2021 WL 8462049, at *9 (C.D. Cal. June 11, 2021) (using Real Rate Report to allow attorney rates of $730 and $800 in Los Angeles); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. CV13-5693 PSG (GJSx), 2017 WL 4685536, at *8 (C.D. Cal. May 8, 2017) (using Real Rate Report to allow partner rates of $700 and $1,200 in Los Angeles).

"The Real Rate Report is powered by the Wolters Kluwer ELM Solutions LegalVIEW data warehouse, which has grown to include $155B+ in anonymized legal data." (Ibrahim Decl. ¶48; Ex. 5.) It includes "lawyer and paralegal rate data filtered by specific practice and sub-practice areas, metropolitan areas, and types of matters." (*Id.*)

Courts in this Circuit allow fees based on an hourly rate at the third quartile within a range identified by reputable publications such as The Real Rate Report. *See, e.g., Brady Mktg. Co. Inc. v. Kai U.S.A. Ltd.*, No. 3:16-cv-1878-MO, 2018 WL 3377083, at *3 (D. Or. July 11, 2018) (noting that awarding "the 75th percentile rate . . . is the usual practice of

this district"); *French v. City of Los Angeles*, No. EDCV 20-00416 JGB (SPx), 2022 WL 2189649, at *17 (C.D. Cal. May 10, 2022) (relying on Real Rate Report to award fees in the third quartile for solo practitioner with 15 years' experience). A court may allow an hourly rate greater than the range in the Real Rate Report as "reasonable in light of [an attorney's] extensive skill and experience." *Flo & Eddie, Inc.*, 2017 WL 4685536, at *8 (finding reasonable partner rate of $1,200 in Los Angeles (above the rate identified in The Real Rate Report) based on partner's extensive skill and experience).

The 2022 Real Rate Report, *inter alia*, provides the following relevant data:

| 2022 Real Rates by Geographic Region and Matter Type | | | | |
|---|---|---|---|---|
| Region | Matter Type | Attorney Level | Median | **Third Quartile** |
| Los Angeles, CA | Litigation | Partner | $725 | **$1,045** |
| Los Angeles, CA | Litigation | Associate | $615 | **$855** |
| Seattle, WA | Litigation | Associate | $468 | **$530** |

| 2022 Real Rates by Geographic Region and Years of Experience | | | | |
|---|---|---|---|---|
| Region | Attorney Level | Years' Experience | Median | **Third Quartile** |
| Los Angeles, CA | Partner | Fewer than 21 Years | $801 | **$1,075** |
| Los Angeles, CA | Associate | 7 or More Years | $550 | **$840** |
| Seattle, WA | Associate | 7 or More Years | $429 | **$473** |

| 2022 Real Rates by Geographic Region for General Liability Litigation | | | | |
|---|---|---|---|---|
| Region | Attorney Level | Years' Experience | Median | **Third Quartile** |
| Los Angeles, CA | Partner | Fewer than 21 Years | $835 | **$995** |
| Los Angeles, CA | Associate | 7 or More Years | $475 | **$735** |
| Seattle, WA | Associate | 7 or More Years | N/A | N/A |

(Ibrahim Decl. ¶48; Ex. 5.)

Here, Class Counsel Almadani and Ibrahim both graduated from top law schools,

and each have nearly two decades of litigation experience, including extensive experience at prestigious law firms. Mr. Almadani has litigated matters of national significance and has considerable federal trial experience, including nearly a decade at two prestigious U.S. Attorney's Offices. Mr. Ibrahim has also litigated matters of national significance, including large class actions, and has secured awards for his clients collectively worth over $100 Million to date. Class Counsel have utilized their collective experience to litigate this case vigorously and secure a tremendous result for the Class.

Nevertheless, for the lodestar cross check, Class Counsel have used a conservative partner-hourly-rate ($850) that falls well within the range identified by The Real Rate Report, *below* the third quartile for partner rates, and even near or below the third quartile for *associate* rates in the Los Angeles region. Mr. Wang's rate of $475 is also reasonable and well within The Real Rate Report range for an attorney with 11 years' experience in the Seattle region.

Therefore, the first two of the three reasonableness factors identified above—(1) the experience, skill, and reputation of the attorneys requesting fees, and (2) the prevailing rate in the community for comparable attorneys—both support Class Counsel's fee request in this case for purposes of a lodestar cross check.

The third factor—the novelty or difficulty of the issues presented—also supports the fee request. Here, the risk, expense, complexity, and likelihood of protracted litigation have been significant. The case has required Class Counsel to, among other things, investigate the validity of claims arising from Defendants' practices on three different websites, painstakingly pouring through historical Internet data, vet and procure an appropriate class representative for each of the three cases, and file and prosecute three distinct actions against foreign defendants who have, throughout this litigation, used their foreign status to evade service and discovery, requiring considerable litigation on Class Counsel's part. (Ibrahim Decl. ¶¶2-9.)

Class Counsel also defeated several of Defendants' challenges to the pleadings and personal jurisdiction, propounded two sets of discovery, reviewed the more than 546,000

pages of documents produced by Defendants, and successfully prosecuted and defended against multiple discovery motions, including obtaining an order to compel the deposition of Defendants' Chairman and highest-ranking executive. (*Id.* at ¶¶6-15; *see, e.g.,* D.E. 71, 73, 89.) Class Counsel also conducted four Rule 30(b)(6) depositions of Defendants' foreign corporate representatives, along with interviews of important executive witnesses for class certification and settlement. (*Id.* at ¶17.) Counsels' efforts additionally included lengthy settlement negotiations in multiple mediation sessions and through dozens of direct communications with counsel to achieve the Settlement. (*Id.* at ¶¶22-31.)

Moreover, as the Court is aware, a significant challenge in false pricing cases such as these is devising a damages model that accounts for a restitutionary measure of damages. This is no easy task given the divergent case law on this issue; indeed, experienced class action attorneys in past have failed at this very task. *See, e.g., Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL 1072129, at *12 (C.D. Cal. Mar. 15, 2016) (granting summary judgment based on Plaintiffs' failure to demonstrate "a viable measure of restitution, such as a 'price premium' model in which an expert isolates the amount of the price attributable to the false representation.") For this reason, Class Counsel here: (i) conducted very detailed legal and factual research concerning this difficult issue; (ii) had multiple conversations with a myriad of marketing and damages experts; (iii) independently learned difficult economic and marketing concepts to properly assess the viability of competing damage models; (iv) selected a defensible damage model after extensive analysis; (v) expended considerable resources and worked with the experts early in the litigation to establish the damage model and secure a strong litigation position; and (vi) strategically used that damage model and strong litigation position to secure a stellar result for the Class. (Ibrahim Decl. ¶16.)

The complexity of the issues presented here, and the strategic approach taken by Class Counsel to tackle those issues cannot be overstated. Therefore, for cross-check purposes, Class Counsel's hourly rates are reasonable and consistent with (if not conservative for) prevailing rates in the Los Angeles area for attorneys of comparable skill

litigating a large and complex matter such as this.

### b.   The Hours Billed by Class Counsel are Reasonable

Courts must bear "in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008); *Parkinson*, 796 F. Supp. 2d at 1172. Indeed, in contingency fee cases, "the payoff is too uncertain, as to both the result and the amount of fee . . . . By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Id*.

Furthermore, while "[t]he court may reduce the number of hours awarded because the lawyer performed unnecessarily duplicative work, but determining whether work is unnecessarily duplicative is no easy task." *Moreno*, 534 F.3d at 1112 (9th Cir. 2008). "When a case goes on for many years, a lot of legal work product will grow stale; a competent lawyer won't rely entirely on last year's, or even last month's, research: Cases are decided; statutes are enacted; regulations are promulgated and amended. A lawyer also needs to get up to speed with the research previously performed." *Id*. Duplication is thus "*necessary*" and "inherent in the process of litigating over time." *Id*. (emphasis in original).

Notably, a lodestar cross-check does not require the court to "closely scrutinize" the time spent and may focus on "counsel declarations summarizing overall time spent," as opposed to "demanding and scrutinizing daily time sheets in which the work performed was broken down by individual task." *Laffitte v. Robert Half International*, 1 Cal. 5th 480, 505 (2016); *see also Jasper*, 2014 WL 12577426, at *9, n.10 (court used lodestar cross-check method without detailed billing records recognizing that the cross-check is optional). Class Counsel here have nevertheless submitted detailed billing records to demonstrate that they have spent tremendous time and resources litigating this matter, often having to forgo other work more certain to yield compensation. (Ibrahim Decl. ¶¶49-52, Ex. 6; Almadani Decl. at ¶11, Ex. 1; Wang Decl. at ¶5, Ex. 1.) Class Counsel have collectively spent approximately 3,659 hours on this litigation, resulting in lodestar fees

of $2,761,658 to date as reflected in the chart below.

| Attorney Hours | | | | |
|---|---|---|---|---|
| Attorney | Attorney Level | Hourly Rate | Billable Hours | Total |
| Yasin Almadani | Partner | $850 | 1,547.5 | $1,315,375 |
| Ahmed Ibrahim | Partner | $850 | 1,184 | $1,005,720 |
| Seattle, WA | Associate | $475 | 927.5 | $440,563 |
| TOTAL | | | 3,659 | $2,761,658 |

(*Id.*) These hours were not only reasonable and necessary, but efficient given the amount, complexity, and quality of work done in this case.

At the pre-filing stage, Class Counsel spent considerable time and resources investigating the matter, analyzing Defendants' websites both live and historically, reviewing the case law for challenging issues, and strategizing the proper manner to move forward. (Ibrahim Decl. ¶2.) Class Counsel then spent significant time with their clients to choose the appropriate class representatives. (*Id.*) Class Counsel devoted significant resources drafting and revising three separate complaints, which were subsequently amended to make the pleadings even stronger. (*Id. at* ¶¶3-4.) In 2020, Class Counsel spent countless hours on factual and legal research to successfully oppose Defendants' myriad of challenges to the pleadings, which included opposition papers from Plaintiffs that were over 200 pages, including exhibits that Class Counsel spent significant efforts to independently secure in the pre-discovery phase. (*Id.* at ¶¶5-8.)

In late 2020, Class Counsel successfully opposed Defendants' attempt to delay discovery and depositions on the basis of COVID and being foreign entities. (Ibrahim Decl. at ¶9.) Then, in early 2021, Class Counsel promptly served written class discovery on Defendants in each of the Actions consisting of two sets of interrogatories and document demands, and one set of requests for admission. (*Id.* at ¶10.) Due to the inadequate responses, Plaintiffs were forced to file a lengthy motion to compel further discovery. (D.E. 67.) In April 2021, Magistrate Judge McDermott issued two separate orders granting Plaintiffs' motion, in significant part, and denying Plaintiffs' motion, in

27

certain respects. (D.E. 71, 73.)

In March 2021, Plaintiffs responded to written class discovery consisting of interrogatories, document demands, and requests for admission. (Ibrahim Decl. ¶12.) Defendants also filed a motion to compel discovery. (D.E. 76.) However, on July 19, 2021, Judge McDermott denied the motion in its entirety, the only exception being that Plaintiffs were ordered to provide a verification confirming they had no documents responsive to one document demand. (D.E. 83.)

Not including voluminous spreadsheets and data, Defendants produced more than 546,000 pages of documents responsive to Plaintiffs' document demands. (Ibrahim Decl. ¶14.) Class Counsel and their team reviewed these documents to conduct depositions and prepare their class certification motion. (*Id.*) Class Counsel combed the discovery and worked closely with their experts to devise and refine a damage model that would likely pass muster under the most challenging of case law. (*Id.* at ¶¶14, 16.)

Because Class Counsel had done a thorough job of analyzing the discovery and finding compelling evidence against the highest of Defendants' leadership, Plaintiffs were able to notice the deposition of Boohoo Group's Executive Chairman. (Ibrahim Decl., ¶15.) This led to another tough battle where Defendants filed a motion for protective order to quash the deposition, which Plaintiffs opposed with a strong filing supported by the evidence Class Counsel had secured. (D.E. 78.) On July 28, 2021, Judge McDermott again sided with Plaintiffs, rejecting Defendants' arguments and concluding that "Plaintiffs have presented evidence that [the Executive Chairman] has unique personal non-repetitive knowledge of facts relevant to this suit and to class certification[.]" (D.E. 89 at 3.) The Executive Chairman was thus ordered to appear for deposition. (*Id.*)

In late January and early February 2022, Plaintiffs deposed four Rule 30(b)(6) corporate representatives designated on behalf of the BH, PLT, and NG brands to testify concerning class topics central to the allegations of wrongdoing. (Ibrahim Decl. ¶17, Ex. 2; *see also* D.E. 138-142.) In addition, Plaintiffs' counsel conducted an additional three deposition-like interviews of key defense witnesses on relevant topics. (*Id.*) Because Class

28

Counsel had done their homework combing the half-million pages in discovery, Plaintiffs secured strong evidence from the deposition and interviews to support their case.

Class Counsel also engaged in lengthy settlement negotiations for a year from May 2021 through May 2022. (Ibrahim Decl., ¶¶22-31.) Class Counsel participated in five mediation sessions with retired United States District Judge Irma Gonzalez, and countless additional sessions with Defendants' Counsel outside of mediation to reach an optimal result for the Class. (*Id.* ¶¶22-31.) Class Counsel were able to accomplish this by utilizing the evidence they had gathered, and the damages model they had developed, staying firm in their position to secure the best possible result for the Class. Judge Gonzalez, who had spent considerable time on the case, commented that Class Counsel had achieved an excellent result for the Class and the request for attorneys' fees seemed reasonable to her. (Ibrahim Decl. ¶30; Almadani Decl. ¶12.)

Therefore, Class Counsel submit that the hours expended in this case, 1,547.5 for Mr. Almadani, 1,184 for Mr. Ibrahim, and 927.5 for Mr. Wang, for an approximate total of 3,659 attorney hours are reasonable and commensurate with the work performed.

        c.      *All Relevant Factors Support Applying a Multiplier to Class Counsel's Lodestar*

"[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment" in cases such as this. *In re Washington Public Power Supply Sys. Sec. Litig.*, 19 F.3d at 1299-00. A district court may adjust a lodestar figure upward or downward to account for various factors. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570–571 (9th Cir. 2019) Among the factors the court may consider include "the complexity of this case, the risks involved and the length of the litigation." *Id.* (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975)).

Applying a multiplier mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases. *In re Washington Public Power Supply Sys. Sec. Litig.*, 19 F.3d at 1299. "Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal

29

profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose." *Id.* at 1299. "If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing." *Id.* at 1300 (internal citations and quotation marks omitted). Moreover, Class Counsel here advanced nearly a quarter-million dollars in out-of-pocket expenses without any assurance of ultimate success, thereby making the representation that much riskier.

In this case, the lodestar fees total $2,761,658 based on the reasonable rates and hours above. The out-of-pocket costs incurred by Class Counsel total approximately $243,514 to date. Hence, the negotiated attorneys' fees exclusive of costs total $4,506,486, yielding a modest lodestar multiplier of **1.63**, which is fair and reasonable, and is far below the 3 to 4 range "common in lodestar awards for lengthy and complex class action litigation" of the type seen in this case. *See, e.g., Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal.1995) (holding that multiplier of 3.6 was "well within the acceptable range for fee awards in complicated class action litigation" and explaining that "[m]ultipliers in the 3–4 range are common"); *Gutierrez v. Stericycle, Inc.*, No. LA CV15-08187JAK (JEMx), 2019 WL 12470143, at *9 (C.D. Cal. Mar. 22, 2019) (recognizing that class actions may have multipliers of three to four, and approving a multiplier of 1.58); *Martin v. FedEx Ground Package Sys., Inc.*, No. C 06-6883 VRW, 2008 WL 5478576, at *8 (N.D. Cal. Dec. 31, 2008) (approving a multiplier of 1.48, and describing it as "reasonable, indeed on the low side"); *see also Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 255 (2001) ("Multipliers can range from 2 to 4 or even higher.") Similarly, in the Ninth Circuit, multipliers "ranging from one to four are frequently awarded […] when the lodestar method is applied." *Vizcaino*, 290 F.3d at 1051 (internal quotation marks omitted); *In re Hyundai*, 926 F.3d at 572 (holding that a 1.5521 multiplier was "modest or in-line with others we have affirmed"); *Gergetz v. Telenav, Inc.*, No. 16-CV-04261-BLF, 2018 WL 4691169, at *7 (N.D. Cal. Sept. 27, 2018) (approving

2.625 multiplier on lodestar "in light of the facts that Class Counsel accepted this case on a contingency basis, had to forego other work to litigate this case, and achieved a truly excellent result for the class."); *Sheikh v. Tesla*, Inc., No. 17-CV-02193-BLF, 2018 WL 5794532, at *8 (N.D. Cal. Nov. 2, 2018) ("[A] multiplier of 2.36 is within the range of reasonableness.").

Accordingly, consistent with California and Ninth Circuit law, the **1.63** multiplier requested here is not only reasonable, but modest, especially given that class members will not lose a dime if Class Counsel's entire fee request is granted. Class Counsel thus respectfully request that the Court grant them the full amount of negotiated fees.

### 4. *Class Counsel's Fees Should Be Measured Based On the Full Value of the Settlement Because It Is Not a Coupon Settlement*

The Court should also award attorneys' fees to Class Counsel in the amount requested because the Gift Cards are not "coupons" within the meaning of the Class Action Fairness Act (CAFA), 28 U.S.C. § 1711, *et seq.* Accordingly, as the Court already recognized at preliminary approval (D.E. 148 at 11), the fee award should be measured according to the face value of the benefits to be distributed under the Settlement, and not according to any "redemption value."

CAFA requires courts to (1) apply "heightened scrutiny" to settlements that award "coupons" to class members, and (2) base fee awards on the coupons' redemption value, rather than on their face value. *In re EasySaver Rewards Litig.*, 906 F.3d 747, 754–55 (9th Cir. 2018) (citing 28 U.S.C. § 1712). "Thus, delineating settlements that award cash or cash-equivalent certificates from those awarding coupons affects the calculation of attorneys' fees." *Seegert v. Lamps Plus, Inc.*, 377 F. Supp. 3d 1127, 1130 (S.D. Cal. 2018) (citing *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182–86 (9th Cir. 2013)).

Congress did not define "coupon" when promulgating CAFA. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 950 (9th Cir. 2015). However, the Ninth Circuit has outlined three factors to guide the inquiry of whether proposed class relief is a coupon: "(1) whether class members have to 'hand over more of their own money before they can take advantage of' a credit, (2) whether the credit is valid only 'for select products or

31

services,' and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable." *Easysaver*, 906 F.3d at 755 (quoting *Online DVD*, 779 F.3d at 951)

Applying this test, the Court stated as follows in its ruling granting preliminary approval of the Settlement:

> Beyond the Court's assessment of the value of the settlement, generally-speaking, Plaintiffs have addressed why the Court should not view the proposed settlement here as a "coupon" settlement, which would obligate the Court to apply "heightened scrutiny" and base any fee award on redemption-value. *See, e.g., McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021); *In re Easysaver Rewards Litig.*, 906 F.3d 747, 754-55 (9th Cir. 2018). The gift cards in question have no expiration dates, blackout dates, minimum purchase requirements or fees (for inactivity or otherwise), and may be used in conjunction with other offers and promotions. *See* Settlement Agreement, ¶¶ 2.1(a)(iii), (iv), (vi), (vii), (xii). The websites where the gift cards may be used include thousands of items available for sale for $10 or less. *See*, *e.g.*, Stipulation, ¶ 19; Tregillis Decl., ¶¶ 57-59. In addition, there are no limits on transferability and the cards may be combined together – "stacked" – subject only to a right of Defendants to request an investigation from the settlement administrator with respect to any request to "stack" more than $500 worth of gift cards (to avoid fraud and to attempt to ensure the cards are used for personal-use). *See* Settlement Agreement, ¶¶ 2.1(a)(viii)-(x), 3.7. Lost gift cards will be replaced upon request. *See id.*, ¶ 2.1(a)(xiii). All of these facts suggest that this settlement should not, in fact, be considered a "coupon" settlement.

(D.E. 148 at 11.) Nothing has changed since the Court's ruling. The Court should again determine that this Settlement is not a "coupon" settlement within the meaning of CAFA. Accordingly, Class Counsel's fee request should be approved.

## B.   Class Counsel's Out-of-Pocket Expenses are Reasonable and Compensable

An attorney is entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (quoting *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). Plaintiffs are entitled to recover the litigation expenses

they reasonably incurred in investigating, prosecuting, and settling this case. *See In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2008) (allowing recovery of "expenses relat[ing] to photocopying, printing, postage and messenger services, court costs, legal research on Lexis and Westlaw, experts and consultants, and the costs of travel for various attorneys and their staff throughout the case."); *Mendoza v. Hyundai Motor Co., Ltd.*, No. 15-CV-01685-BLF, 2017 WL 342059, at *14 (N.D. Cal. Jan. 23, 2017) (holding costs are compensable under the CLRA and Civil Code § 1021.5).

It is no secret that class action lawsuits can be expensive, if litigated correctly. In this matter, Class Counsel incurred approximately $243,514 in costs for the benefit of the Class, including (1) $207,065.25 in expert/consultant fees; (2) $13,154.25 in e-discovery database fees; (3) $12,898 in deposition fees; (4) $8,263.57 in mediation fees; and (5) $2,133.15 in other typical costs such as filing, service, printing, copying, postage, and court transcript fees. (Ibrahim Decl. ¶53.) These costs were advanced by Class Counsel without any assurance of success or recoupment of costs, magnifying the risk incurred.

As the Court will note, the bulk of the out-of-pocket costs ($207,065) are attributable to expert witness fees. This is because a significant challenge in this case was to develop an appropriate damages model that would withstand judicial scrutiny under the most challenging of methods described in the case law. *See, e.g., Chowning*, 2016 WL 1072129, at *12 (requiring a price premium measure of restitution in a false pricing case). Though expensive, the experts here were necessary to develop a defensible damage model, and the costs incurred for the front-loaded damages work are compensable. *See generally Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *6 (N.D. Cal. Feb. 6, 2013) (holding that class counsel's "necessary expenses also included the retention of three experts," allowing counsel "to effectively and accurately evaluate both the potential damages in this case, as well as the strengths and weaknesses of the damage calculations they would be prepared to present at trial").

This expert work was necessary in two respects. First, the marketing expertise and consumer survey regarding the Defendants' deceptive marketing practices—an expensive

undertaking—allowed the expert to opine on the merits of Plaintiffs' claims, which was relevant to show Rule 23(b)(3) predominance at class certification. (Ibrahim Decl. ¶54.) Second, the onus was on Plaintiffs to proffer a viable classwide damages model to obtain class certification and to later actually execute the model and calculate damages for trial. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Plaintiffs' marketing expert's consumer survey also allowed the expert to isolate the price premium paid by consumers market-wide, which was then used by Plaintiffs' damages expert to opine on the restitutionary damages incurred by Class Members. (Ibrahim Decl. ¶54.) To accomplish this, Plaintiffs' damages expert culled, organized, and analyzed voluminous discovery, including millions of lines of actual consumer purchase data and every single daily marketing campaign run by Defendants for the bulk of the class period. (*Id.*) Both experts engaged in a tremendous amount of work, and their damages analysis enabled Plaintiffs to intelligently evaluate the damages at issue, which was critical to Plaintiffs' ability to negotiate the proposed class settlement. (*Id.*) *See* Fed. R. Civ. P. 23(e)(2)(C) (requiring courts to consider whether "the relief provided for the class is adequate.")

## C. The Requested Service Awards for Plaintiffs Are Reasonable

Finally, the Court should approve the requested service awards for the three named Plaintiffs in this action, Farid Khan, Haya Hilton, and Olivia Lee. According to the Settlement, each of them may seek an incentive award not to exceed $5,000 with no opposition from Defendants. (Settlement at § 2.3.)

The decision whether to award an incentive payment to a class representative, and the size of that award, is within the district court's discretion. *See*, *e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). As the Court has recognized, such incentive awards "are commonly-approved" in the Ninth Circuit. (D.E. 148 at 9 (citing *In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1115 n.6 (9th Cir. 2021) and *Rodriguez v. Evergreen Prof'l Recoveries, Inc.*, No. C19-0184-JCC, 2021 WL 2577130, *4 (W.D. Wash. June 23, 2021)). The criteria courts may consider in determining whether to make a service award include:

> (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299 (S.D. Cal. 1995).

Here, the Court should approve $5,000 service awards for Plaintiffs Khan, Hilton, and Lee. Each of them has been actively involved in this matter since before the three complaints were filed in April and May of 2020. (D.E. 133-5 (Khan Decl.) at ¶10; D.E. 133-6 (Hilton Decl.) at ¶10; D.E. 133-7 (Lee Decl.) at ¶10.) They each committed significant time and effort to this case from its inception through settlement. Among other things, they provided important factual input on the complaint and amended complaints, worked closely with Class Counsel to respond to Defendants' written discovery and locate information requested by Defendants, and ultimately were the catalysts for this action without whom the case could not be brought. (D.E. 133-5 (Khan Decl.) at ¶12; D.E. 133-6 (Hilton Decl.) at ¶12; D.E. 133-7 (Lee Decl.) at ¶12; Ibrahim Decl. ¶¶55-57.)

Moreover, the amount of the proposed service awards are well within the norm, particularly where, as here, the total payment of $15,000 constitutes a miniscule fraction of the total minimum monetary value of the settlement of $33 Million. *See Online DVD*, 779 F.3d at 947-48 (upholding $5,000 incentive awards that were 417 times larger than $12 gift cards because the awards were only 0.17% of the total $27 Million settlement fund); *Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO (SPx), 2019 WL 13027266, at *7 (C.D. Cal. Dec. 30, 2019) ($5,000 incentive award "presumptively reasonable").

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court award the following: (1) attorneys' fees in the amount of $4,500,000.00 to Class Counsel, (2) $350,000 in settlement administration expenses to be paid to KCC, (3) $243,514 to Class Counsel for litigation expenses and costs, and (4) $5,000 each to Plaintiffs Farid Khan, Haya Hilton, and Olivia Lee as service awards.

35

Dated: November 14, 2022

Respectfully submitted,

ALMADANI LAW

*/s/ Yasin M. Almadani*
Yasin M. Almadani, Esq.


AI LAW, PLC

*/s/ Ahmed Ibrahim*
Ahmed Ibrahim, Esq.

*Attorneys for Plaintiffs Individually and*
*On Behalf of All Others Similarly Situated*